[Crim. Nos. 22239, 24376. Second Dist., Div. One. Aug. 13, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES MANSON et al., Defendants and Appellants.

118

## COUNSEL

Albert D. Silverman, under appointment by the Court of Appeal, Daye Shinn, Maxwell S. Keith, Kanarek & Berlin, Irving A. Kanarek and Roger Hanson for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

VOGEL, J.*—

### FACTS

Appellants Charles Manson, Patricia Krenwinkel, and Susan Atkins[1] were indicted by a grand jury on seven counts of murder and one count of conspiracy to commit murder. Appellant Leslie Van Houten was indicted in two of the same seven counts of murder and in the conspiracy count.

A jury found all appellants guilty as charged and further found the murders to be of the first degree. After the penalty phase the same jury

---

*Assigned by the Chairman of the Judicial Council.

[1] Also charged in the indictment on all eight counts were Charles Watson and Linda Kasabian. Watson was separately tried and convicted. Kasabian was granted immunity and the charges were dismissed as to her.

imposed death sentences upon all appellants. The resulting judgment was appealed directly to the Supreme Court (Pen. Code, § 1239, subd. (b)). While this case was pending that court decided *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], cert. den., 406 U.S. 958 [32 L.Ed.2d 344, 92 S.Ct. 2060], invalidating the death penalty. On that basis, these appeals were transferred to this court for determination.

## The Homicides

The events giving rise to the charges contained in the indictment are two successive multiple homicides occurring in the City of Los Angeles during August of 1969.[2] We here recite the nature of the homicides. Additional facts are discussed in the segments of this opinion to which they have primary relevance.

*THE TATE MURDERS:* In August of 1969 Roman Polanski and his wife, Sharon Tate Polanski, were tenants in residence at 10050 Cielo Drive. During this time Mr. Polanski was out of the country and Mrs. Polanski maintained the residence. Wojiciech Frykowski and Abigail Folger lived with her. Mrs. Winifred Chapman was the cook and housekeeper. Mrs. Chapman left the main residence between 4 and 4:30 p.m. on August 8, 1969.[3]

On the following day, August 9, Mrs. Chapman returned to the Cielo Drive residence and discovered a ghastly scene. The police were summoned and on investigation located five victims of a brutal homicide. Just inside the entrance to the residence and near the entry gate they located a Rambler automobile. Inside of the vehicle they found the body of Steve Parent. The bodies of Frykowski and Folger were on the front lawn. In the living room, connected by a piece of rope, police located the bodies of Tate and Jay Sebring. A towel was wrapped around Sebring's neck and covered his face.

Substantial amounts of blood and blood trails were found about the property. The word "Pig" was written in blood on the front door.[4]

---

[2] One of the victims of the first murders, Sharon Tate Polanski, was an active and well-known movie actress using the stage name of Sharon Tate. The second set of murders involved two victims who were husband and wife, Leno and Rosemary La Bianca. For convenience the two events that are the subject of this opinion shall be referred to as the Tate murder and the La Bianca murder.

[3] In addition to the main residence there is also a guest cottage on the grounds. During August of 1969 it was occupied by William Garretson who was in residence to care for the owner and lessors' dogs.

[4] The blood was determined to be that of Sharon Tate Polanski.

Examination of the bodies by the coroner revealed that the victims suffered numerous injuries. Tate suffered 16 stab wounds. Folger was found to have been stabbed 28 times. Sebring's body showed seven penetrating stab wounds and one fatal gunshot wound. Frykowski's body exhibited 51 stab wounds and his scalp had 13 lacerations apparently inflicted with a blunt instrument; Frykowski's body had two gunshot wounds. Parent's body had five gunshot wounds.

There was no apparent evidence of ransacking or larceny. Jewelry and some money were found on the victims and on the premises.

*THE LA BIANCA MURDERS:* On August 10, 1969, Frank Struthers, the 16-year old son of Rosemary La Bianca, returned from a vacation to his home at 3267 Waverly Drive. Expecting to find his mother and stepfather, Leno La Bianca, Struthers instead discovered the dead body of Leno La Bianca. Police were summoned to the residence. Mr. La Bianca's body was in the living room, his face covered with a blood-soaked pillow case. His hands were tied behind his back with a leather thong. A carving fork was stuck in his stomach, the two tines inserted down to the place where they divide. On Mr. La Bianca's stomach was scratched the word "War." An electric cord was knotted around his neck. The coroner's examination revealed 13 stab wounds, in addition to the scratches, and 14 puncture wounds apparently made by the tines of the carving fork. A knife was found protruding from his neck.

Mrs. La Bianca's body was found in a front bedroom. Her hands were tied with an electric cord. A pillow case was over her head and an electric cord was wound about her neck. Her body revealed 41 separate stab wounds.

There was no apparent evidence of ransacking. Except for Rosemary La Bianca's wallet, no property appeared to be missing from the victim's bodies or from their home.[5]

"Death to the Pigs" was written in blood on a wall in the living room; over a door, "Rise"; and on a refrigerator door, "Healter [sic] Skelter."

[5]The residence contained several diamond rings, wristwatches, expensive camera equipment, coin collections and many rifles and guns.

## The Conspiratorial Relationship[6]

At trial, respondent's evidence strongly supported a theory that the homicides were the product of conspiratorial relationships and activities. An enormous amount of evidence bearing on the societal association between Manson, Atkins, Krenwinkel, Van Houten and certain third persons was introduced. The scope of these relationships in terms of time and intensity is germane. While it is true that mere association with the perpetrator of a crime does not prove criminal conspiracy, it is a starting place for examination. (*People* v. *Lewis* (1963) 222 Cal.App.2d 136, 144 [35 Cal.Rptr. 1].)

The very nature of this case and the theory of the prosecution compel reference to circumstantial evidence of the conduct and relationship of the parties. ■ *People* v. *Kobey* (1951) 105 Cal.App.2d 548 [234 P.2d 251] confirms that such reference is proper: "Virtually the only method by which a conspiracy can be proved is by circumstantial evidence—the actions of the parties as they bear upon the common design. It is not necessary to show directly that the parties actually closeted themselves, attained the proverbial meeting of the minds and agreed to undertake the unlawful acts. [Citation.] It is a familiar principle of the law that in deriving whether an agreement was unlawful the triers of the fact may consider the events that occurred 'at or before' or 'subsequent' to the formation of the agreement. From the proof of the occurrences beforehand and at the time of the agreement linked with evidence of the overt acts a jury may determine that a criminal conspiracy was formed. [Citations.] The major portion of the evidence might consist of the conversations and writings of the conspirators or it may consist of the overt acts done pursuant to the conspiracy. Such acts may establish the purpose and intent of the conspiracy and relate back to the agreement whose purpose may be otherwise enshrouded in the hush-hush admonitions of the conspirators. Whatever be the order of proof the jury has finally to determine whether the alleged conspiracy has been established." (*People* v. *Kobey, supra,* p. 562; see also, *People* v. *Steccone* (1950) 36 Cal.2d 234, 237-238 [223 P.2d 17]; *People* v. *Wheeler* (1972) 23 Cal.App.3d 290, 307 [100 Cal.Rptr. 198]; *People* v. *Finch* (1963) 213 Cal.App.2d 752 [29 Cal.Rptr. 420].)

Sometime in 1967 Manson found his way to the Haight-Ashbury district of San Francisco. While there he became associated with young

---

[6]We intentionally discuss certain issues out of the order of occurrence at trial. Our purpose is to locate a recitation of relevant facts at the appropriate places in the text.

girls and women who were runaways, drop outs or otherwise disassociated with conventional society. He obtained a Volkswagen bus, collected some of his female companions, and began traveling about the country.

Ultimately, he established a commune of about 20 people at Chatsworth, California. Composed of Manson's companions from Haight-Ashbury and others, the members were mostly young women, three of whom had young children. The group became known as the "Family" even though none were related by blood or marriage except for the mothers and children. The Family, a community unto itself, rejected conventional organizations and values of society. By August 1969 the commune included Susan Atkins, Patricia Krenwinkel, Leslie Van Houten, and two other co-indictees—Charles Tex Watson and Linda Kasabian.

At Chatsworth the Family occupied portions of an established horse ranch owned and operated by George Spahn. Spahn permitted the group to live there in exchange for the young women doing certain domestic and secretarial work and the young men maintaining the ranch trucks. The Family used certain bunkhouses, and other buildings,[7] and also maintained campsites, one of which was located in Devils Canyon (the "Waterfall").

Without doubt, Manson was the leader of the Family. The scope of his influence ranged from the most simple to the most complex of matters. He decided where the Family would stay; where they would sleep; what clothing they would have, and when they would wear it; when they would take their evening meal; and when they would move. Additionally, he concerned himself with the structure and composition of the Family. Manson directed that the children not be cared for by their natural mothers because he believed the children should be freed of their mothers' "ego." He wanted the children kept out of sight because he believed they were being watched by the Black Panthers.

Manson ordered one of the male members of the Family, Paul Watkins, to get more females and bring them to him. Instructing the female members of the Family to provide sexual favors to members of the commune, and to do the same for outsiders for the purpose of

---

[7]Spahn had been in the business of providing horses for the motion picture industry. Consequently, in addition to the usual structures found at equestrian establishments, other buildings had been erected as sets for motion pictures.

recruiting new members, Manson also directed them to deny their favors if enlistment seemed unlikely.

Manson established an elaborate system of security. At his direction female members were ordered to stand guard. Members were ordered to dye T-shirts black for use at night. Walkie talkies were set up and used to connect the different campsites on the ranch. Camouflage was used to cover some of the property. Clearly, Manson's directions were designed to insulate the Family from the outside world.

Manson's position of authority was firmly acknowledged. It was understood that membership in the Family required giving up everything to Manson and never disobeying him. His followers, including the co-appellants, were compliant. They regarded him as infallible and believed that he was a "God man" or Christ. Family member Danny DeCarlo testified that each co-appellant said that "Charlie sees all and knows all." Kasabian was told by the others "We never question Charlie. We know that what he is doing is right."

The Family's willingness to follow Manson's directions is salient to the People's theory of the case. The establishment and retention of his position as the unquestioned leader was one of design. A fundamental method used by him to inculcate the Family with his views of life, values, and philosophy was to address them after evening meals. On these occasions Manson would do most of the talking or play his guitar and sing songs, many of which purported to carry profound messages. Manson firmly believed these gatherings were necessary.[8]

---

[8]The reason for the talks is set forth in the testimony of Paul Watkins:

"Q. Several times he told the Family why it was necessary to talk?

"A. Yes, at different times to different people because if a new person was there, he also would want to tell them.

"Q. What did he say as to the reason why it was necessary to talk to the Family at night?

"A. Because most people were like computers. In other words, they did not know anything that had not been put in them by schools, churches, parents, friends, relatives, radio, television and everything, and every other means of communication. Nothing they had was their own; that they didn't know anything. They [sic] only thing they knew is what they had been told and programmed, and that he with his music and his words could unprogram, take those programs out and leave a void, or nothing, in which love could come through.

"Q. Did Mr. Manson ever talk to you about the concept of death?

"A. Yes.

"Q. Many times?

"A. Yes."

He frequently repeated to members of the Family (including the co-appellants, collectively or individually) exhortations on the relationship between love and death. Manson's preoccupation with the subject is vividly revealed in a statement by Manson to Paul Watkins: "In order to love someone you must be willing to die for them and must be willing to kill them, too. You must be willing to have them kill you. You must be willing to experience anything for them."

Manson had a fascination with the Beatles[9] and with one of their songs, "Helter Skelter" in particular. Telling the Family and others that the Beatles were speaking to him and warning of imminent conflict between the blacks and the whites, Manson gave the name Helter Skelter to a chimerical vision of a race war. To the Family, Helter Skelter meant the occurrence of a revolution started by blacks to gain control of the world to subdue the conventional establishment of the college educated, wealthy white community and power structure. These whites were referred to by Manson and his followers as "Pigs."

Manson frequently discussed this revolution with members of the commune, describing in detail how whites would be atrociously murdered by blacks. The killings would be marked by the symbolic ritual of writing with the blood of the victims. A major theme of Helter Skelter was that Manson would lead his followers to safety during the apocalyptic event and, at its conclusion, he and the Family would emerge from this place of safety—a bottomless pit located in Death Valley—and take control of the world and restore order. Connected to the aberration of Helter Skelter was Manson's equation of himself to Jesus Christ, his followers as the true Christians and members of conventional white society as the Romans—otherwise designated "Pigs."

A further facet of this fantasy included Manson's pronounced interest in death. One witness aptly testified, "Death is Charlie's trip. It really is." Manson spoke of Helter Skelter constantly. With the passage of time, his concern became intense. He finally proclaimed he would have to cause the revolution. There is specific evidence that Manson declared the belief that *he* would have to show the "nigger" how to do it. Family member Dianne Lake testified that in the summer of 1969 Manson told her ". . . we had to be willing to kill pigs to help the black people start revolution Helter Skelter." In the presence of Lake and of the co-appellants Manson said, "I am going to have to start the revolution." By the

---

[9]The Beatles were a popular group of musicians who became entertainment idols in the 1960's.

summer of 1969, the time he predicted Helter Skelter would begin, he talked about it more and more. Quite obviously, a fundamental part of life in the commune entailed exposure to Manson's obsession with Helter Skelter.

## EVIDENCE OF OTHER CRIMES

To amplify the extent of Manson's influence on the Family, testimony of certain sexual activities was presented.

Kasabian testified that on one occasion an unidentified 16-year old girl, clad only in bikini panties, was placed in the center of a room. Many of the Family members were present, including appellants. Manson made advances to this girl. She bit him. He struck her in the face, knocking her to the ground, and committed an act of sexual intercourse with her. He then bid the other male and female members to engage in sexual acts with the girl. Manson then directed all the members of the Family to take off their clothing and to "make love" together. They followed his directions.

Barbara Hoyt, a witness for respondent, was a member of the Family. She described an incident where she was ordered by Manson to orally copulate Juan Flynn, a frequent associate of the Family. Hoyt testified that she did not want to perform the act, but did so because she was afraid of Manson.

■ Relying on Evidence Code section 1101, Manson contends the above matters were highly prejudicial and erroneously admitted. We find no error. ■ "[E]vidence of other crimes is inadmissible as regards guilt when it is offered solely to prove criminal disposition because the probative value of such evidence as to the crime charged is outweighed by its prejudicial effect. However, such evidence may be properly admissible if it is offered to prove a fact material to the charged crime and meets the general tests of relevancy as to such fact. ■ '[T]he general test of admissibility of evidence in a criminal case is whether it tends logically, naturally, and by reasonable inference, to establish any fact material for the People or to overcome any material matter sought to be proved by the defense.' [Citations.]" (*People* v. *Durham* (1969) 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198], cert. den., 395 U.S. 968 [23 L.Ed.2d 755, 89 S.Ct. 2116].)

■ Although the evidence concerning these events was indeed dramatic, it nevertheless reasonably tended to show Manson's leadership of the Family,[10] the inference being that if Manson could induce bizarre sexual activities, he could induce homicidal conduct. While the evidence is less than flattering, its prejudicial character is outweighed by its evidentiary value showing Manson's involvement in the murders. (*People* v. *Randolph* (1970) 4 Cal.App.3d 655, 661 [84 Cal.Rptr. 559].)

## KASABIAN'S TESTIMONY

The only direct evidence tying appellants to the commission of the Tate-La Bianca murders was the testimony of Family member Linda Kasabian. She testified that on the evening of August 8, 1969, at the Spahn ranch, Manson told her, "Now is the time for Helter Skelter." He ordered her to get a change of clothing, a knife and her driver's license. Kasabian complied and when she returned with those articles Manson told her ". . . to go with Tex and to do what Tex told [her] to do."[11] She then proceeded to an automobile. Watson was standing next to the driver's side talking with Manson. Atkins and Krenwinkel were in the back seat. Kasabian and Watson then got in the car and began to leave. At that moment Manson called for them to stop and they did. Manson went up to the car, put his head in and said, "You girls know what I mean, something witchy."[12] Watson then drove directly to 10050 Cielo Drive, where he stopped the car, got out and appeared to cut some overhead wires. He then turned the vehicle around and parked it. Kasabian held three knives and one gun which Watson had asked her to discard if they were stopped en route.

The car was parked and all four got out. With Watson carrying some rope, they proceeded up a hill, over an embankment or fence and into the outer premises of a private residence. A car approached towards a gate opening onto the street. As it stopped, Watson leaped forward with gun in hand. The driver said, "Please don't hurt me I won't say anything." Watson shot him.[13] Kasabian saw the driver slump over. Tex turned off the ignition.

[10] Kasabian, Atkins, Krenwinkel and Van Houten were present at the described rape and at the group sexual activity.

[11] The reference was to Charles "Tex" Watson.

[12] The Family had argot of its own. In the past Manson directed the women to blaze trails to various parts of the camp by hanging articles in the trees. This was described as making "witchy" little things from sticks and other natural material and hanging them in trees. The women were referred to as "witches"; those under 18 "the young ones."

[13] Kasabian testified she heard four shots. The coroner testified his examination revealed five separate gunshot wounds.

They proceeded to the house. Watson ordered Kasabian to go to the back to look for open doors or windows. She did as directed, found none, and returned to the front of the house. Kasabian saw Watson cut a window screen. She did not, however, see anyone enter the house as Watson then told her to return to the "car" to stand lookout.[14] She did as directed.

Within a few minutes Kasabian heard screams and the words "No, please, no" coming from the house. She ran to the house. She saw a man exiting with blood on his face. The man fell to the ground. Atkins came out and Kasabian said "Sadie, please make it stop."[15] Atkins replied, "It is too late." While these remarks were being exchanged the man who had fallen got up. He was attacked by Watson who stabbed and clubbed him. Kasabian observed Krenwinkel with a knife in her hand chasing a woman. Kasabian ran back to the car Watson had parked.

Eventually Krenwinkel, Atkins and Watson returned to that car. They had blood on their clothes. Watson got behind the wheel, the others got in, and they all left. Kasabian discovered they no longer had her knife with them and that a portion of the grip of the gun was broken.[16] It had been intact when she saw it earlier that night. In the course of traveling away from the residence Watson, Atkins and Krenwinkel changed clothes. At Watson's direction Kasabian threw the removed clothing out of the car and later did the same with the remaining knives. The group returned to the Spahn ranch to find Manson outside waiting for them. He asked if they felt any remorse and they said no. He directed them not to talk about the event with anyone at the ranch and to get some sleep. They then retired.

After dinner on the following day, Kasabian was with appellants Krenwinkel and Van Houten at the Spahn ranch. Manson told the three women to get a change of clothes and to meet him at the bunkhouse. When they arrived there Manson, Atkins, Watson, Krenwinkel and Steven Dennis Grogan, another Family member, were present. Manson told them they were going out again that night. He said the killings of the preceding night were too messy and he was going to show them how to

---

[14]The clear implication of this testimony is the "car" into which Watson had fired gunshots.

[15]Susan Atkins used the alias Sadie Glutz.

[16]A gun matching the description given by Kasabian was found later, approximately 1.8 miles away. Broken pieces of the grip found at Cielo Drive fit the weapon found. A knife similar to that described by Kasabian was found at the Cielo Drive premises.

do it. As they all entered the car Manson gave Kasabian a leather thong. With Kasabian driving and Manson giving directions, they drove about in a random fashion, making some stops to permit Manson to check out locations for the ostensible purpose of locating victims to murder.

After driving about through a maze of roads, Manson ordered Kasabian to stop the car in front of a residence on Waverly Drive. Kasabian recognized the home as belonging to Harold True, a man known to some of the Family. She told Manson he could not go there. Manson stated he was going next door (the La Bianca residence). Manson got out and left the others. Several minutes later he returned. He said that he had tied up a man and a woman. Manson then spoke directly to Van Houten, Krenwinkel and Watson, advising, "Don't let them know you are going to kill them."

After the others exited, Manson got back in the car with Kasabian, Atkins and Grogan. Manson handed Kasabian a wallet, telling her he wanted to dispose of it so that it would be found by a black person who would use the credit cards. His expressed hope was that the blacks would be blamed for the crime. Leaving Van Houten, Krenwinkel and Watson at the La Bianca residence, Kasabian, Atkins, Grogan and Manson departed. They stopped at a gas station where Kasabian hid the wallet in a restroom. Manson then drove to the beach where he spoke to Kasabian about an actor she had met. Manson gave Kasabian a small pocket knife and instructed her to kill the actor. She showed Manson the apartment house where the actor lived.[17] Manson then gave Grogan a gun and told Grogan and Atkins to go with Kasabian into the actor's apartment. After telling all three to hitchhike back, Manson told Atkins to go to the Waterfall when she returned. Manson then left.

Kasabian claimed she wanted to abort the suggested killing and succeeded in doing so. She testified that she purposely led the other two to the wrong apartment. Kasabian, Grogan and Atkins then started their return and arrived back at the ranch mid-morning of the next day to find Manson asleep in the parachute room.

### KASABIAN IMMUNITY

From the outset of her testimony—July 27, 1970—Kasabian made it clear that she had been tendered a grant of immunity (Pen. Code,

---

[17]Kasabian claimed she intentionally pointed to the wrong door when responding to Manson's inquiry as to where this man lived.

§. 1324). However, no written request for her immunity was filed with the court until August 10, 1970, after the completion of direct examination. On that date the trial judge signed the order requiring her to answer questions.[18]

■ Manson, complaining that the failure to rule on Kasabian's immunity status prior to the completion of her direct testimony constituted reversible error, relies on the following declaration in *People v. Walther* (1938) 27 Cal.App.2d 583, 590-591 [81 P.2d 452]: "We may assume that the district attorney has a right to arbitrarily select one of two coconspirators to whom he may tender immunity from prosecution in reward for his state's evidence against his colleague, but such evidence is open to suspicion lest the temptation thus to escape a threatened penalty of law may result in unreliable testimony. Under such circumstances the evidence of a coconspirator should be examined with great care. When a codefendant who is a coconspirator has been offered immunity from prosecution in reward for his testimony, the cause should be promptly dismissed against him. Otherwise, the maintenance of the action against him throughout the trial may serve to intimidate the witness and furnish an inducement for him to color his testimony."

We do not interpret *Walther* as standing for an inflexible rule of law. *Walther* instructs that pending charges *should* be promptly dismissed. We therefore hold that the admissibility of testimony of a witness who has been offered immunity must turn on the facts of each case. In contrast to the *Walther* court, the Supreme Court confronted a similar situation with a different result in *People* v. *Lyons* (1958) 50 Cal.2d 245 [324 P.2d 556]. In *Lyons,* the defendant complained that his accomplices had been induced to testify untruthfully against him. Prior to testifying the accomplices had entered a plea of guilty to certain charges. The court had postponed the sentencing of the accomplices until they had testified against the defendant. The prosecution conceded that the accomplices had been induced to testify by promises of reduced sentences.

We are of the opinion that no meaningful distinction exists between testimony obtained as the result of a grant of immunity and testimony obtained as the result of a plea bargain. Both "furnish the defendant

---

[18]Kasabian's direct testimony commenced July 27, 1970, and concluded July 30, 1970; she did not conclude her entire testimony until August 19, 1970. The immunity order was signed on August 10, 1970, and the charges were dismissed as to Kasabian on August 13, 1970.

with a powerful weapon for attacking the credibility of the inherently suspect witnesses. . . ." (*People* v. *Lyons* (1958) 50 Cal.2d 245, 265 [324 P.2d 556].) Neither is necessarily unfair as a matter of law.

It is naive to suggest that an offer of immunity is not enticing to a witness who would otherwise be exposed to serious criminal charges. It is equally naive to suggest that the immunity should be given entirely, completely and finally without first obtaining the testimony that invited the grant of immunity in the first place. A fundamental purpose of Penal Code section 1324 is to make possible the prosecution of criminal conspiracies. (*People* v. *Pineda* (1973) 30 Cal.App.3d 860, 866-868 [106 Cal.Rptr. 743].)

Authority cited in support of appellants' contention is not applicable. The evidence does not show that Kasabian was offered immunity on the condition that her testimony produce a conviction (see *People* v. *Green* (1951) 102 Cal.App.2d 831, 834-835 [228 P.2d 867]) nor does it show that the trial judge or anyone else gave Kasabian reason to believe that her testimony must conform to certain statements that she made to any law enforcement officers. (See *Rex* v. *Robinson* (1921) 30 B.C. 369 [70 D.L.R. 755]; *People* v. *Medina* (1974) 41 Cal.App.3d 438, 452-455 [116 Cal.Rptr. 133].) There is absolutely no evidence that the offer of immunity to Kasabian was conditioned on anything other than her testifying fully and fairly about her knowledge of the Tate-La Bianca murders. Her testimony was properly admitted.

Collaterally, Manson points out that prior to calling Kasabian as a witness, she was interviewed by the prosecution. From that he invites the conclusion that her testimony is nothing more than a script written by respondent. The fact of her interview is hardly startling. Common sense generally compels lawyers to interview witnesses prior to calling them. Pragmatic lawyers do not call witnesses unless they expect favorable testimony. Manson was not denied a fair trial by reason of the interview.

## COMPETENCY OF KASABIAN

Prior to Kasabian's testimony Manson moved to have her examined by a court-appointed psychiatrist to determine her compe-

tency.[19] The motion was supported by declarations[20] asserting that Kasabian had used LSD in substantial amounts and over a period of several years. The declaration of A. R. Tweed, M.D., was also attached. Doctor Tweed identifies himself as a psychiatrist; his declaration renders the opinion that habitual long term use of LSD can affect an individual's ability to perceive and otherwise adversely affect mental orientation and declares that a psychiatric examination of Kasabian "would be an important tool to evaluate" her mental status and ability "to give a picture as undistorted as possible." The court denied Manson's application to have Kasabian examined and permitted the witness to testify. By her own admission Kasabian had used LSD approximately 50 times since 1965. She used other hallucinogenics as well. However, she testified that, with one possible exception, she did not use any LSD or other hallucinogenic between May and August, 1969. She admitted to the use of marijuana during this period.

Relying on *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], Manson and his co-defendants reasserted their demand that Kasabian be examined by a court-appointed psychiatrist. Each time the motion was made it was denied.

To clarify the issue we note that appellants' contention has two parts: (1) that Kasabian was incompetent because she was so disabled by the use of LSD that she could not perceive that about which she purported to testify; and (2) that the use of LSD had so disabled Kasabian's mind that her testimony was not credible.

The trial court is vested with the responsibility to determine competence (*People* v. *Blagg* (1970) 10 Cal.App.3d 1035, 1039 [89 Cal.Rptr. 446]) by the standard found in Evidence Code sections 700-702. Here our main concern is with Evidence Code section 702 that "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter. Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter. [¶] A witness' personal knowledge of a matter

---

[19] The written motion asserts that the examination is needed to determine Kasabian's *credibility*. The supporting points and authorities and much of the argument assumes the psychiatric examination would provide *impeaching* evidence predicated on the witness' use of hallucinogenics. Notwithstanding this circumstance we understand the basic point of the motion is to challenge Kasabian's *competence*. That is an entirely different matter.

[20] The notice of motion purports to be supported by the declaration of Louise Share. That document is not in the clerk's transcript lodged with this court. We have called for and examined all original files and exhibits and have located Share's declaration.

may be shown by any otherwise admissible evidence, including his own testimony."

The code requirement of "personal knowledge" includes the capacity to perceive accurately and the capacity to recollect what has been perceived. (Jefferson, Cal. Evidence Benchbook (1972) § 26.2, p. 351.) This standard points to two time frames: (1) the time of perception; (2) the time of recollection. In the instant case there was no evidence that Kasabian was under the influence of any hallucinogenic at the time of the critical events about which she testified or at the times she testified. Notwithstanding Dr. Tweed's declaration concerning the possible affects and delayed reactions—flashbacks—that attend the use of LSD, the record does not support a disqualification of the witness under the Evidence Code as a matter of law. While the impeaching effect of her use of hallucinogenics was properly placed before the jury, her competence to be a witness was a question properly resolved by the court. (*United States* v. *Barnard* (9th Cir. 1973) 490 F.2d 907, 912, cert. den., 416 U.S. 959 [40 L.Ed.2d 310, 94 S.Ct. 1976]; *People* v. *McCaughan* (1957) 49 Cal.2d 409, 420 [317 P.2d 974].)

Appellants reliance on *Ballard* v. *Superior Court, supra,* is misplaced. *Ballard* and its progeny provide for appointment of a psychiatrist to examine a prosecuting witness in a sex offense case to ascertain credibility. The procedure, which may result in the psychiatrist testifying to give his opinion concerning the veracity of the witness, is applicable to the subject of impeachment and not to competency. Whether or not a psychiatrist is appointed is a matter within the sound discretion of the trial court. (*People* v. *Russel* (1968) 69 Cal.2d 187, 195 [70 Cal.Rptr. 210, 443 P.2d 794].)

The nature of the charges in this case is such that psychiatric testimony for purposes of impeachment would be extraordinary. "In cases not involving sex offenses California courts usually reject attempts to impeach a witness by means of psychiatric testimony." (*People* v. *Johnson* (1974) 38 Cal.App.3d 1, 6-7 [112 Cal.Rptr. 834].) While we do not suggest that *Ballard* is necessarily limited to cases involving sex offenses, we here accept the admonition "[that a] psychiatrist's testimony on the credibility of a witness may involve many dangers: the psychiatrist's testimony may not be relevant; the techniques used and theories advanced may not be generally accepted; the psychiatrist may not be in any better position to evaluate credibility than the juror; difficulties may arise in communication between the psychiatrist and the jury; too much reliance may be

placed upon the testimony of the psychiatrist; partisan psychiatrists may cloud rather than clarify issues; the testimony may be distracting, time-consuming and costly." (*People* v. *Russel, supra,* 69 Cal.2d at p. 195, fn. 8.)

The trial court's denial of the motion for psychiatric examination was proper. In 18 days of examination Kasabian testified clearly and comprehensibly. Her descriptions were not unclear and her demeanor was candid. Her testimony in its entirety demonstrates her competency.[21] (*People* v. *Pike* (1960) 183 Cal.App.2d 729, 732 [7 Cal.Rptr. 188].) We find no error.[22]

## CORROBORATION

Kasabian's description of her involvement in the Tate-La Bianca murders would have justified her prosecution for those offenses. Accordingly, the trial court properly characterized her as an accomplice as a matter of law. Consequently, Kasabian's testimony must be corroborated with respect to each appellant. (Pen. Code, § 1111.)[23]

■ The character and nature of corroborative evidence may be very general and may vary according to the circumstances of each case. (*People* v. *Luker* (1965) 63 Cal.2d 464, 469 [47 Cal.Rptr. 209, 407 P.2d 9].) On the other hand, the standard by which the sufficiency of such evidence is determined has been repeatedly articulated. ■ In *People* v. *Hathcock* (1973) 8 Cal.3d 599, 617 [105 Cal.Rptr. 540, 504 P.2d 476], the Supreme Court succinctly stated that standard as follows: " 'The evidence required for corroboration of an accomplice "need not corroborate the accomplice as to every fact to which he testifies but is

[21]Precluding use of procedures afforded by *Ballard* did not prevent any appellant from attempting to impeach Kasabian by reason of her use of drugs.

[22]Manson alludes to the fact that the trial court did order psychiatric examinations of Dianne Lake and Michael Hendricks. Those persons had histories of confinement in mental institutions. That difference distinguishes Lake and Hendricks from Kasabian. Furthermore, *Ballard's* application depends upon the case history and surrounding circumstances as they apply to each witness.

[23]Penal Code section 1111 provides as follows:

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

sufficient if it does not require interpretation and direction from the testimony of the accomplice yet tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth; it must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." [Citations.] Moreover, evidence of corroboration is sufficient if it connects defendant with the crime, although such evidence "is slight and entitled, when standing by itself, to but little consideration." [Citations.]' "

Commonly a defendant's own statements and admissions are found to be sufficient corroboration to support the testimony of an accomplice. (*People* v. *Negra* (1929) 208 Cal. 64, 69 [280 P. 354].) This case is no exception. Although appellants' admissions and declarations are not the exclusive corroborative evidence, they are the most substantial. Appellants have asserted various grounds of reversible error with respect to some of this corroborative evidence. These evidentiary objections are here considered in their substantive context with respect to each appellant.

*MANSON CORROBORATION — ITEM 1:* Among the circumstances implicating Manson in the Tate-La Bianca murders are his frequently proclaimed prophesies of Helter Skelter. Predicting a war started by blacks "ripping off" white families in their homes, Manson stated that "Blackie" (the blacks) would revolt against and kill the "Pigs" (the white establishment). From 1968 through the summer of 1969 Manson told various people about Helter Skelter and what it entailed.

Family member Barbara Hoyt testified that between April and September 1969 Manson spoke of Helter Skelter frequently. He said Helter Skelter ". . . was coming down fast" and that he "would like to show the Blacks how to do it."

Dianne Lake testified that in June, July and August of 1969 Manson stated to various members of the commune, including coappellants, that they "had to be willing to kill pigs to help the black people start the revolution 'Helter Skelter'." During the summer of 1969, Manson repeatedly stated that he would have to start the revolution.

Another witness testified that in July 1969 Manson told him: " 'Well, I have come down to it, and the only way to get going is to show the black man and the pigs is to go down there and kill a whole bunch of these fuckin' pigs.' "

Paul Watkins, testifying that Manson told him Helter Skelter would start in the summer of 1969, described Manson's plan: "[T]here would be some atrocious murders; . . . some of the Spades from Watts would come up into the Bel-Air and Beverly Hills District and just really wipe some people out, just cut bodies up and smear blood and write things on the wall in blood, and cut little boys up and make the parents watch. All kinds of just super-atrocious crimes that really would make the white man mad." Manson told Watkins the deeds would precipitate a retaliation by whites who would shoot "black people like crazy;" ultimately Muslims would appear and shame the white people for their reaction. The blacks would murder the whites by "sneaking around and slitting their throats." According to Watkins, Manson declared that "He had to bring [Helter Skelter] down." Significantly, Manson's description of the killings to occur during Helter Skelter included the writing of the word "Pig" on walls or otherwise smearing walls with the blood of the victims.

■ Where the identity of the accused is in issue, his prior conduct may, under proper circumstances, be admitted to prove intent, motive or knowledge of a particular plan and scheme that reasonably tends to connect him to the crime in question. (Evid. Code, § 1101, subd. (b).) The testimony of these several witnesses tends to confirm that Manson was the originator and purveyor of a warped fantasy. The consistency of the statements reveals an intense obsession on Manson's part to see the fulfillment of his prediction. The similarity between the Helter Skelter prophesy and the manner in which the Tate-La Bianca murders occurred is sufficiently great to be characterized as strong circumstantial evidence to corroborate the testimony of Kasabian. (*People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627]; *People* v. *Wilt* (1916) 173 Cal. 477 [160 P. 561].)

Manson argues that the statements of intent to do a future act were not directed against the victims of the crimes with which he was charged and that it was therefore error to admit them. A similar contention has been rejected by our Supreme Court. It is only necessary that the threats show "some connection with the injury inflicted on the deceased." (*People* v. *Wilt, supra,* 173 Cal. at p. 482.)

The declarations of intent attributed to Manson are admittedly general. However, his declarations to foment bloodshed, even without specific reference to a particular victim, are relevant because the actual method and manner of the killings substantially conformed to Manson's predictions. The indefiniteness of a threat is not necessarily an obstacle to its admission if there is sufficient collateral evidence to bring the ultimate victims within the generic class of the subject of the threat. (*People* v. *Craig* (1896) 111 Cal. 460, 466 [44 P. 186]; *State* v. *Presley* (1973) 110 Ariz. 46 [514 P.2d 1234, 1235]; 1 Wigmore on Evidence, § 106; 40 C.J.S., Homicide, § 206(c), pp. 1110-1111.) Here, even though Manson's declarations never included a specific threat against the victims of the Tate-La Bianca murders, they, in fact, came within his generic threats and were properly admitted.

Moreover, the declarations were properly admitted as evidence of the particular method and mode by which a crime was to be committed in the future. They were relevant to the issue of motive and knowledge which in turn tends to prove identity. (See *People* v. *Neal* (1950) 97 Cal.App.2d 668, 673 [218 P.2d 556].)

Manson's pronouncements pertaining to Helter Skelter are proper corroboration of Kasabian's testimony. Even slight and circumstantial evidence which, standing alone, would be insufficient for conviction and entitled to little consideration, will serve to corroborate an accomplice. (*People* v. *Simpson* (1954) 43 Cal.2d 553, 563 [275 P.2d 31]; *People* v. *Wayne* (1953) 41 Cal.2d 814, 822 [264 P.2d 547]; *People* v. *Claasen* (1957) 152 Cal.App.2d 660, 664 [313 P.2d 579].) The probative value of this evidence to corroborate Manson's participation in the murders outweighed any undue prejudice; it was properly admitted in accordance with Evidence Code section 1101, subdivision (b). (*People* v. *Beamon* (1973) 8 Cal.3d 625. 632-633 [105 Cal.Rptr. 681, 504 P.2d 905].)

*MANSON CORROBORATION — ITEM 2:* Juan Flynn was a witness for the prosecution. He testified that he lived at Spahn ranch, earning his room and board as a laborer. While there he met Manson and the other members of the commune. Flynn did not become a member of the Family but did frequently associate with its members on an intimate basis. Flynn testified that Manson admitted to him that he was "doing all [the] killings."[24] This testimony was limited to Manson only.

---

[24]Flynn testified as follows:
"A. Mr. Manson walked in and he went like this (indicating).

On August 18, 1970, prior to testifying at this trial, Flynn had given a statement to the Los Angeles Police Department. Appellants were provided with a 16-page report of that interview. The report did not refer to the foregoing incident and admission.[25] Sometime before Flynn's testimony, appellants were, however, provided with a later written communication revealing Manson's admission as quoted above.[26] Flynn's prior inconsistent statement omitting reference to Manson's admission was used to impeach Flynn's subsequent testimony including the admission.

In an attempt to rehabilitate Flynn, respondent called David Steuber, a California highway patrolman. Steuber testified that he interviewed Flynn on December 19, 1969, at Shoshone, California, and that he recorded the interview. The recording, produced in court, includes a statement by Flynn substantially similar to his in-court testimony concerning Manson's admission. Ultimately, the critical portion of the Steuber tape was played for the jury.

"Q. Brushed his left shoulder with his right hand?
"A. Well, yes. Like that. And the girls walked out, you know.
"Q. How long after he brushed his left shoulder did the girls walk out?
"A. Well, the first one was Miss Glutz, you know. She walked out, you know.
"Q. How long after he made this brushing motion to his left shoulder did they walk out?
"A. Right when they noticed it, you know.
"Q. Immediately?
"A. Immediately, yes.
"Q. Okay. What is the next thing that happened?
"A. Well, I was going to eat, you know, and I am sitting down at the table like this.
"Q. There was just you and Mr. Manson there?
"A. Yes. I wasn't watching him. I was watching the food, you know. Then he grabbed me by the hair, you know, and put a knife on my throat, and he said, 'You son-of-a-bitch, *don't you know I am the one who is doing all these killings?*' (Italics added.)
"Q. What is the next thing that happened, Juan?
"A. I told him—well, you know, I thought he was just boasting, you see—so I told him—he said, 'Are you going to come with me?' And I said, 'I am eating and I am right here, you know.' So he put the knife down. He says, 'Okay. You kill me.' And I says, 'I don't want to do that,' you know."

[25]The parties stipulated that, "On August 18, 1970, Mr. Flynn spoke to Sergeant Sartucci over at the Los Angeles Police Department, and the conversation comprised 16 pages, and there is no reference in these 16 pages to the knife incident."

[26]Flynn testified that he had an interview with Deputy District Attorney Vincent T. Bugliosi, one of the prosecuting attorneys, a week prior to the time he was called to the witness stand. Bugliosi stated he did not know of the admission until that time. Bugliosi prepared a written statement concerning the interview revealing the admission and distributed it to each defense counsel.

Before the jury heard the tape appellants made strenuous objections on several grounds, all of which were overruled. ▇ Manson now assigns as reversible error the admission of the Steuber tape.

There is no disagreement that Flynn's failure to reveal this critical admission when interviewed by the Los Angeles Police Department raised the specter of recent fabrication. ▇ It is elementary that recent fabrication may be inferred when it is shown that a witness did not speak about an important matter at a time when it would have been natural for him to do so. When that inference does arise, it is generally proper to permit rehabilitation by a prior consistent statement. "Different considerations come into play when a charge of recent fabrication is made *by negative evidence* that the witness did not speak of the matter before when it would have been natural to speak. His silence then is urged as inconsistent with his utterances at the trial. The evidence of consistent statements at that point becomes proper because 'the supposed fact of not speaking formerly, from which we are to infer a recent contrivance of the story, is disposed of by denying it to be a fact, inasmuch as the witness did speak and tell the same story.' " (*People* v. *Gentry* (1969) 270 Cal.App.2d 462, 473 [76 Cal.Rptr. 336].)

▇ Respondent asserts that the Steuber tape was admissible pursuant to Evidence Code section 1236.[27] Manson argues that section 1236 is inapplicable because the witness was shown to have a bias or motive for fabrication before the time of the prior consistent statement. (Evid. Code, § 791, subd. (b).)[28]

The predicate for Manson's assertion turns on collateral facts. On August 16, 1969, Spahn ranch was raided by the Los Angeles County Sheriff's office in connection with suspected criminal activity involving

---

[27]Evidence Code section 1236 reads as follows: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

[28]In its entirety Evidence Code section 791 reads as follows:
"Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after:
"(a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or
"(b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

the theft of dune buggies. The raid resulted in a number of people, including Flynn, being arrested. On cross-examination Flynn was asked whether or not he was mad at Manson because of this incident. Flynn answered that he believed Manson and the Family were responsible for the raid but that he did not blame Manson. Additionally, Flynn testified that he worked off and on as an actor. On cross-examination Flynn was asked if he was testifying in order to obtain fame, the clear insinuation being that Flynn was cooperating as a prosecution witness in order to advance his own theatrical ambitions. Flynn denied that suggestion. Manson's argument turns more on the insinuation of the questions than on any of Flynn's testimony. The questions, and not Flynn's answers, suggest that Flynn developed a bias as a result of his being arrested on August 16, 1969.

Appellant's argument fails because it ignores the fact that Evidence Code section 791 has two parts. Subdivision (a) permits evidence of a prior consistent statement to rehabilitate a witness impeached by a statement contrary to his trial testimony while subdivision (b) allows the prior consistent statement to rehabilitate after an express charge or implication of recent fabrication or of bias. Whether or not subdivision (b) of Evidence Code section 791 is applicable is of no consequence to the application of subdivision (a) of that section. Even if it is assumed the Steuber tape postdated the inception of any bias or motive to fabricate on the part of Flynn, that fact would only bear on its introduction within the circumstances described in subdivision (b) of section 791. It certainly would not preclude application of subdivision (a) of section 791 and the introduction of the Steuber tape predating the August 16, 1970, interview. The statement was properly admitted. (Cf. *People* v. *Duvall* (1968) 262 Cal.App.2d 417, 420-421 [68 Cal.Rptr. 708]; *People* v. *Walsh* (1956) 47 Cal.2d 36, 41-43 [301 P.2d 247].)

An additional complaint about the Steuber tapes is based on Manson's assertion that the prosecution failed to comply with a discovery order. The contention lacks merit. The prosecution, claiming it first learned of the Steuber interview during the course of Flynn's cross-examination, represented that it had no contact with Steuber or the District Attorney of Inyo County for whom Steuber was acting until after Flynn was under cross-examination. The deputy district attorney offered to be sworn and to testify to that fact.

Furthermore, appellant had the opportunity to cross-examine both Steuber and the District Attorney of Inyo County and thus to discover

the circumstances by which the representatives of Los Angeles County came into possession of the Steuber tapes. Having foregone the opportunity to ascertain whether or not the "Steuber tape" was known to the prosecution in advance of trial, Manson cannot now successfully claim a violation of the discovery order. There is simply a void in the evidence that appellant did nothing to fill even with the opportunity to do so.

Another contention made by Manson with respect to the introduction of the Steuber tape is that the tape was "suppressed." ██ Suppressed evidence is that evidence favorable to the defendant which the prosecution fails to disclose prior to or during trial. (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341].) ██ In this case, Flynn's testimony concerning Manson's admission was made known to appellant before trial. Delay in producing the tape itself until after trial commenced does not transform Flynn's testimony into "suppressed" evidence.[29]

Three other evidentiary complaints that Manson asserts concerning Flynn's testimony must be discounted.

██ Flynn's testimony concerning threats on his life, relevant to his state of mind and credibility, was properly admitted despite Manson's assertion to the contrary. The threats tend to explain Flynn's delay in relating some of his trial testimony. While it is generally true that a defendant cannot be held accountable for threats made against witnesses without his consent or authority (*People* v. *Terry* (1962) 57 Cal.2d 538, 565-566 [21 Cal.Rptr. 185, 370 P.2d 985]), here the court admonished the jury to consider Flynn's testimony ". . . solely as to what this witness'

---

[29]Manson's argument based on a denial of discovery is premised on his assertion that if he had known of the existence of a prior consistent statement he would not have cross-examined Flynn in such a way as to raise the specter of recent fabrication. We do not find that argument compelling. If Flynn's testimony as to the admission had not been attacked on the basis of his failure to mention it to the Los Angeles Police Department, then it would have stood unimpeached. We do not believe that that would have benefited Manson. By focusing on Flynn's unexplained silence when interviewed by the Los Angeles Police Department, Manson cast some doubt on Flynn's credibility. That doubt remains notwithstanding the introduction of a prior consistent statement. The jury could then consider the veracity of a witness who omitted significant information at a time when it would have been quite appropriate to have revealed it. Manson contends that permitting Steuber to testify gave a patina of truth to what Flynn said. It is just as logical to assert that the Steuber tape emphasized Flynn's glaring omission when interviewed by the Los Angeles Police Department. The jury was instructed to consider it for the singular purpose of assessing Flynn's credibility.

state of mind may have been with respect to relating to law enforcement persons the substance of the matters covered by his testimony in this trial. This testimony is not to be considered for any purpose with regard to Mr. Manson, that is, his testimony on these conversations." The admonition removed the impediment to such testimony since Manson was not held accountable for it.

Another aspect of Flynn's testimony drawing charges of error was his statement that on one occasion Manson said, "Well, why don't we go in there and tie them up and cut them to pieces." Referring to occupants of a house with whom Flynn was acquainted, Flynn's testimony was in response to a question concerning a conversation Flynn had with Manson about the epithet "pig." The question was asked on cross-examination after the subject was raised on direct. Consequently, inquiry and response were proper. (Evid. Code, § 356; *Long* v. *Cal. Western States Life Ins. Co.* (1955) 43 Cal.2d 871, 881 [279 P.2d 43].) Even so, at the insistence of appellants' counsel, the court admonished the jury to disregard the declaration attributed to Manson. No prejudice resulted.

■■ Flynn testified that on one occasion he saw Manson fire a handgun, and he identified an exhibit otherwise identified as one of the murder weapons as being that gun. Flynn's testimony indicated that Manson fired the gun at or in the direction of Flynn and a third person. Manson cites the receipt of this testimony as prejudicial error. We disagree. Manson's use of the handgun is circumstantially relevant. It tends to connect him to one of the instruments of the Tate murder. The court admonished the jury to disregard Flynn's testimony insofar as it pertained to Manson's target. That admonition was sufficient and there was no error.

*MANSON CORROBORATION — ITEM 3:* The handgun introduced in evidence as People's Exhibit 40 was a weapon to which Manson had access. Consistent with Kasabian's testimony concerning the use of a gun by Watson to strike Frykowski on the head, pieces of a righthand pistol grip were found at the Tate residence. These pieces fit People's Exhibit 40.[30] While there is no contention that Manson was at the Tate residence, evidence that a weapon used by him was a weapon used in the Tate murders has some probative value in demonstrating a relationship between him and the event. (*People* v. *Buono* (1961) 191 Cal.App.2d 203,

---

[30]The handgun was found by an 11-year-old boy on September 1, 1969. He located it on a hillside by his home, just off of Beverly Glen Road, approximately 1.8 miles from the Tate residence.

220 [12 Cal.Rptr. 604]; *People* v. *Channell* (1951) 107 Cal.App.2d 192, 197 [236 P.2d 654].)

*MANSON CORROBORATION — ITEM 4:* It is uncontradicted that prior to August 1969, Manson was acquainted with the Cielo Drive residence and with the home of Harold True adjoining the La Biancas' home on Waverly Drive. Even though no homicide occurred in True's residence, the circumstance that Manson was familiar with both general locations is susceptible to an interpretation exceeding mere coincidence. "The state of mind of a person is a fact to be proved like any other fact when it is relevant to an issue in the case; and when knowledge of a fact has important bearing upon the issues, evidence is admissible which relates to the question of the existence or nonexistence of such knowledge, [citations]." (*Larson* v. *Solbakken* (1963) 221 Cal.App.2d 410, 418 [34 Cal.Rptr. 450].)

*MANSON CORROBORATION — ITEM 5:* The fact that Leno La Bianca's hands were tied with leather thongs is circumstantially probative. Several witnesses testified that Manson frequently wore such thongs around his neck and in November of 1969 leather thongs were recovered from Manson's clothing.

 *AGGREGATE OF MANSON CORROBORATION:* In the aggregate, the evidence is more than sufficient. "Although the corroboration must connect the defendant with the commission of the offense, it 'may be slight and entitled to little consideration when standing alone.' [Citation.] The requisite corroboration may be provided by circumstantial evidence." (*People* v. *Valerio* (1970) 13 Cal.App.3d 912, 923 [92 Cal.Rptr. 82].)

 In addition to Manson's admissions, his relation to the Buntline revolver (Exh. 40), his familiarity with the locations of the crimes, and his habit of having on his person the same kind of material used to bind one of the victims are, in the aggregate, circumstantial evidence corroborating the testimony of Kasabian. (*People* v. *Henderson* (1949) 34 Cal.2d 340 [209 P.2d 785].)

 *CORROBORATION—ATKINS, KRENWINKEL, VAN HOUTEN:* An important part of the evidence produced to corroborate accomplice testimony against Atkins, Krenwinkel and Van Houten consisted of their independent admissions and declarations. These are summarized as follows:

(1) *Atkins*—After her arrest and while incarcerated at Sybil Brand Institute awaiting trial, Atkins confided in two other inmates concerning her participation in the Tate murder. These inmates, Virginia Graham Castro and Roni Howard, informed the law enforcement agencies of the admissions. Another inmate, Roseanne Walker, testified that she and Atkins listened to a broadcast concerning the Tate and La Bianca murders. Atkins commented on the broadcast, "That ain't the way it went down." In addition to the statements made to fellow inmates, Atkins wrote several letters inculpating herself in the Tate-La Bianca murders. Of these, three were marked and admitted into evidence. Finally, Family member Barbara Hoyt was allowed to testify that she overheard Atkins say that Sharon Tate was the last to die.

(2) *Krenwinkel*—Through the testimony of Dianne Lake, the jury was informed that Krenwinkel admitted she "had dragged Abigail Folger from the bedroom to the living room."

(3) *Van Houten*—Dianne Lake testified that Van Houten told her that she had participated in the stabbing of a dead body. The substance of the testimony implies that Van Houten participated in the La Bianca murders.

The jury was instructed that these enumerated admissions were admissible only as to each respective declarant.

With respect to co-appellants Krenwinkel and Atkins, there is corroboration beyond their admissions and declarations. Krenwinkel's fingerprint was found at the Tate residence. As to her, that is sufficient corroboration by itself. (*People* v. *Ray* (1962) 210 Cal.App.2d 697, 703 [26 Cal.Rptr. 825].)

Discarded clothing found by a witness in the vicinity of Cielo Drive[31] was examined for blood and other evidence. A chemist testified that not all the stains were capable of interpretation; he was, however, able to positively identify the stains on one item as human, blood type B. Folger,

[31]A witness for the prosecution testified that he located a bundle of clothing in a hillside area near Benedict Canyon. The clothing consisted of three pairs of pants, three shirts and a sweatshirt. These items, dark in color, were admitted in evidence.

The testimony was taken subject to a motion to strike until such time as the court conducted a hearing on the admissibility of the statement of Susan Atkins. The thrust of the motion was premised on the contention that publication of Susan Atkins' story in the Los Angeles Times on December 14, 1969, was the product of improper state action encouraging and enabling the witness to locate the items of clothing. Relying on the doctrine stated in *Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441,

Frykowski and Parent had blood type B. Human hair was found on another of the items. Compared with Atkins' hair, testing showed similarities in terms of color, length and medullary characteristic. While the location of clothes with bloodstains in the vicinity of Cielo Drive only substantiates Kasabian's testimony, the identification of hair similar to Atkins' hair on that clothing provides corroboration within the meaning of Penal Code section 1111 as to Atkins. The weight given to such evidence is for the jury. (See *People* v. *Carr* (1972) 8 Cal.3d 287, 292 [104 Cal.Rptr. 705, 502 P.2d 513]; 31 Am.Jur.2d, Expert and Opinion Testimony, § 129.)

Krenwinkel was ordered by the court to provide exemplars of her handwriting. On the advice of counsel, she refused. Evidence of her refusal was admitted against Krenwinkel. Obviously the purpose of this procedure focused on the writings in blood at the scenes of the homicides.[32] The refusal to give a handwriting exemplar tends to show a consciousness of guilt and is both corroborative and independently probative. (*People* v. *Hess* (1970) 10 Cal.App.3d 1071, 1076-1077 [90 Cal.Rptr. 268, 43 A.L.R.3d 643].)

Other evidence included the fact that Van Houten, Krenwinkel and Atkins gave false names when they were arrested. ■ The use of an alias is circumstantial evidence of consciousness of guilt. ■ It is therefore relevant and corroborative of Kasabian's testimony. (*People* v. *Perry* (1972) 7 Cal.3d 756, 775-776 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Olea* (1971) 15 Cal.App.3d 508, 515 [93 Cal.Rptr. 265]; Pen. Code, § 1127c.)

Krenwinkel also contends there is no corroborative evidence to connect her with the commission of the La Bianca murders. She erroneously presumes her implication in the Tate murders is not corroborative within the meaning of Penal Code section 1111. The fact

455-456, 83 S.Ct. 407] Manson incorrectly reasoned that the testimony and clothing were unlawfully obtained evidence. The court correctly admitted the evidence.

We simply cannot perceive how the witness' location of this evidence can be characterized as "Fruit of the Poisonous Tree." We find no authority for the proposition that the location of evidence by a private citizen not acting under the direction of law enforcement agencies is unlawful or constitutionally impermissible. (See *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628 [114 Cal.Rptr. 114, 522 P.2d 674] and authorities cited at p. 632.) Moreover, there was no proof that the publication referred to was the product of governmental action, improper or otherwise.

[32]The writing on a refrigerator at the La Biancas was "HEALTER SKELTER." The People offered to prove that Krenwinkel spelled Helter Skelter in that distinctive way. The evidence was not allowed, but this initiated the demand for the exemplar.

that these crimes occurred on successive dates and in a significantly similar way is very probative. It is a circumstance of corroborative nature properly considered by the trier of fact. (*People* v. *Robinson* (1960) 184 Cal.App.2d 69, 77 [7 Cal.Rptr. 202]; *People* v. *Wilson* (1926) 76 Cal.App. 688, 694-695 [245 P. 781].)

## ARANDA-BRUTON

Relying on *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] and *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], all appellants assign error to the admission into evidence of the declarations of Atkins, Krenwinkel and Van Houten.

When the prosecution is in possession of a declaration inculpating not only the declarant but another nondeclaring codefendant, *Aranda* commands an election from among three procedures: (1) a severance of the nondeclarant codefendant to permit him a separate trial; (2) editing a declaration to delete all matter inculpating the nondeclarant; or, (3) exclusion of the entire declaration if the case is to proceed as a joint trial and there is no reasonable way to edit the declaration to delete the inculpating material. *Bruton* expanded the *Aranda* holding to constitutional dimensions.

When Atkins', Krenwinkel's and Van Houten's admissions were offered, the court conducted evidentiary proceedings, editing the admissions and eliminating references to co-appellants and Watson. As submitted to the jury, the declarations read in the first person.

After each admission the jury was instructed to consider the admission only as to the particular declarant to whom it was attributed. Consequently, we find no error in the procedure followed. These admissions, the testimony of Linda Kasabian, and items of physical evidence sufficiently and independently linked each appellant to the commission of the crimes charged. That connection is sufficient to discount any claim of error regarding admission of the edited statements. We find no case suggesting "that it is *Bruton* or *Aranda* error to admit in evidence the admission or confession of one defendant, which reflects his commission of a crime that is revealed by the physical evidence, because it might reflect on the issue of whether or not a crime was actually committed by not only the declarant but also by another, whom evidence, other than the confession, links to the declarant's activities. In fact *Aranda* suggests

the contrary. It suggests that if references to the participation of anyone else, whether directly or indirectly identified or not, are nonexistent, or are deleted, the trial may be joint, and the extrajudicial statement may be received as against the declarant . . . ." (*People* v. *Epps* (1973) 34 Cal.App.3d 146, 157 [109 Cal.Rptr. 733]; see also, *People* v. *Romo* (1975) 47 Cal.App.3d 976, 984 [121 Cal.Rptr. 684].)

We recognize appellants' contention that the theory of the prosecution is in large part dependent upon evidence pertaining to the life style and communal organization of these people. In opposing the introduction of the admissions, counsel for Krenwinkel eloquently argued that to admit them would be highly prejudicial because other evidence made it clear that these people ate together, slept together, had sex together, and functioned as a unit so that identification of one amounted to identification of all. This argument misses the point.

The issue is whether or not the declaration of one connects a nondeclarant to the crime in question.[33] The problem confronted by *Aranda* and *Bruton* is typically the case where the only evidence linking the nondeclarant codefendant is the admission of his accomplice. Here all appellants are linked to the crimes by the testimony of Kasabian. Over and above Kasabian's testimony there is the substantial corroborating evidence discussed above. Because each admission was edited to delete any explicit reference to anyone other than the declarant, none was made inadmissible by reason of circumstantial implications that might be drawn by the jury.[34]

Concluding that introduction of the declarations of appellants did not violate the mandate of *Aranda* or *Bruton,* we note also that, in any event, if error did occur, it was harmless beyond a reasonable doubt. (*Brown* v. *United States* (1973) 411 U.S. 223, 231 [36 L.Ed.2d 208, 215, 93 S.Ct. 1565]; *Harrington* v. *California* (1969) 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726].)

[33] If that proposition was valid, separate trials would be mandatory in every case including all the following factors: (1) several defendants who have a societal relationship; (2) the prosecution turns on the testimony of an accomplice; and (3) defendants' self-inculpatory statements are needed for corroboration.

[34] See *People* v. *Marcus* (1974) 36 Cal.App.3d 676, 680-681 [111 Cal.Rptr. 772, 58 A.L.R.3d 594], where the co-defendants were brothers. That relationship did not foreclose the use of independent edited admissions.

## SUFFICIENCY OF THE EVIDENCE

The testimony of Kasabian and the evidence offered in corroboration thereof, if believed by the jury, is sufficient to support the verdicts of guilty as to each appellant. (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 962 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Bynum* (1971) 4 Cal.3d 589, 599 [94 Cal.Rptr. 241, 483 P.2d 1193].)

Manson's assignment of error to the trial court's denial of his motion made pursuant to Penal Code section 1118.1, unsupported by argument or citation of authority, is frivolous.

## CONFIDENTIAL STATUS OF INCRIMINATING ADMISSION

■ After her arrest Atkins was incarcerated at Sybil Brand Institute. In accordance with regulations adopted and enforced by the Los Angeles County Sheriff all incoming and outgoing mail was opened, examined and censored. Four letters written by Atkins thus came into respondent's possession; at trial, three were admitted against her and they now form the basis of a contention that their seizure was a violation of her rights under the First and Fourteenth Amendments of the federal Constitution. Her contention is without merit.[35]

The real issue raised by Atkins is not her surface objection to censorship but rather that her mail was turned over to the prosecuting authority in the present case, the District Attorney of Los Angeles County. She suggests this constitutes an unlawful seizure of evidence against her. Compelling authority demands a contrary conclusion.

" 'A man detained in jail cannot reasonably expect to enjoy the privacy afforded to a person in free society. His lack of privacy is a necessary adjunct to his imprisonment. . . . Officials in charge of prisoners awaiting trial may censor their mail, regulate communications between them and outsiders and under certain circumstances forbid communications between such prisoners and certain classes of visitors. [Citations.]' " (*People* v. *Dinkins* (1966) 242 Cal.App.2d 892, 902-903 [52 Cal.Rptr. 134].) The majority of jurisdictions permit the admission of mail authored by unconvicted prisoners if it is obtained by means of routine mail censorship. (Annot. Prisoners—Censored Mail as

---

[35]None of the letters were addressed to any lawyer. Therefore, the issue of privilege is not germane.

Evidence 52 A.L.R.3d 553.) Here the record supports a conclusion that the aforementioned exhibits were lawfully obtained. They were therefore properly admitted.

KASABIAN'S TESTIMONY
IRRELEVANT, INHERENTLY IMPROBABLE, LOGICALLY IRRELEVANT

■ Manson asserts that Kasabian's testimony must be disregarded on the grounds that it is irrelevant, inherently improbable and logically ambiguous. This sweeping condemnation is made even broader by reason of the numerous aspects of Kasabian's testimony included in this categorical assignment of error. For the most part Manson's complaint is best described as specious quibbling over extrinsic and speculative issues. These assignments of error are nothing more than conflicts in the evidence. Such conflicts are to be resolved by the trier of fact. "The moral certainty which the law in its humanity exacts before upholding the conviction of a man charged with crime does not exclude every speculative and fanciful possibility . . . ." (*People* v. *Ah Sun* (1911) 160 Cal. 788, 791 [118 P. 240].)

Manson's assertion that Kasabian's testimony is inherently improbable is without merit. Objections based on the theory of inherent improbability place a substantial burden on the objector. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den., 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118].) Manson fails to meet that standard. Kasabian testified to nothing that was physically impossible or false on its face. (See *People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758].)

The contentions of ambiguity and logical irrelevancy are inapplicable. Manson invites us to discount all of Kasabian's testimony by reading it without reference to the entire record and by focusing on some conflicts in her descriptions. This we cannot do. "Circumstances which, taken singly, seem to afford no logical inference as to the issue, may when considered with other circumstances give rise to such an inference. Thus the test of relevancy must not be too strictly applied to a single question asked of a witness or to any other single item of evidence. 'The theory upon which evidence of circumstances is admitted . . . is not that each circumstance stands flawless in its proof of the ultimate fact, but that each certain circumstance has a relation to and points reasonably to the fact sought to be proved.' " (Witkin, Cal. Evidence (2d ed. 1966) § 313 (3), p. 276.)

We have reviewed each of the items catalogued by Manson as irrelevant, inherently improbable, ambiguous or logically irrelevant. We totally disagree with his contentions and find them too devoid of merit to justify particularized discussion of each one.[36]

### PREJUDICIAL ADMISSION OF EVIDENCE

On direct examination Kasabian was asked what induced her to go to the Spahn ranch in the first place. In her answer she referred to what she had been told by another member of the commune, Catherine Louise Share, known as Gypsy. Kasabian testified that Gypsy had ". . . told me that there was a beautiful man that we had all been waiting for, and that he had been in jail for quite a number of years . . . ." Manson's attorney objected and moved for a mistrial.

Although the motion was denied, the jury was admonished "to disregard Mrs. Kasabian's remark about anybody having spent any time in jail." Manson's claim of error is therefore misplaced. Moreover, during cross-examination of Family member Brooks Posten, Manson's attorney elicited testimony revealing that Manson had a parole officer. Both the admonition and the allusion to circumstances indicating his prior status as a convict purge Kasabian's reference to jail of any prejudicial effect.

A similar assignment of error is made by Manson with respect to Kasabian's allusion to Manson's use of LSD. On direct examination, and without objection, Brooks Posten testified to an occasion when Manson was under the influence of Psilocybin. On cross-examination, and without objection, Posten stated that Manson favored LSD. Paul Watkins testified without objection to another occasion when Manson was ". . . on an acid trip."

The occasions to which these witnesses referred involved times when Manson alluded to himself as a Christ figure. This self-characterization was a part of respondent's evidence in support of its contention that Manson was the leader of the Family. Manson's state of mind and his

---

[36]An example of the type of matter appellant has included in this broad assignment of error is the following: Kasabian testified concerning the entry to Cielo Drive over a barbed wire fence. Manson places great emphasis on this because (1) there is no explanation for entry to the premises by other than the main gate in view of the fact that Watson, Krenwinkel, and Atkins exited by that route; (2) the barbed wire fence was not cut even though Watson had wire cutters; and (3) neither the clothing or person of Kasabian was torn or scratched by the barbwires.

appearance on these occasions is therefore relevant. At the least it was germane to show whether or not Manson's statements were consciously made or seriously entertained. In any event, this testimony came in without objection thereby foreclosing any claim of error on this appeal. (Evid. Code, § 353, subd. (a).) Furthermore, evidence elicited by all sides made it perfectly clear that hallucinogenics were used at Spahn ranch.

### Post La Bianca Homicide Conduct

■ Complaining about Kasabian's testimony concerning his statement directing Kasabian to kill an actor, Manson contends it was inadmissible hearsay.[37] According to Kasabian this direction was given within hours after she, Manson, Atkins and Grogan had retreated from the La Biancas' residence.

Disposition of this contention of error occurs when the case of *People v. Leach* (1975) 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296] is contrasted to the case at bench. In *Leach* our Supreme Court made clear the rule that extrajudicial declarations of a coconspirator offered for the truth of the matters stated are inadmissible if the declarations are made after the termination of the conspiracy. Here the rule of *Leach* is inapplicable.

The conspiracy in which appellants were engaged was broader than the substantive crime of murder. Circumstantial evidence proves the overriding purpose of appellants and their coindictees—the fomentation of the race war Manson characterized as Helter-Skelter. Boundaries of a conspiracy are not limited by the substantive crimes committed in furtherance of the agreement.[38]

---

[37]Kasabian's testimony concerning Manson's declarations is as follows: "And then he said, 'What about that man that you and Sandy met? Isn't he a piggy?' And I said, 'Yes. He is an actor.' And then he further questioned me and he asked me if the man would let me in? And I said, 'Yes.' And he asked me if the man would let my friends in, Sadie and Clem. And I said, 'Yes.' And he said, 'Okay. I want you to kill him,' and he gave me a small pocketknife. And at this point, I said, 'Charlie, I am not you. I cannot kill anybody.' And I don't know what took place at that moment, but I was very much afraid. And then he started to tell me how to go about doing it, and I remember I had the knife in my hand, and I asked him, 'With this?' And he said, 'Yes,' and he showed me how to do it. (Indicating.) He said, 'As soon as you enter the residence, the house, as soon as you see the man, slit his throat right away.' And he told Clem to shoot him. And then, also, he said if anything went wrong, you know, not to do it."

[38]"It is furthermore possible for the object dimension, like the party dimension, to be of indeterminate scope. 'Murder Incorporated' would be a group contemplating the commission of other than a definite number of crimes. Each member of it therefore 'takes his chances,' and is a party to a conspiracy whose object dimension includes the

Here the conspiracy amounted to fulfillment of Manson's prophecy. The characterization of Helter Skelter as a fanatical fantasy is of no consequence. (*United States* v. *Bryant* (N.D.Tex. 1917) 245 F. 682, 684; *Blumenthal* v. *United States* (1947) 332 U.S. 539, 556-557 [92 L.Ed. 154, 167-168, 68 S.Ct. 248]; Perkins on Criminal Law (2d ed. 1969) p. 635.) The gist of the conspiracy was the comprehended common design, however bizarre and fanciful. It is not necessary that the object of the conspiracy be carried out or completed. (*People* v. *Bedilion* (1962) 206 Cal.App.2d 262, 271 [24 Cal.Rptr. 19].) The corollary of that proposition is that the conspiracy continues until it is accomplished or abandoned. It is obvious that Helter Skelter was never realized and the conspiracy remained pending. *Leach* is accordingly inapplicable—the conspiracy had not terminated.

We further distinguish *Leach* on the ground that Manson's declarations were not offered for the truth of their contents. Since the statements were not hearsay, the coconspirator exception of Evidence Code section 1223 is inapplicable. Despite a belief to the contrary by the trial court, relevance was not at all dependent upon the truth of the matter stated. The relevancy of Manson's orders to kill exists in the revelation of the nature of the conspiracy. (*People* v. *Lewis* (1963) 222 Cal.App.2d 136, 144 [35 Cal.Rptr. 1].)[39]

### EVIDENTIARY IMPLICATION OF GESTURES AND SELF-INFLICTED MARKS

■ Appellants were more than passive participants in their trial. On numerous occasions they spoke out, interrupting the proceeding by commenting and gesturing to each other and third persons, including witnesses. As a result, the prosecution called Detective Sergeant Manuel F. Gutierrez of the Los Angeles Police Department. Testifying that he was in the courtroom during the trial, Gutierrez described a specific incident observed by him. While Kasabian was testifying Manson looked at her, ". . . took his right index finger from right to left and made a motion across the bottom [of] his chin from right to left." As described, it is not too imaginative to characterize that conduct as a threat.[40]

---

offenses in fact undertaken." (*Developments in the Law—Criminal Conspiracy* (1959) 72 Harv.L.Rev. 920, 930.)

[39]This second approach obviates the necessity of determining whether or not the conspiracy was still pending. (See Oakley, *From Hearsay to Eternity: Pendency and the Co-Conspirator Exception in California—Fact, Fiction, and a Novel Approach* (1975) 16 Santa Clara Law. 1, 36-38.

[40]After more exacting examination Gutierrez described the motion of the finger to be made across the neck, a gesture commonly recognized as simulating slitting a throat.

Testimony establishing intimidation of a witness while she is testifying is certainly relevant. (*People* v. *Rosoto* (1962) 58 Cal.2d 304, 350 [23 Cal.Rptr. 779, 373 P.2d 867], cert. den., 372 U.S. 955 [9 L.Ed.2d 978, 83 S.Ct. 953]; *People* v. *Teitelbaum* (1958) 163 Cal.App.2d 184, 216-217 [329 P.2d 157], cert. den., 359 U.S. 206 [3 L.Ed.2d 759, 79 S.Ct. 738]; Witkin Cal. Evidence 2d ed. (1974 Supp.) § 513, p. 417.)

Gutierrez also stated that he observed an "X" on Manson's forehead and that, on the following day, he saw "X's" on the foreheads of Atkins, Krenwinkel and Van Houten. This behavior had some tendency to show the affinity between the appellants as well as the asserted leadership of Manson. It is not too speculative to presume these decorations were observable by the jury. Testimony concerning these markings could not be prejudicial and its admissibility was well within the discretion of the trial court. (Evid. Code, § 352.) The stigmatic effect of this circumstance, if any, was produced entirely by the voluntary act of appellants.

## INTRODUCTION OF NEGATIVE EVIDENCE

██ Witness Stephanie Schram testified that on the night of August 8, 1969, Manson was with her and that on August 9 he left when it got dark and she did not see him until the next morning. Manson, complaining that this evidence tended to place him at the Spahn ranch near the time of the murders, contends it was prejudicial because it gave some "synthetic confirmation" to Kasabian's testimony. No objection was made at trial to this part of Schram's testimony. The failure to object waives any defect. (Witkin, Cal. Evidence (2d ed.) § 1285, p. 1188.)

## RESTRICTION ON CROSS-EXAMINATION (Chapman)

██ Atkins' counsel attempted to question housekeeper Winifred Chapman about the presence of drugs and narcotics at the Cielo Drive residence. The court sustained a prosecution objection on the grounds of irrelevance.

Manson argues that inquiry should have been permitted because at one time the police entertained the suspicion that the homicides might have been connected to disagreements relating to the sale and use of drugs. Manson's offer of proof was that Mrs. Chapman might "be able to tell us whether or not there was any LSD, narcotic drugs in the residence. . . ." The offer was deficient. It did not in any way relate to the victims

involvement with drugs.[41] Moreover, the evidence was irrelevant because it pertained only to a very speculative suspicion that some third person had committed the homicides. (*People* v. *Chapman* (1975) 50 Cal.App.3d 872, 881 [123 Cal.Rptr. 862].)

## IN-COURT IDENTIFICATION

During the course of cross-examination, Danny DeCarlo was asked to identify Charles Tex Watson. At the request of Krenwinkel's attorney and over Manson's objection, Watson was produced in court. We find no error in this procedure. In-court identification is an accepted method of testing a witness' competency and credibility. (Evid. Code, § 780, subd. (c).)

## RESTRICTION OF CROSS-EXAMINATION (DeCarlo)

Manson also complains that he was not permitted to fully cross-examine DeCarlo about DeCarlo's state of mind toward black people. DeCarlo testified that he did not like some of the things black people did. He was then asked, "Tell us about that, Mr. DeCarlo." An objection to the question was sustained. Manson argues that DeCarlo's answer may have shown that DeCarlo hated black people and that DeCarlo's testimony concerning Manson's prejudice against black people was really a reflection of DeCarlo's prejudice. Actually at issue is DeCarlo's credibility. Further amplification of DeCarlo's bias would not reasonably tend to prove he lied about what Manson said. The trial court's ruling was correct.

## RESTRICTION OF CROSS-EXAMINATION (Lake)

During cross-examination of Dianne Lake, Manson's counsel wanted to ask if "Tex" Watson had told her *he* killed Sharon Tate and that Tate had pleaded for her life. The record reflects that counsel's reference was to a report of a statement by Lake to a deputy district attorney. It is urged that the testimony was relevant because it was contrary to Lake's purported statement that Susan Atkins had told her *she* had killed Sharon Tate. The record does not support that argument. Lake did not testify that Susan Atkins told her anything. Consequently

---

[41] If the presence of drugs in the residence was significant there is evidence of that fact in the record. Sergeant Michael McGann of the Los Angeles Police Department testified that marijuana, hashish, cocaine and MDA were found on the premises. All parties stipulated to the chemical nature of these items. Therefore, even if the excluded testimony of Chapman was relevant, its exclusion was not prejudicial.

we do not find fault with the court's ruling that the question was outside the scope of direct.

Moreover, we do not see how such testimony would benefit Manson. The prosecution's thesis was that Manson was vicariously liable for the acts of all the coindictees. If the jury believed Manson to be a conspirator, aider or abettor he was culpable for all of the homicides regardless of who held the knife. Finally, if the court's ruling was error it was harmless. (Cal. Const., art. VI, § 13.)

### ADMISSION OF EXHIBITS

■ Over appellants' objection, respondent placed into evidence numerous photographs, many of which depict the deceased victims. Some photographs are black and white and some are color; all show the victims either at the place of death or at the morgue. Some of the exhibits objected to at trial and by Manson on this appeal are diagrams of certain locations or objects. The argument tendered by appellant has at its core the assertion that the exhibits constitute "inflamatory photographs of the bodies of the victims at Cielo Drive and Waverly Drive." Accordingly, we address this contention with respect to the photographs of the victims only.

The prejudicial effect of the photographs must, of course, be weighed against their relevance. (Evid. Code, § 352.) The striking thing about the photographs is that they show the numerous wounds inflicted on the bodies of all the victims save Steven Earl Parent. Demonstration of numerous stab wounds is relevant because it tends to substantiate the testimony of Kasabian. For example, Kasabian's description of a frenzied scene involving a great deal of slashing, cutting and striking is fortified by the exhibits.

Appellants' reliance on *People* v. *Seastone* (1969) 3 Cal.App.3d 60 [82 Cal.Rptr. 907] to support the contention that the exhibits should not have been admitted is misplaced. *Seastone* supports admission of the photographs. In affirming a conviction of murder the court in *Seastone* rejected the same contentions made here. (3 Cal.App.3d at p. 66.)

Even though the photographs to which appellant objects are admittedly gruesome, they are nonetheless extremely relevant to prove an element of the crime charged, malice. Their relevance outweighs any possibility of prejudicial effect. The denial of appellants' request to

replace color photographs with black and white photographs was within the discretion of the trial court. Manson's further claim that his attorney should have been allowed to describe each exhibit for the record is silly. We conclude that the trial court did not abuse its discretion by admitting these exhibits.

## JURY VIEW

During the course of trial and while Kasabian was on the witness stand, Manson's attorney moved to "have proceedings at the Tate residence." A similar motion was made with respect to Waverly Drive. Deeming the diagrams and photographs adequate, the trial court considered and denied the motions. We find no error in this exercise of the court's discretion.

## RESTRICTION OF APPELLANTS' TESTIMONY

At the conclusion of the prosecution's case in chief, all defense counsel announced that the defendants rested subject only to the admission of certain exhibits into evidence. Krenwinkel then informed the court: "Your Honor, I wish to testify, and also my two sisters would like to testify and put on our defense." The defense lawyers advised the court of their opposition to their clients taking the witness stand. The female appellants nevertheless insisted on their right to do so. The court meticulously questioned Atkins, Krenwinkel and Van Houten concerning their knowledge of the risks of taking the witness stand. In the presence of their clients, defense counsel informed the court that it was their considered opinion that the testimony of appellants was incriminating and amounted to a judicial confession.

The disagreement between counsel and clients was so adamant that the attorneys advised the court that they would not call their respective clients to the witness stand and would not ask any questions. Their refusal was fixed regardless of any order the court proposed to compel their participation. Ultimately, Manson joined with the other appellants and, over the objection of his counsel, offered to testify.

It is fundamental that a defendant has the right to testify in his own behalf even if doing so is contrary to the advice of his attorney. (*People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710]; *People* v. *Guillen* (1974) 37 Cal.App.3d 976, 985 [113 Cal.Rptr. 43]; *People* v. *Blye* (1965) 233 Cal.App.2d 143, 149 [43 Cal.Rptr.

231].) The trial judge was cognizant of this proposition. The paradox created was how to apply the rule in the context of a multi-defendant case fraught with *Aranda-Bruton* problems combined with the disinclination of defense counsel to cooperate by acting as interrogator.[42] Because all defense counsel declined to interrogate it was recognized that such testimony would be in a narrative form.

Notwithstanding the court's disposition to "relax the rules" to some degree, it remained the court's obligation and province to regulate the conduct of proceedings to exclude inadmissible matter from the hearing of the jury. In the instant case the risk that narratives by the appellants would include inadmissible evidence was substantial. Therefore, the court's proposal to receive the testimony outside the presence of the jury prior to putting it before the jury was sound. (Cf. *Carlton* v. *Superior Court* (1968) 261 Cal.App.2d 282, 292 [67 Cal.Rptr. 568]; *People* v. *Scherr* (1969) 272 Cal.App.2d 165, 169-170 [77 Cal.Rptr. 35].) When the court announced that proposal, all appellants save Manson refused to testify. In short, they demanded the right to narrate before the jury without any preview that might afford insulation against *Aranda-Bruton* error or proper judicial editing—all or nothing at all.

Manson complains that the imposition of a hearing as a condition precedent to the testimony of Atkins, Krenwinkel and Van Houten was error. Citing *Rodriguez* v. *Superior Court* (1970) 9 Cal.App.3d 493 [88 Cal.Rptr. 154] and *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834 [117 Cal.Rptr. 437, 528 P.2d 45], he urges that the condition operated to grant unwarranted and invalid prosecution discovery. These cases, concerning pretrial discovery on the issue of an alibi defense, are inapplicable. Here we are not concerned with providing information which would ease the prosecution's burden. We do not view the court's proposed method of proceeding as a discovery matter, per se.

While an *in camera* proceeding would give the prosecution a preview of the defendants' case, that procedure certainly does not violate any

[42]There is not the slightest suggestion that defense counsels' refusal to participate in the presentation of the appellants' testimony was based on the assumption that any of it was perjured. The apparent reluctance of counsel was founded on their presumption that their obligation was to obtain an acquittal and that their clients' testimony would obliterate that possibility. They also suggested that counsel, not clients determine who will testify. Their assumption is wrong on these facts. While a client is entitled to competent advice, he is not obligated to follow it. We do not suggest that counsel must necessarily tolerate client resistance. However, once trial has commenced, and certainly when it has become protracted, it is improbable that counsel can withdraw. (Cf. *People* v. *Jackson* (1960) 186 Cal.App.2d 307, 315 [8 Cal.Rptr. 849].)

constitutional right. Since appellants had declared their intention to testify, the proposed proceeding was not tantamount to compelling a waiver of the privilege against self-incrimination. (Cf. *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673].) We reject Manson's argument that the trial court deprived him of the opportunity to cross-examine his coappellants. The fact is they elected to deprive him that opportunity by rejecting the valid and reasonable resolution proposed by the court. Moreover, if counsels' representations concerning the prospective testimony of Atkins, Krenwinkel and Van Houten is correct, it was self-incriminatory. Neither Manson nor respondent could compel such testimony.[43]

## MANSON/BUGLIOSI INTERVIEW

 It is contended that the prosecution interfered with the defense by holding a private interview with appellant Manson. Specifically, we are told that Deputy District Attorney Bugliosi, over the objection of Manson's attorney, conferred privately with Manson during the trial and thereby stifled Manson's disposition to testify. Citing *Prudhomme* v. *Superior Court, supra,* 2 Cal.3d 320, Manson characterizes these alleged interviews as "unconstitutional discovery" proceedings.

The issue was placed before the trial court when Irving Kanarek, Manson's attorney, advised the judge that "just after the noon recess Mr. Bugliosi, who previously has stated to me that he was going to use every trick he possibly could find to convict Charles Manson and put him in the gas chamber, . . . approached and spoke to Charles Manson, over my express objections."

Bugliosi informed the court, "All three defense attorneys urged it, and Manson said, 'I want to talk to you.'" Kanarek responded, "But I forbade him." Apparently there is no disagreement that the deputy district attorney did interview Manson on at least one occasion. It is unclear, however, whether the interview was conducted with or without Kanarek's knowledge or consent.[44] It was argued but not proved that

---

[43]Following Manson's testimony out of the presence of the jury, the trial judge changed his mind. Atkins, Krenwinkel and Van Houten were advised and offered the opportunity to go forward with their testimony before the jury. They refused. The record also reveals that after testifying before the court without the jury, the judge asked Manson if he wished to proceed to testify before the jury. Manson responded, "No, I've said everything I want to say."

[44]Paul Fitzgerald, the attorney for Krenwinkel advised the court: "I think I should be held in contempt, if anybody, because Mr. Bugliosi did not solicit this conversation. I

Manson invited the interview. No evidence revealed the substance of this Manson-Bugliosi conference.

Manson argues that this subject would be illuminated if we took judicial notice of a book, Helter-Skelter, co-authored by prosecutor Bugliosi. Helter-Skelter is a purported account of the trial of this case; it constitutes no part of the record on appeal. (*Price* v. *Price* (1948) 85 Cal.App.2d 732, 734 [194 P.2d 101]; cf. *People* v. *Pena* (1972) 25 Cal.App.3d 414, 421 [101 Cal.Rptr. 804].) Moreover, we reject Manson's suggestion that we employ judicial notice as a means of learning more concerning his alleged multiple conferences with Bugliosi. (Evid. Code, §§ 452, 459.) While we may take judicial notice of the fact that the book exists, we decline to notice its contents. (*Berry* v. *Chaplin* (1946) 74 Cal.App.2d 669, 676 [169 P.2d 453].) Even if we assume this post-trial literary effort by Bugliosi is a reasonably accurate report of all events surrounding the trial, his observations are not testimony and cannot be considered for the truth of the matter stated. (*People* v. *Long* (1970) 7 Cal.App.3d 586, 591 [86 Cal.Rptr. 590].)

The fundamental assignment of error is that Bugliosi interviewed Manson without Kanarek's consent. The error is best characterized as a violation of Manson's *Miranda* rights and fair trial rights and as an improper interference with his attorney-client relationship (*Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199]; *People* v. *Isby* (1968) 267 Cal.App.2d 484 [73 Cal.Rptr. 294]).[45]

approached, with Mr. Hughes and Mr. Shinn, Mr. Bugliosi and I had a conversation with regard to Mr. Bugliosi talking to Mr. Manson. [¶] Now, Mr. Manson knew this. It was actually at his request. He wanted to talk to Mr. Bugliosi about representations that Mr. Bugliosi had made about friends and acquaintances of Mr. Manson attempting to intimidate prosecution witnesses, and Mr. Manson wanted to find out what Mr. Bugliosi's position was, and to tell him that he didn't have anything to do with the intimidation of the prosecution witnesses. [¶] Now, it was our understanding that it was going to be an off-the-record conversation, that it was not going to be used in any sense against Mr. Manson, and that Mr. Manson wanted to do it and that Mr. Bugliosi wanted to do it. [¶] Manson knew that he need not consent to this conversation and, in fact, in our presence, had a conversation with Mr. Kanarek in which he said he chose not to follow Mr. Kanarek's advice and speak to Mr. Bugliosi. [¶] It was not Mr. Bugliosi's fault."

[45]"It must be concluded from our reading of *Massiah* and *Miranda* that the Supreme Court has distinguished two distinct constitutionally proportioned rights. The first right is that an accused must be advised of his right to counsel when the accusatory stage of the criminal process has been reached, and the second right is that after a criminal charge has been filed against a defendant and he has counsel, he may not be subject to an interrogation instigated by law enforcement officers for the purpose of eliciting incriminatory statements without effective aid of his counsel. In the case at bench, the criminal charge had been filed, defendant arraigned and counsel appointed to represent

██ If instigated by an accused specifically waiving the right to counsel, interrogation out of counsel's presence may be permissible. (*Griffin* v. *Superior Court* (1972) 26 Cal.App.3d 672, 696-702 [103 Cal.Rptr. 379]; *People* v. *Rowe* (1972) 22 Cal.App.3d 1023, 1032 [99 Cal.Rptr. 816].) ██ Contrary to Manson's assertion, no demand was made for an evidentiary hearing on this subject.[46] We therefore can make no determination on the record of this appeal of the presence or absence of *Massiah-Miranda* error. Determination of possible prejudice to Manson resulting from interviews with Bugliosi is not obtainable on the record before us and is incapable of resolution in this appeal. (Cf. *People* v. *Pena* (1972) 25 Cal.App.3d 414, 423-424 [101 Cal.Rptr. 804].)

In view of the gravity of appellant's claim some additional observations are appropriate. First, the record belies appellant's present assertion that he might have testified but for the interview. The fact is Manson offered to testify in front of the jury two month's *after* Kanarek complained of the Manson-Bugliosi interview. We note also that neither Manson nor Kanarek ever argued to the trial court that the interviews affected Manson's disposition about testifying.

If it is true that Bugliosi's interview with Manson occurred under circumstances contrary to law, then a major ethical question arises. The deputy district attorney is no less a member of the State Bar than any other admitted lawyer. His obligation to adhere to the Rules of Professional Conduct is mandated by the Legislature. (Bus. & Prof. Code, § 6076.) We deem it necessary to mention that *any* counsel venturing to deal with an adverse party is inviting trouble.[47]

him. From this factual statement it can be concluded that defendant had been advised of his right to counsel and he had elected to be represented by counsel rather than represent himself. Thereafter defendant was entitled to the effective aid of counsel at any interrogation instigated by the law enforcement officers." (*People* v. *Isby, supra,* 267 Cal.App.2d at pp. 494-495.)

[46]The subject of the prosecution's alleged interviews came about tangentially when the court had before it an application by Manson's counsel to conduct a show cause hearing to determine if Bugliosi should be held in contempt of court because of an out-of-court incident involving a prospective and subpoenaed defense witness, Sandra Good. Nothing in that petition or supporting papers alludes to the Manson-Bugliosi interview.

[47]The California State Bar Rules of Professional Conduct, rule 7-103, provides that, "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body." (Formerly rule 12.)

The American Bar Association's Canon of Ethics, EC 7-18, provides that, "The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel. For this reason a lawyer should not

Notwithstanding the seriousness of this issue we cannot resolve it in the abstract. Mere unverified assertions are insufficient to find reversible error or to draw conclusions about questions of unprofessional conduct.

### COLLATERAL ESTOPPEL

Manson refers us to the case of *People* v. *Watson,* 2d Crim. No. 22241, a nonpublished opinion of the Court of Appeal, Second Appellate District, Division Five. He implores us to take judicial notice of that case in order to invoke the doctrine of collateral estoppel, but advises that we cannot take judicial notice because of California Rules of Court, rule 977. From that juxtaposition Manson seeks to construct a violation of his constitutional rights. Appellant's argument is specious. Rule 977 specifically exempts from its operation nonpublished opinions relevant under the doctrine of collateral estoppel.[48]

### CHALLENGE TO GRAND JURY COMPOSITION

■ Manson moved to quash the indictment on the grounds that the 1969 grand jury was improperly constituted. The motion was interposed by the filing of a notice of motion and a declaration in support thereof. It is the burden of the defendant to support that contention with evidence. Because no evidence was offered by the declaration or otherwise with respect to any issue raised by the motion to quash the indictments, the motion was properly denied. The motion must be supported by more than bald conclusions. (*People* v. *Goodspeed* (1972) 22 Cal.App.3d 690, 702 [99 Cal.Rptr. 696]; *People* v. *Cohen* (1970) 12 Cal.App.3d 298, 310 [90 Cal.Rptr. 612].)

### CHALLENGE TO GRAND JURY INDICTMENT PROCEDURE

Manson next urges that the initiation of prosecution by indictment is constitutionally infirm. The thrust of appellants argument is that *Goldsby*

communicate on the subject matter of the representation of his client with a person he knows to be represented in the matter by a lawyer, unless pursuant to law or rule of court or unless he has the consent of the lawyer for that person. If one is not represented by counsel, a lawyer representing another may have to deal directly with the unrepresented person; in such an instance, a lawyer should not undertake to give advice to the person who is attempting to represent himself, except that he may advise him to obtain a lawyer."

[48]We note the susceptibility of rule 977 to the construction that collateral estoppel only applies in civil cases. In light of *People* v. *Taylor* (1974) 12 Cal.3d 686 [117 Cal.Rptr. 70, 527 P.2d 622], we question that construction.

v. *United States* (1895) 160 U.S. 70 [40 L.Ed. 343, 16 S.Ct. 216], should not be the law. *Goldsby* has not been reversed. The Supreme Court of this state continues to acknowledge the constitutional viability of grand jury indictments. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 746 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den., 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382].)

In raising the issue of whether or not the grand jury procedure is a denial of due process or equal protection under the law, Manson directs our attention to *Johnson* v. *Superior Court* (1975) 15 Cal.3d 248, 262 [124 Cal.Rptr. 32, 539 P.2d 792]. We presume the point of that citation is to underscore the procedural differences between a grand jury indictment and the filing of a felony complaint which Justice Mosk so meticulously outlines in his concurring opinion. *Johnson* does not, however, support the contention that the institution of criminal proceedings by grand jury hearing and indictment in any way impaired the appellants' constitutional rights of due process or equal protection.

## Motion to Quash Petit Jury Venire

Appellants filed a motion to challenge the petit jury venire. By stipulation appellants and respondent placed before the court for its consideration in ruling on this motion portions of the transcript in the Los Angeles Superior Court case entitled People v. Powell and Smith. In substance, the motion argued that significant numbers of identifiable classes of the community were omitted from the jury panel. Substantially the same evidence was considered in *People* v. *Powell* (1974) 40 Cal.App.3d 107 [115 Cal.Rptr. 109], cert. den., 420 U.S. 994 [43 L.Ed.2d 677, 95 S.Ct. 1435].

The trial court correctly denied the motion challenging the petit jury venire for the same reasons stated in *People* v. *Powell,* 40 Cal.App.3d at pp. 123-142.[49]

Manson also complains that the jury venire was improperly constituted by the absence of blacks and by the excusal of prospective jurors unequivocally declaring their opposition to the death penalty. Neither complaint has merit. Manson cannot rely on the holding of *Peters* v. *Kiff*

---

[49]We are aware that in *People* v. *Powell* the challenge was to the 1968 jury venire and that in the present case the challenge is to the 1970 venire. That makes the denial of the motion all the more correct since the evidence submitted in support of the motion did not focus on the right jury venire.

(1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163] allowing an accused to complain of the absence and exclusion of an identifiable segment of the community from the jury even though he is not a member of such group; *Peters* v. *Kiff* has been held by our Supreme Court to operate prospectively only. (*People* v. *Sirhan, supra*, 7 Cal.3d 710.) Manson's trial predated *Peters* v. *Kiff*.

As to exclusion of persons opposed to the death penalty, the issue has been decided contrary to Manson's contention. (*People* v. *Rhinehart* (1973) 9 Cal.3d 139, 155 [107 Cal.Rptr. 34, 507 P.2d 642].)

### PENAL CODE SECTION 995

 Atkins testified before the grand jury on December 5, 1969. Prior to that time she was charged in another murder case for which the court had appointed Richard Caballero to represent her. By reason of that fact Atkins and Caballero maintained the relationship of attorney-client with respect to these proceedings even prior to his formal appointment herein on December 10, 1969. As a matter of fact, Caballero testified as a witness before the grand jury concerning his representation of Atkins. Atkins' testimony before the grand jury is a complete revelation of the involvement of herself and her coappellants in the Tate-La Bianca murders. By itself that testimony alone was sufficient for the indictment to issue. (*People* v. *McRae* (1947) 31 Cal.2d 184, 186-187 [187 P.2d 741].)

On March 11, 1970, Caballero was replaced as Atkins' attorney by Daye Shinn. Shinn filed a "Motion to Set Aside Indictment Under Section 995 of the Penal Code." The motion was heard by the court on April 13, 1970, and denied. It is apparent from the record that the court reviewed the entire grand jury transcript. Atkins' assignment of error to the denial of the 995 motion is not well taken.

Our review of the trial court's determination is limited by the rule that the indictment will be set aside only where there is either no evidence that a crime has been committed or no evidence to connect the defendant with the crime. Guided by the same criteria as the trial court when it reviews the grand jury proceedings, we look for that state of facts which would lead a man of ordinary caution or prudence to believe, and conscientiously entertain, a strong suspicion of the guilt of the accused (*Simmonds* v. *Superior Court* (1966) 245 Cal.App.2d 704, 710 [54 Cal.Rptr. 195]) and consider the evidence in the light most favorable

to the order, upholding it if it is supported by substantial evidence. (*People* v. *McCoy* (1974) 40 Cal.App.3d 854, 861 [115 Cal.Rptr. 559].) Having reviewed the grand jury proceedings under the above standards, we conclude that the trial court's ruling was correct. (*People* v. *Roth* (1968) 261 Cal.App.2d 430, 444 [68 Cal.Rptr. 49].)

Atkins' motion pursuant to Penal Code section 995 was supported by her declaration that her testimony before the grand jury was the product of physical intimidation and psychological pressure. The transcript of grand jury proceedings is a total denial of that assertion. There she stated under oath that her testimony was given willingly, after advice that her testimony constituted a waiver of constitutional rights.

Atkins' assertion that her testimony before the grand jury was false is irrelevant to the issue here involved. The function of the superior court in reviewing the grand jury proceedings is to not "substitute its judgment as to the weight of the evidence . . . nor judge the credibility of the witnesses." (*People* v. *Roth, supra,* 261 Cal.App.2d at p. 444; *Cox* v. *Vaught* (10th Cir. 1931) 52 F.2d 562, 563.)[50] Our review is limited to the evidence taken by the grand jury. (*People* v. *Barrett* (1969) 2 Cal.App.3d 142, 148 [82 Cal.Rptr. 424].)

## HABEAS CORPUS PETITION

Following denial of her motion to set aside the indictment, Atkins filed a "Notice of Pretrial Motion to Suppress Admission and Confession." The matter was placed off calendar on May 27, returned to the

[50]Relying on *Communist Party* v. *Control Board* (1956) 351 U.S. 115 [100 L.Ed. 1003, 76 S.Ct. 663]; *Mesarosh* v. *United States* (1956) 352 U.S. 1 [1 L.Ed.2d 1, 77 S.Ct. 1, 9]; and *McNabb* v. *United States* (1943) 318 U.S. 332 [87 L.Ed. 819, 63 S.Ct. 608], Atkins argues that the indictment can be attacked because it issued as the result of perjured testimony. The first two cases involved circumstances where it was demonstrated that nonparty witnesses had clearly perjured themselves. The *McNabb* case is totally inapplicable as it concerned confessions made as a result of undue delay in arraignment. We know of no case where a defendant who testified before a grand jury or at a preliminary hearing was permitted to recant that testimony. The most analogous case of which we are aware is *People* v. *Schmidt* (1915) 216 N.Y. 324 [110 N.E. 945]. In *Schmidt* the defendant was charged with murder and pleaded not guilty by reason of insanity. The jury rejected the contention of insanity and found the defendant guilty of first degree murder. After conviction the defendant petitioned the court, asserting that his confession of guilt was false and that he feigned insanity to protect other persons. The court responded that, ". . . A criminal may not experiment with one defense, and then when it fails him, invoke the aid of the law which he has flouted, to experiment with another defense, held in reserve for that emergency. It would be strange if any system of law were thus to invite contempt of its authority." (110 N.E. at p. 946.)

calendar on July 21, 1970, and denied. It is apparent by the colloquy between the court and Atkins' counsel that there was some substantial confusion as to what relief appellant was seeking by this last mentioned motion. Atkins was apprehensive that her testimony before the grand jury would be used against her in the course of trial.[51] Therefore, much of her procedural maneuvering was really an attempt to suppress her grand jury testimony. Because Atkins did not testify during the trial, and her grand jury testimony was not introduced, this motion deserves no further attention.

■ On July 16, 1970, Atkins filed a petition for writ of habeas corpus, unendorsed in any way by the court as required by Penal Code section 1476. Curiously, the matter was before the court on July 14, 1970. We note the absence of verification of the petition and that it could have been rejected on that basis alone. (*In re Newell* (1923) 64 Cal.App. 103 [220 P. 425]; Pen. Code, § 1474, subd. 3.) Attached to the petition is Atkins' declaration, executed under penalty of perjury. This declaration is set forth in the margin.[52]

---

[51]All references to the "trial" refer to the guilt phase unless otherwise noted in the text.

[52]"I, SUSAN ATKINS, declare and say:

"That I am one of the defendants in the Case of *People v. Manson,* et al., Los Angeles Superior Court Case No. A 253 156.

"That before testifying before the Grand Jury Hearing on December 5, 1969, I stated that I did not want to testify, but my attorney, RICHARD CABALLERO, influenced me to testify.

"That before December 5, 1969, my attorney, RICHARD CABALLERO, and a member of the District Attorney's office, VINCENT T. BUGLIOSI, discussed at MR. CABALLERO's office, the questions and answers that would be asked at the Grand Jury hearing.

"That at the time of the Grand Jury Hearing, I had no intentions of giving up my constitutional rights to remain silent, and my attorney did not explain the consequences if I testified at the hearing; and the only advice given to me by my attorney was that it was for my benefit.

"That after the Grand Jury hearing, I informed my attorney that everything I said at the Grand Jury hearing was incorrect, and that I wanted to retract my statements; but my attorney, RICHARD CABALLERO, did not take the necessary steps to do this.

"That subsequent to the Grand Jury hearing, a Times Reporter whose name I was informed and believed to be, JERRY COHEN, and a stenotype operator, was present with my attorney at Sybil Brand Institute for Women obtaining my life story for a book; and at that time I told them that my statements at the Grand Jury hearing were not true and insisted that they be retracted, but my attorney failed to do so.

"That my statements made at the Grand Jury hearing were not voluntary, nor did I knowingly and intelligently waive my rights under the Fifth Amendment to remain silent.

"I declare under penalty of perjury that the foregoing is true and correct.

"Executed on July 14, 1970, at Los Angeles California.

When viewed against the backdrop of the petition it is clear from Atkins' declaration that she was demanding a dismissal on the following grounds: (1) that Caballero failed to provide her with effective counsel by persuading her to testify against her will in order to serve a conflicting economic interest in the publication of her copyrighted by-line story; and (2) that she did not voluntarily, knowingly and intelligently waive her Fifth Amendment right to remain silent.

These contentions are based on occurrences *dehors* of the grand jury proceedings. It was consequently appropriate for Atkins to test the validity of the indictment by petition for writ of habeas corpus. (*In re Carmen* (1957) 48 Cal.2d 851, 854 [313 P.2d 817]; *In re Joiner* (1960) 180 Cal.App.2d 250-252 [4 Cal.Rptr. 667]; *In re Flodstrom* (1954) 134 Cal.App.2d 871 [277 P.2d 101], reinstated (1955) 45 Cal.2d 307 [288 P.2d 859]; and Pen. Code, § 1487, subd. 7.)

Although the trial court advised Atkins' counsel that it would not take evidence on the petition for writ of habeas corpus, the court did invite an offer of proof. Without stating its reasons, the court then summarily denied the writ. Atkins assigns error to that denial.

The fact that the petition was filed during the course of jury selection may have been sufficient to justify denial for a lack of diligence. The defects in the papers themselves may have justified the action of the court. However, having invited an argument on the petition, it appears that the court did not reject it on technical grounds but rather found it deficient as a matter of law. It is not necessary, however, to determine the correctness of the trial court's ruling. The denial of a petition for habeas corpus is not appealable. (*People* v. *Griggs* (1967) 67 Cal.2d 314, 317 [61 Cal.Rptr. 641, 431 P.2d 225]; *People* v. *Vega* (1955) 136 Cal.App.2d 202, 205 [288 P.2d 278].) Upon a denial of a petition for habeas corpus in the superior court Atkins' proper recourse would have been to renew her petition in the same court, the Court of Appeal or the Supreme Court. (24 Cal.Jur.2d, Habeas Corpus, § 107, p. 596.)

The court's denial of the petition for writ of habeas corpus truncated the entire question of the voluntariness of Atkins' grand jury testimony. Consequently, there is no fair evidentiary basis upon which we now can review that subject. Neither can we treat this appeal as a petition for habeas corpus. Atkins' claim of ineffectiveness of counsel does not

appear in the record in a form permitting our review on appeal. (*People v. Brotherton* (1966) 239 Cal.App.2d 195, 199 [48 Cal.Rptr. 513].)[53]

## USE OF PERJURED TESTIMONY

Susan Atkins testified at the grand jury proceedings but not at trial; Roni Howard and Virginia Graham did not testify before the grand jury but did testify at trial. Manson draws attention to the fact that before the grand jury Atkins stated that Watson had killed Sharon Tate. At trial Graham and Howard testified that Atkins claimed she had killed Sharon Tate.

From this conflict Manson argues, (1) that he was convicted by the knowing use of perjured testimony, and (2) that respondent suppressed Atkins' grand jury testimony. Both contentions are without merit. In the first place, the jury was admonished to consider the Graham-Howard testimony as to Atkins only. Secondly, it was Atkins' right to exercise her Fifth Amendment right to not testify. The People could not compel her to testify and were not obligated to grant her immunity to induce her to do so. (Cf. *People v. Northrup* (1962) 203 Cal.App.2d 470, 475 [21 Cal.Rptr. 448].)

Manson makes much of Bugliosi's testimony during the penalty phase to the effect that he believed Atkins did stab Tate even though he knew she would testify to the contrary before the grand jury. Bugliosi's opinion on the subject is just that. The record does not reflect that the testimony was in fact perjured. (Cf. *People v. Gordon* (1973) 10 Cal.3d 460, 473 [110 Cal.Rptr. 906, 516 P.2d 298]; *In re Mooney* (1937) 10 Cal.2d 1, 85 [73 P.2d 554].)

Manson suggests that any conflict between Atkins' grand jury testimony and the Graham-Howard trial testimony could have been resolved

[53]During the penalty phase of the trial several witnesses were called by the defense to give testimony concerning the sale of Atkins' copyrighted by-line story. In December, 1969, proximate to the grand jury proceedings, Caballero was introduced to the owner of Twenty Pimlico Publications, Inc., Lawrence Schiller, by another lawyer, Paul Caruso, with whom Caballero shared office space, overhead and courtesies. Ultimately, Caruso, Caballero, Atkins and Twenty Pimlico Publications Inc., entered into an agreement for the sale of Atkins' story of the Tate-La Bianca murders. The division of proceeds to be received through sale of the story was negotiated at 25 percent for Pimlico and the remaining 75 percent divided 60 percent to Atkins and 40 percent to Caruso and Caballero. This is the economic conflict to which Atkins points as the underlying reason for the alleged ineffectiveness of counsel. In exchange Caballero obtained a commitment from the Los Angeles District Attorney to not seek the death penalty as to Atkins and to not use her grand jury testimony against her if she decided to contest the charges.

if respondent had granted immunity to Atkins. The application for immunity is solely an administrative function (*People* v. *Pineda* (1973) 30 Cal.App.3d 860, 867 [106 Cal.Rptr. 743]) and the refusal to grant it to Atkins did not result in a denial of due process of law to any appellant. (*People* v. *Williams* (1970) 11 Cal.App.3d 1156, 1164 [90 Cal.Rptr. 409]; cf. *People* v. *Northrup, supra,* 203 Cal.App.2d 470, 475.)

## RIGHT TO COUNSEL

■ Only Manson contends on this appeal that he was erroneously denied the fundamental right to proceed pro se. However, all appellants early in the case applied to the trial court to so proceed. The ultimate decision of the lower court was that no appellant was capable of self representation. At the time counsel was appointed for each appellant, there "[was] no constitutional right to proceed pro se at trial." (*People* v. *Sharp* (1972) 7 Cal.3d 448, 451 [103 Cal.Rptr. 233, 499 P.2d 489].)

While this appeal was pending, *Sharp* was invalidated by the United States Supreme Court. (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].) However, our own Supreme Court has concluded that "the *Faretta* decision is not to be given retroactive application. . . ." (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 163 [127 Cal.Rptr. 467, 545 P.2d 843].) Consequently, *Faretta* has no application to this appeal. No other error is attributable to the fact that no appellant was permitted to proceed pro se. Manson's contention that he was prejudiced by not being permitted to represent himself is not supported by the record.

## INCARCERATION OF ATKINS' COUNSEL

■ Atkins contends that the jailing of her lawyer during the course of trial constituted reversible error. We do not agree. The record discloses that on August 4, 1970, out of the presence of the jury, the court held Attorney Daye Shinn in contempt and immediately imposed sentence.[54] In accordance with the court's instructions, Shinn was returned to the courtroom each day of his incarceration. During this time

[54]The court stated: ". . . I sentence you to spend three nights in the County Jail, commencing as soon as this Court adjourns each day, starting today, and continuing until 7:00 a.m. each morning, on the following conditions: [¶] You are to have full attorney privileges and you are to have access to confer with your client either before you are taken from this courtroom in the afternoon or early evening, or in the morning before you are returned to this courtroom, or after you return to the courtroom, at your option."

Shinn represented that he was fatigued and not prepared to proceed. On these grounds he applied for "short" continuances. They were denied.[55]

Citing *People* v. *Fusaro* (1971) 18 Cal.App.3d 877 [96 Cal.Rptr. .368], cert. den., 407 U.S. 912 [32 L.Ed.2d 686, 92 S.Ct. 2445], in support of her contention, Atkins argues that in the absence of ". . . overwhelming circumstances, the court-imposed delay caused by jailing the defense lawyer in midtrial is inherently wrong, damaging to the defendant's right to a speedy trial and antithetical to the public interest in speedy, economical justice." (*Id.,* at p. 890.) Here, however, the court's order was fashioned to avoid delay and to afford Shinn access to his client. No trial time was lost. Atkins fails to direct our attention to anything revealing an adverse affect on her lawyer's advocacy. It is incumbent on Atkins to show that the commitment to jail produced some form of ineffectiveness of counsel. (*People* v. *Simms* (1970) 10 Cal.App.3d 299, 313 [89 Cal.Rptr. 1].) Having failed to meet this obligation, her contention of reversible error fails. (See *United States* v. *Schrimsher* (5 Cir. 1974) 493 F.2d 848, 854.)

## FREE PRESS/FAIR TRIAL

The undeniably extensive news media[56] coverage received by this case gives rise to appellants' claim that publicity denied them a fair and impartial trial.

When the crimes were discovered in August of 1969 they were greatly publicized. The media's revelations focused primarily on the savageness of the killings, the absence of clues revealing the identity of the perpetrators, and certain details about the private lives and relationships of the victims. Particular emphasis was given to the Tate murder because one of the victims was a movie actress.

In early December 1969 appellants were identified as the primary suspects. Expanded and accelerated media coverage ensued. The most cursory examination of the record demonstrates that beginning on

[55]The contempt citation resulted after Shinn was found responsible for placing a newspaper on the counsel table. It was used by Manson to display to the jury the "MANSON GUILTY, NIXON DECLARES" banner of the August 4, 1970, edition of a Los Angeles newspaper. Previously the court had ordered counsel to remove all such items from the counsel table.

[56]By "news media" we include radio, television, newspapers, and other forms of written publications prepared for circulation in the community and directed to the populace at large.

December 1, 1969, massive publicity tracked the progress of the case through the courts. No one denies that this case attained state, national and international notoriety. We must therefore address what is becoming an all-too-common constitutional conundrum: Has a defendant in a criminal case received a fair trial when extensive publicity is generated in the public media?

The publicity attending this case was anticipated.[57] Details of the Tate-La Bianca murders were laid before the public colorfully embroidered with the backgrounds, histories, and aberrant lifestyles of appellants and other members of the Family. This expose treatment is found in the banners, headlines, and captions of newspapers published throughout the state. These same events and subjects were transmitted into the public domain by radio and television broadcasts.[58]

The earliest exposition identifying appellants with the Tate-La Bianca murders was published on December 14, 1969, in the Los Angeles Times.[59] This article, a detailed confession substantially conforming to Atkins testimony before the grand jury, was ultimately published in book form.[60]

### MISCELLANEOUS PRETRIAL MOTIONS

The public exposure produced several motions for change of venue and mistrial.[61] On February 16, Manson, appearing in propria persona,

[57]When appellants Atkins, Krenwinkel, and Van Houten were before the superior court on December 10, 1969, for arraignment and plea, the court, on its own motion, issued an order restricting publicity. The preamble reads as follows: "It is apparent, and this Court is going to take judicial notice of the fact, that this case has received extensive news media coverage as a direct result of its apparent public interest; further, it is equally apparent to this Court by reading various newspapers and weekly periodicals that this news media coverage is not limited to the County of Los Angeles, but has been extensive not only in the entire State of California but in the Nation as well, and of this fact the Court now takes judicial notice."

[58]Our review included news scripts of seven television stations and four radio stations covering the period between August 11, 1969, and March 22, 1970.

[59]The publication was preceded by the following introduction: "EXCLUSIVE DETAILS, SUSAN ATKINS' STORY OF 2 NIGHTS OF MURDER. The following article appears also today in European newspapers and magazines. Its authenticity has been established. It results from an interview conducted before a judicial order was issued restraining those taking any part in the Tate murder case from making disclosures regarding it. The article carries the following copyright: Copyright 1969 by Susan Atkins and Lawrence Schiller."

[60]The Killing of Sharon Tate by Lawrence Schiller.

[61]Because of the complexity of the issues relating to publicity we will first address appellants' preliminary motions. Background information provided in this part of the

applied for relief. Urging that the publicity was so devastating he could not be fairly tried anywhere in California, he argued for either a dismissal or an "interlocutory" dismissal "until such time, if any, as a fair trial becomes possible." The court inquired as to whether Manson was petitioning for a continuance only. Manson replied: "The only way a continuance would help me would be if it was over a period of two or three years. A continuance for six months would serve no purpose at all, and further a continuance that long would't [sic] be in the best interests of the other defendants that are involved in this, and mine also." Manson's refusal to waive his right to a speedy trial eliminated continuance as an available solution. Alternatively, a motion for change of venue was tendered, with Manson stating to the court that he regarded such relief as "very trivial." We view Manson's assessment as candid and the court's denial as correct.

At this stage of the proceedings the district attorney's exhibits included the December 19, 1969, edition of Life Magazine,[62] copies of Sacramento and San Francisco press coverage, including a Sunday supplement magazine for the Sacramento Bee,[63] and an indexed compilation of newspaper coverage for all but 13 of the counties in the State of California.[64]

opinion is intended to facilitate our later discussion of the primary issue raised in this portion of the appeal—whether the publicity denied appellants a fair trial.

[62]This edition featured a complete expose of the crimes and the persons involved. On the cover appears a full face photograph of Charles Manson, bannered as follows: "THE LOVE AND TERROR CULT—THE MAN WHO WAS THEIR LEADER—THE CHARGE OF MULTIPLE MURDER—THE DARK EDGE OF HIPPIE LIFE." Inside is a full spread photograph of Susan Atkins and Charles Manson under which in bold letters is set forth the following: "THE WRECK OF A MONSTROUS 'FAMILY'."

[63]The collection of newspaper clippings includes straight reporting and editorial comments appearing in the San Francisco Examiner, Chronicle and Nichi Bei Times from December 6 through January 12, 1970, and the Sacramento Union and the Sacramento Bee from December 17, 1969, through January 8, 1970. This Sunday supplement, included in the January 11, 1970, edition of the Sacramento Bee, carried a feature article about the crimes with emphasis on the accused. It is entitled: "THE 'MANSON FAMILY' MURDERS, by Lloyd Shearer."

[64]The compilation is segregated into manila folders by county. It also includes a schedule entitled "Publicity Re: Manson Trial in Northern California Newspapers" consisting of nine pages, the last page being entitled "NEWSPAPER CIRCULATION." The last page of that schedule sets forth circulation for the Los Angeles Times, Los Angeles Herald Examiner, San Francisco Chronicle, and San Francisco Examiner. The 13 counties and their population for which there is no newspaper copy in this exhibit are Alpine—397, Amador—9,900, Calaveras—10,289, del Norte—17,771, Lake—13,786, Lassen—13,597, Modoc—8,308, Plumas—11,620, San Benito—15,396, Sierra—2,247, Sutter—33,380, Tuolumne—14,404, Trinity—9,706. We take judicial notice that these 13 counties are rural and of the smallest populations in the State.

On March 24, 1970, Krenwinkel and Manson moved for a change of venue (Pen. Code, § 1033). The evidence considered at that time included the exhibits heretofore mentioned and additional exhibits incorporated by reference to People v. Robert Kenneth Beausoleil, Los Angeles Superior Court case No. A-057452. By stipulation the number of viewers, listeners and readers of some of the identified media was established.[65]

The book, The Killing of Sharon Tate, was focused upon by submission of a declaration of Public Defender Investigator Robert Long disclosing that the paperback had been circulated widely in Southern California, and, presumably, throughout the state.[66] As additional exhibits respondent supplied the court with communications from radio and television stations outside of Los Angeles County showing that airwaves throughout California were carrying further transmissions of information concerning this case.

The journalistic energy spawned by this case goes beyond the material we have mentioned.[67] It is patently clear that the crimes charged, as well

Obviously metropolitan newspapers were distributed in these counties, too. Populations are as of 1970.

[65]Certainly the number of viewers, listeners and readers of television and radio stations and newspapers identified in the introduced exhibits is relevant. Unfortunately, the stipulation does not indicate the full pervasiveness of these publications. For example, the stipulation that KNXT—Channel 2, CBS, has 18 hours of news weekly, and 1,018,000 viewers for the early news and 413,000 viewers for the evening news in no way informs the trial court or us of the area referred to. The same is true with respect to the circulation numbers for newspapers. The stipulation that the Los Angeles Times has a daily circulation of 975,491, and a Sunday circulation of 1,308,711 is not a determination that this circulation is limited to Los Angeles County. This observation holds true with respect to almost all of the stipulations concerning each member of the media identified. Obviously, transmission of television and radio waves are not truncated at political boundaries, and counties besides Los Angeles are markets not ignored by the Times-Mirror Corporation.

[66]Long's declaration advises that he telephoned the publisher, The New American Library Inc., in New York. He ascertained that the company was a fully owned subsidiary of the Times Mirror Corporation of Los Angeles, California. He could not elicit the total number of copies printed, published, or distributed. He did ascertain that 8,725 copies of the paperback had been distributed in Orange County and parts of Los Angeles County. Moreover, his declaration advises that another 5,000 copies have been received and distributed by an entity designated as "Inner City Magazines, a firm specializing in the distribution of periodicals and magazines." Inner City Magazines had distributed all 5,000, but there is no indication as to where they were disseminated.

[67]At the March 24, 1970, hearing on Manson and Krenwinkel's motion for change of venue, a catalogue prepared by counsel for Linda Kasabian in support of her withdrawn motion for change of venue was admitted. It consists of 183 exhibits that are either originals or copies of newspaper or magazine articles dating from August 9, 1969, through

as the identity and the involvement of appellants, permeated every corner of this state with varying degrees of intensity. The ubiquity of media coverage made any such differential one of insignificant degree. A change of venue offered no solution to the publicity problem. Even if venue had been changed, nothing could have prevented the public media from swinging its attention to that place. The magnetic pull of such notorious cases is compelling.[68]

The same conclusion is required with respect to any suggestion of a reasonable delay.[69] "[The] nature of modern communications media limits the effectiveness of both continuances and change of venue" (*Gagging the Press in Criminal Trials* (1975) 10 Harv.Civ. Rights—Civ. Lib.L.Rev. 608, 617-618). Our independent review of the evidence before the court on March 24, 1970, reveals that neither change of venue nor a continuance offered a practical solution to the problem. The denial of the Manson-Krenwinkel motion was correct.

On June 5, 1970, Van Houten filed a motion for change of venue (Pen. Code, § 1033). With leave of court Atkins and Manson joined in that motion. After stipulation that all evidence submitted in support of the earlier Manson and Kasabian motion for change of venue be admitted with this motion and after due consideration by the court, the motion was properly denied.

### MOTION FOR MISTRIAL

 Provoked by the fact that Deputy District Attorney Aaron Stovitz, one of the prosecutors in this case, had given an "off-the-record"

January 21, 1970. It includes feature articles covering the crime and appellants in the December 12, 1969, and January 19, 1970, editions of Time Magazine. Appellants also submitted a copy of a Los Angeles Magazine for February 1970, containing a feature article entitled "COULD YOUR DAUGHTER KILL"; again, reference is made to the events of this case. By March 8, 1970, the entertainment section of the Los Angeles Times contained an advertisement about a motion picture that is an unmistakable exploitation of the Tate-La Bianca murders, and the Manson Family.

[68]"Change of venue leaves open the obvious possibility that publicity will also be engendered in the area to which the trial has been transferred. [Citation.] Also, change of venue is useless if the publicity has been nationwide, or, in a court of limited jurisdiction, if the publicity has been spread through the entire jurisdiction." (*Prejudicial Publicity in Trials of Public Officials* (1975) 85 Yale L.J., 123, fn. 2.)

[69]Krenwinkel's attorney aptly remarked that: "Even if you put this case over five years I doubt if the publicity would really abate. Perhaps . . . the publicity would substantially abate in two or three years, but once there was an announcement that the trial was about to take place, I think the publicity would be on again in full force and swing, and I seriously doubt that it would ever substantially abate to the degree that the defendants could be afforded a fair trial."

interview in March of 1970, all appellants filed a motion for mistrial just prior to the impanelling of the jury. The interview was tape recorded and Stovitz admitted his participation. Testifying that he extracted a promise from the reporters to not use his name, not quote him and not use any information he provided, Stovitz asserted that the most he did was to refer the reporters to previously published newspaper articles containing the material they were seeking. Stovitz was cognizant of the court's order of December 10, 1969, concerning publicity. The product of this interview was a feature article appearing in Rolling Stone, June 25, 1970 (No. 61).

On this appeal respondent repeats the explanation made by the prosecution at trial to excuse Stovitz' conduct. In essence, the argument attempts to shift responsibility from the district attorney's office to the publishers of Rolling Stone. This maneuver is predicated on the assertion that Stovitz had a right to believe his comments were confidential and constituted no more than a private conversation.[70]

However sincere Mr. Stovitz may have been, his conduct was in direct violation of the court's publicity order. Examination of the Rolling Stone article does not indicate that Stovitz' contribution to the total stream of public information was significant. A perusal of the Rolling Stone feature reveals only one small part attributable to Stovitz. That part contains no remarkably unique revelations.

The apparent source for most of the Rolling Stone expose was the interviews granted by many members of the Family and others having some past relationship with them. By this observation we in no way minimize the prosecutor's misconduct, but only stress the abundance of information funneled to the media through sources other than the district attorney's office. It is apparent that Stovitz' contribution was only a droplet in the sea of publicity.

Information appearing in Rolling Stone is not particularly different in substance from that found in a December 19, 1969, edition of Life Magazine or in the paperback book, The Killing of Sharon Tate. More important, no member of the jury was familiar with the particular edition of Rolling Stone. In fact, only one veniremen could identify

[70]To underscore Stovitz' sincerity respondent points to a portion of the admitted conversation wherein Stovitz stated to the reporters, "I will rap with you on the level. Our case is not that strong. There are no fingerprints, no one saw them. All we are depending on is the testimony of Susan Atkins up to now. If she doesn't testify, which she says now she isn't going to, then Linda Kasabian corroborates that."

Rolling Stone as a publication. We conclude that Stovitz' violation of the publicity order was inconsequential and did not contribute to the verdict obtained. While its propriety may be questionable, in the context of the matter before us it was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People v. Modesto* (1967) 66 Cal.2d 695, 712 [59 Cal.Rptr. 124, 427 P.2d 788], cert. den., 389 U.S. 1009 [19 L.Ed.2d 608, 88 S.Ct. 574].)

When the motion to dismiss was argued on June 29, 1970, much more than the Stovitz/Rolling Stone interview was addressed. Appellants' counsel expressed consternation about public comments by then District Attorney Evelle Younger, and his deputies, with respect to their novel procedural application to remove Irving Kanarek as Manson's counsel. Objecting to the district attorney's public declarations about the publicity order and the proceedings conducted outside of the presence of the public, appellants described the district attorney's attempt to remove Kanarek as a subtle and invidious device to further pyramid the notoriety of the case. We are not convinced.

The district attorney has a legitimate interest in protecting any conviction he obtains. Consequently, apprehension about Kanarek's methodology is not necessarily ingenuous. Although it may be unique, it is not irrational for the prosecutor to request a preappeal resolution of the conflict between a defendant's right to counsel of his choosing and his right to effective assistance of counsel. (Compare *Smith v. Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65], and *People v. Ibarra* (1963) 60 Cal.2d 460 [34 Cal.Rptr. 863, 386 P.2d 487].) We find nothing improper or prejudicial in this procedure.

The district attorney's numerous press conferences criticizing the court's publicity orders and chastizing Manson's counsel were not within the ambit of the "Order re Publicity" or the "Order Augmenting Order re Publicity."[71] No evidence was produced that the district

[71]The Los Angeles Herald Examiner of June 30, 1970, carried the banner headline, "DA SEEKS TO OUST MANSON'S LAWYER." The Los Angeles Times, July 5, 1970, contained an article under the headline "PLAN TO LOCKUP TATE JURORS HIT," purporting to quote District Attorney Younger as follows: "The process deprives you of an awful lot of good jurors who because of family or personal or business obligations . . . cannot go to jail."

attorney made any statements concerning the guilt or innocence of the appellants, or any reference to the evidence that would be offered against them. Likewise there was no showing that his public statements in any way disclosed any evidence adduced during the course of any proceeding conducted out of the presence of the jury.[72]

While neither approving nor disapproving the district attorney's approach to the potentially difficult problems accruing by reason of the incessant publicity, we do not believe his actions reached prosecutorial misconduct dimensions.[73]

## VOIR DIRE PROCEEDINGS

During the course of voir dire proceedings the court was advised that appellants intended to challenge, for cause, every prospective juror. Specifically, appellants threatened to invoke that provision of Penal Code section 1073 permitting a challenge for ". . . the existence of a state

---

[72]With this record we have received and reviewed Exhibit ARB-1, a 498-page compilation of news releases and reports identified as follows: "LOS ANGELES COUNTY DISTRICT ATTORNEY WEEKLY NEWS—SUMMARY RELEASES TO PRESS, RADIO AND TELEVISION FROM DECEMBER 18, 1969 TO DECEMBER 17, 1970 PERTAINING TO TATE-LA BIANCA CASES." Appellants urge that this is the ultimate demonstration that the prosecutor's office was in league with the news media and, in fact, engendered the enormous publicity this case received. Our review of the exhibit reveals it to be nothing more nor less than copies of public and court proceedings and reproductions of news releases previously appearing in a variety of publications. This document does not come within the operation of the restraining orders issued by the court. Though large, it is relatively sterile. It is wholly unreasonable to believe the prosecutor's office would not be contacted for public comment concerning a sensational case. Excluding the reprints of stories previously carried in the media we view this material as a device employed by the district attorney to meet that demand within permissible limits. Our examination of other evidence demonstrates that journalistic endeavors in this case were not dependent upon the cooperation of the district attorney's office. As pointed out elsewhere, there were innumerable sources to assist the news media in feeding public curiosity.

[73]An ancillary contention is that Attorney General Younger should be disqualified as counsel for respondent on this appeal. The appellants' rationale pivots on the fact that Younger was District Attorney for Los Angeles County when this matter was tried and the assertion that he and his subordinates generated prejudicial publicity. Appellant urges that we find merit in the argument by drawing parallels with the "Watergate" affair. The analogy fails because District Attorney Younger was not implicated in any underlying substantive criminal charge. Moreover, there is no authority for this court to appoint any "special counsel" for the People as appellant suggests. (*People* v. *Municipal Court* (1972) 27 Cal.App.3d 193, 208 [103 Cal.Rptr. 645, 66 A.L.R.3d 717].)

of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, which is known in this Code as actual bias."

Krenwinkel's attorney informed the court that he "plan[ned] to challenge every juror as indicated. They have been exposed to publicity." At the core of Krenwinkel's contention is the assumption that, as a matter of law, a jury in a criminal case cannot be impartial if there is adverse accusatory publicity directed at the individuals charged with the offense. When the publicity is generated in part by the prosecuting officials, appellants continue, the harm is exacerbated.

### Constitutional Issues

At this point in our discussion we deem it necessary to examine case law developments concerning a defendant's right to a fair trial (U.S. Const., Amend. VI) as it is affected by the concomitant right of the public to a press free from unnecessary restrictions (U.S. Const., Amend. I).

For at least two decades the judiciary has grappled with this puzzle. In 1959 the United States Supreme Court took a major step to halt trial by newspaper, reversing a federal district court conviction because the jury had been exposed to newspaper accounts revealing the defendant's previous felony convictions. (*Marshall* v. *United States* (1959) 360 U.S. 310 [3 L.Ed.2d 1250, 79 S.Ct. 1171].)

Thereafter, in *Irvin* v. *Dowd* (1961) 366 U.S. 717 [6 L.Ed.2d 751, 81 S.Ct. 1639],[74] the Supreme Court engaged in a searching examination of voir dire, uncovering facts translating into an arithmetic equation indicating gross probabilities adverse to the accused. In the case then before it the Supreme Court found that 90 percent of the veniremen

---

[74]In *Irvin* the court reversed an Indiana state court conviction.

entertained some opinion that the defendant was guilty. The court further found that eight of the twelve actual jurors harbored the view that the accused was guilty even before any evidence was introduced.[75] Although the *Irvin* court emphasized the fact that 90 percent of the jury panel questioned revealed a bias, that court did not fix any percentage as universally determinative of a high probability of prejudice. Cases following *Irvin* have not rigidly adhered to a 90 percent factor. On the contrary, considerable latitude is apparent.[76]

Beginning in 1963, the United States Supreme Court made a sharp departure in its approach to cases involving the conflict between fair trial and free press. In *Rideau* v. *Louisiana* (1963) 373 U.S. 723 [10 L.Ed.2d 663, 83 S.Ct. 1417], the court, confronted with particularly egregious exploitation of a criminal prosecution fostered in a totally improper way by public officials, applied a doctrine of presumed prejudice.[77] The *Rideau* court avoided a particularized inspection of the voir dire, looking instead to the due process requirement of "trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.' 'Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall

---

[75]Irvin had exhausted his peremptory challenges and the court disallowed any challenges for cause as to those eight jurors.

[76]*Geagan* v. *Gavin* (1st Cir. 1961) 292 F.2d 244 involved the prosecution of a nationally notorious case that came to be known as "The Brinks Robbery." The crime occurred on January 17, 1950, and resulted in a theft of $1,219,000. The robbers were armed, dressed alike, and wore rubber halloween masks. They succeeded in evading police traps and roadblocks and made good their escape. It was not until 1956 that the robbers were indicted. The entire event was extensively covered in the news media. After their conviction, the "Brinks Robbers" petitioned the United States Court of Appeal, First Circuit, for a writ of habeas corpus on the ground that publicity had so permeated Suffolk County, Massachusetts, that they were denied the opportunity to select a fair and impartial jury. Following the methodology dictated by *Irvin* v. *Dowd, supra,* the court made a searching inspection of the voir dire and found that ". . . almost 28% of the prospective jurors called in the case at bar professed to have formed no opinion at all as to the guilt or innocence of the accused." The *Geagan* court, in actuality, found a 72 percent factor of bias acceptable. (P. 247.)

[77]Convicted of armed bank robbery, kidnaping, and murder; the defendant was sentenced to death on the murder charge. Prior to trial, on the day following his arrest, and in the absence of any counsel, defendant was "interviewed" by the sheriff. Defendant confessed to the charges against him. This "interview," memorialized in a 20-minute moving picture film with a sound track, was broadcast over a television station in the community where the trial took place. The above described events having been conceded, the court noted that ". . . circumstances [showed] that the plan was carried out with the active cooperation and participation of the local law enforcement officers." (373 U.S. at p. 725 [10 L.Ed.2d at p. 665].)

send any accused to his death.' " (373 U.S. at p. 727 [10 L.Ed.2d at p. 666].)[78]

Prejudice was similarly presumed in *Estes* v. *Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628].[79] *Sheppard* v. *Maxwell* (1966) 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507], brought the presumed prejudice doctrine to its zenith. Though generally regarded as the hallmark case on the "free press/fair trial" issue, the *Sheppard* Court did not rest its reversal on the matter of publicity alone but rather characterized the trial proceedings as a "carnival atmosphere." (384 U.S. at p. 358 [16 L.Ed.2d at p. 618].)[80]

Concerned with media coverage of criminal proceedings, *Sheppard* suggested specified procedures to insulate criminal trials from the influence of external forces in general, and pretrial publicity in particular. These included the adoption of strict rules governing the use of the courtroom by newsmen (384 U.S. p. 358 [16 L.Ed.2d pp. 617-618]); insulation of witnesses through the issuance of silence orders; prohibiting "the release of leads, information, and gossip to the press by police officers, witnesses and the counsel for both sides" (384 U.S. p. 359 [16 L.Ed.2d p. 618]); continuances until threat of prejudicial publicity abates; change of venue; sequestration of the jury; and the ordering of a new trial (384 U.S. p. 363 [16 L.Ed.2d pp. 620-621]). Nearly all of these

---

[78]The dissent in *Rideau* underscored the majority's departure from the systematic approach of *Irvin* v. *Dowd* and its progeny. Other cases following *Rideau* reinforced its presumed prejudice doctrine. In *Turner* v. *Louisiana* (1965) 379 U.S. 466 [13 L.Ed.2d 424, 85 S.Ct. 546] prejudice was presumed from the fact that two deputy sheriffs given charge of the jury during its deliberation had been witnesses for the prosecution. The defendant's conviction was reversed.

[79]In *Estes* certain pretrial proceedings and portions of the actual trial were televised. This intrusion satisfied the court that the probability of prejudice was sufficiently great to deem the trial inherently lacking in due process. The court emphasized the disruption caused by the presence of photographers and television cameramen at the trial and pretrial proceedings, in substance finding that this intrusion turned the judge, the accused, the witnesses, and the jury into self-conscious actors. The total effect substantially detracted from the solemnity of the proceedings.

[80]The facts of *Sheppard* demonstrate a horrendous example of pretrial publicity actually instigating prosecution, coupled with a total loss of courtroom control allowing public outrage to permeate the trial itself. The court's reliance on these two factors is revealed in the following statement: "While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which the trial was held. In light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that 'judicial serenity and calm to which [he] was entitled.' (*Estes* v. *Texas, supra*, at 536.)" (384 U.S. at pp. 354-355 [16 L.Ed.2d at p. 616].)

have become established methods for coping with a seemingly intractable problem.

The California experience with the conflict between media coverage and criminal trials parallels the federal experience. The California Supreme Court has embraced the holding of *Sheppard* and taken its cue from the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (1966).

In *Maine* v. *Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372], the court granted a petition for a writ of mandate after the trial court refused a change of venue even though the application asserted that a fair trial could not be obtained because of prejudicial publicity. ▮ The court delineated the standard to be applied: " 'A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved. A showing of actual prejudice shall not be required.' " (68 Cal.2d at p. 383.)

Although the issue is here raised on appeal after conviction rather than by extraordinary writ, the standard of review is the same as that established in *Maine*. (*People* v. *Tidwell* (1970) 3 Cal.3d 62, 68 [89 Cal.Rptr. 44, 473 P.2d 748]; *People* v. *Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *Hathcock* (1973) 8 Cal.3d 599, 618-620 [105 Cal.Rptr. 540, 504 P.2d 476].)

Looking at the facts before us against the backdrop of the above discussed cases, we first seek to define a "fair and impartial" trial. Mr. Justice Holmes has said that "the theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." (*Patterson* v. *Colorado* (1907) 205 U.S. 454, 462 [51 L.Ed. 879, 881, 27 S.Ct. 556].) The *Irvin* court looked to the words of Lord Coke and equated impartiality to "indifference." (366 U.S. at p. 722 [6 L.Ed.2d at p. 755].) We do not interpret a requirement

of "indifference" as demanding that qualified jurors be totally ignorant of the facts and issues involved.[81]

We do not suggest that courts may retreat from their obligation to provide the accused with due process. ▄▄ We do believe that "[g]iven the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors [that] trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances." (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 730 [102 Cal.Rptr. 385, 497 P.2d 1121], cert. den., 410 U.S. 947 [35 L.Ed.2d 613, 93 S.Ct. 1382].)

In making that "independent evaluation" we must elect between the two traditional methods used to discharge our duty. The United States Supreme Court has recently articulated a two part test for deciding which method is applicable to a given case. (*Murphy* v. *Florida* (1975) 421 U.S. 794, 799 [44 L.Ed.2d 589, 594, 95 S.Ct. 2031].)

▄▄ The first part of the *Murphy* test may be stated as follows: where there is an apparent and flagrant departure from fundamental due process and decorum and an intrusion of external influences, prejudice will be presumed. The classic cases falling into this category are *Rideau, Turner, Estes* and *Sheppard.*

Unlike *Rideau,* the case at bench does not involve repeated exposure to television broadcasts of a film in which the defendant confessed to the crimes of which he was later charged. (*People* v. *Sirhan,* 7 Cal.3d at p. 733.) Here the trial judge specifically excluded any prospective juror who had read the confession of Susan Atkins. There is no evidence that any juror had any knowledge that any appellant had confessed. Moreover, unlike *Rideau,* there is absent the deplorable circumstance of law

---

[81]"Certainly an impartial juror is an indifferent juror. Indifference has a unique meaning: no one has ever suggested that an indifferent juror must be totally apathetic. Indeed, indifference imparts a juryman who has no personal interest in the outcome of a trial. In short, indifference conjures up an impression of neutrality, not ennui. Symptomatic of the vague language associated with efforts to isolate impartiality in terms of indifference is the formula suggested in *United States* v. *Wood.* 'Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular test and the procedure is not chained to any ancient and artificial formula.' [¶] From this description it is apparent that the definition of impartiality is not a static concept, but can only be defined in relation to specific facts and circumstances." (*Conflict Between Free Press and Fair Trial* (1966) 51 Cornell L.Q. 306, 307.)

enforcement extracting a filmed confession and releasing it to the media prior to trial. Neither is *Turner* analogous to the present case; no witness on the merits of this trial participated in the maintenance of the jury during its sequestration.

Both *Estes* and *Sheppard* are distinguishable on several grounds. In neither of those cases were the jurors sequestered as they were here. As in *Estes* and *Sheppard,* there was substantial representation by the press. Unlike *Estes* and *Sheppard,* however, here the media was not out of control in the courtroom. The trial judge strictly regulated the activity of news representatives and others by issuing and enforcing a security order that, among other things, precluded photography and news interviews in the courtroom. Through the guilt phase in its entirety the jury was sequestered in accordance with the court's order for jury maintenance. The court ordered radios, televisions and telephones removed from the jurors hotel rooms, and their newspapers and magazines censored of all material concerning the trial.

Although the publicity surrounding this case was massive, it did not detract from "the solemnity and sobriety to which a defendant is entitled." (*Murphy* v. *Florida, supra,* 421 U.S. at p. 799 [44 L.Ed.2d at p. 594].) *Rideau, Estes* and *Sheppard* ". . . cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." (*Id.,* at p. 799 [44 L.Ed.2d at p. 594].)

Because of the distinctions noted we find the present case outside the ambit of those cases where prejudice is presumed. The pretrial and trial proceedings were conducted with restraint and dignity. The only digressions from this atmosphere were produced by the conduct of appellants.[82]

■ The second part of the *Murphy* test, referred to as a "totality of the circumstances" standard (Goldsmith, *Due Process Denial Not*

[82]Specifically, on August 4, 1970, Manson obtained a copy of a Los Angeles newspaper carrying the banner headline "Nixon Says Manson Guilty." In the presence of the jury, prior to the intervention of the court, Manson exhibited this document to the jury. On August 5, 1970, his coappellants chanted "Why don't you convict us the president says we're guilty." To some degree this act belies the sincerity of appellants contentions of concern about publicity. The record is replete with other events revealing appellants' exhibitionist tendencies. To mitigate the effect of these acts the court voir dired each juror as to what had been seen and the effect of it on the jurors. This examination revealed that the jurors were capable of proceeding without violating their oath and obligations.

*Presumed When Knowledge of Past Misdeeds Is Possessed by the Jury: "Totality of Circumstances" Test Will Be Used to Determine Fairness of Trial* (1975) 13 Am.Crim.L.Rev. 285) is derived from *Irvin* v. *Dowd, supra,* 366 U.S. 717 and requires (1) an examination of the voir dire in search of juror hostility; (2) consideration of the general atmosphere of the community or courtroom at the time of trial; and (3) consideration of the length to which the trial court must go to select apparently impartial jurors. (*Murphy, supra,* 421 U.S. at pp. 800, 802-803 [44 L.Ed.2d at pp. 595-596].)

Inferences of possible prejudice may be refuted by information found in the record of the voir dire and trial. (*People* v. *Barger* (1974) 40 Cal.App.3d 662, 671 [115 Cal.Rptr. 298]; *People* v. *Quinlan* (1970) 8 Cal.App.3d 1063 [88 Cal.Rptr. 125]; *People* v. *Salas* (1972) 7 Cal.3d 812 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832].) Here, close inspection of the voir dire and jury selection procedure demonstrates a general familiarity with the case. Jurors, unlike recluses or hermits, do not live in isolation and cannot be expected to be ignorant of news involving matters of general community concern. It would be absurd to establish enormous publicity in sensational cases as a singular standard for invoking a presumption of prejudice.

Before 12 jurors were accepted, 142 prospective jurors were examined. Of the 142, appellants challenged 36 for cause and respondent challenged 11. Six peremptories were exercised by the appellants and 18 by respondent.[83] Fifty-nine of the 142 were excused by stipulation.[84]

Our independent examination of the voir dire record discloses that only 17 of the first 142 prospective jurors—12 percent—stated an inclination to believe in the guilt of appellants. If the 59 members of the panel excused by stipulation are subtracted from 142, the percentage of veniremen expressing a belief in the appellants' guilt is increased to 20 percent. In the selection of 6 alternate jurors, 74 veniremen were examined. Of this number 17—22.9 percent—declared a bias against appellants. Looking to the panel in its entirety, including veniremen examined as prospective alternates, 16 percent indicated an opinion that appellants were guilty.[85]

[83]Only Van Houten exercised all five individual peremptories. Kasabian exercised one peremptory. Neither Manson nor Atkins exercised any peremptory.

[84]The stipulations were the product of claims of hardship due to the lengthy estimation of trial at three to five months.

[85]Compare: 90 percent in *Irvin* v. *Dowd, supra,* 366 U.S. 717.

Our review of the voir dire fails to indicate any appreciable hostility. As noted above, less than one fourth of the potential jurors admitted to any disqualifying prejudices, an especially impressive reaction in view of the fact they were informed in advance that the trial would be lengthy and that they would be sequestered. The jury consumed 11 days in their deliberations of appellants' guilt. Although Manson argues that the lengthy deliberation indicates the presence of prejudice, we believe precisely the contrary. A jury sequestered from June 15, 1970, to January 15, 1971—seven months—would not be expected to protract deliberation if it harbored a bias for conviction.

In addition to the publicity order issued on December 10, 1969, other steps were taken by the court to blunt the effect of external influences. At the outset of voir dire the court conducted part of the questioning of each prospective juror in chambers. Counsel were informed by the court that any prospective juror indicating familiarity with Atkins' published confession would be excused. Voir dire continued in chambers until June 30, 1970, at which time the prosecution objected to the conduct of any proceedings outside the presence of the public unless the transcript of such proceedings was released for public dissemination.[86] The court expressed its disposition to continue with part of the voir dire in chambers if appellants personally consented. Appellants refused to so consent. Voir dire was then removed to open court and conducted before the entire panel until July 7, 1970, when the court resumed its initial procedure.

During voir dire the court allowed in-depth interrogation with respect to publicity. For example, after being apprised of the press conferences called by the district attorney, the court permitted individual inquiry on that subject by each appellants' counsel. To counter the possible influence of the district attorney's press conferences, the court specifically admonished the prospective jurors to avoid all publicity.[87]

---

[86]The court had previously ordered that the clerk's minute orders not be released until conclusion of trial.

[87]With respect to the specific subject of the district attorney's statements concerning Mr. Kanarek, the court told the panel: "Mr. Kanarek is to be considered like any other attorney. He is like any other attorney in this case. The act of the District Attorney in calling a press conference yesterday while this jury was being selected was an irresponsible act. But I admonish you that you are not to consider that or any statement coming out of that conference as having any bearing whatever on any of the issues in this case." The voir dire examination concerning the district attorney's public statements

We further note general acknowledgment that adversities of publicity are considerably offset if trial is conducted in a populous metropolitan area. (*People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 304 [107 Cal.Rptr. 289, 508 P.2d 289]; *People* v. *Barger* (1974) 40 Cal.App.3d 662, 670 [115 Cal.Rptr. 298]; *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872, 883 [101 Cal.Rptr. 411].)[88] Los Angeles County, with a population of 6,993,371 in 1970, was four times more populous than the second largest county in the state. A more metropolitan or heterogeneous area could not be found.[89]

As noted in *Lansdown* v. *Superior Court* (1970) 10 Cal.App.3d 604, 609 [89 Cal.Rptr. 154], "Population, qua population, is not alone determinative; it is but one factor and it must be shown how size, whether of area or of population, neutralizes or dilutes the impact of adverse publicity." If the population is large but predominantly rural, it is not unlike the small counties discussed in *Maine* v. *Superior Court, supra,* (Mendocino County) and *Fain* v. *Superior Court* (1970) 2 Cal.3d 46 [84 Cal.Rptr. 135, 465 P.2d 23] (Stanislaus County). Manson suggests that a small rural

---

about the competency of Manson's attorney manifests the advantages of obtaining a panel reflecting the sophistication of a metropolitan area. Prospective juror Pedro R. Dominguez was queried about his assessment of Mr. Younger's commentary; the following colloquy occurred:

"Q. And did it appear that newscaster was reporting portions of a news conference held yesterday by the District Attorney?

"A. Yes.

"Q. What did you think when you heard that, Mr. Dominguez?

"A. What did I really think?

"Q. I mean, just in your honest opinion?

"A. Well, let me see. There are not many things that I can think of at the moment. I can think of the election coming up and that there might be some relation to these statements he made. It is only speculation on my part, I suppose."

[88]Reliance by defendants upon *Smith* v. *Superior Court* (1969) 276 Cal.App.2d 145 [80 Cal.Rptr. 693] as standing for a contrary rule is misplaced. *Smith* was before the court on a petition to mandate a change of venue. The charges against Smith were primarily the result of a newspaper investigation and exposure. (276 Cal.App.2d at p. 148.) Moreover, the nature of the charge was parochial because it involved alleged bribery of a Los Angeles City official.

[89]By letter of April 8, 1976, all parties were notified that this court contemplated taking judicial notice of certain social and economic statistics contained in specified publications. By using the data contained in three of those publications we have made a comparison of certain social and economic characteristics of the populations of California counties with populations of 500,000 or more. These comparisons are made to demonstrate the heterogeneous character of these larger counties. (Evid. Code, § 452, subd. (h); *People* v. *Spears* (1975) 48 Cal.App.3d 397, 399 [122 Cal.Rptr. 93]; *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 710 [117 Cal.Rptr. 856]. See Appendix I, *post*, pp. 229-230.)

county would be more sympathetic to appellants and their commune. We doubt it.[90]

Transfer of this case to another county would not have inhibited public attention. "Even as the effect, if any, of publicity upon the prospective jury cannot be presently ascertained, so also is the benefit, if any, of a change of venue beclouded with uncertainty. To remove the trial of a highly publicized case . . . to a small community outside of [a large metropolitan city] would tend to focus the spotlight more brightly upon the case. Modern means of news communication have taken away many of the reasons for the transfer of the *cause celebre* which may have existed fifty years ago." (*Application of Cohn* (2d Cir. 1964) 332 F.2d 976, 977.) A metropolitan setting with its diverse population tends to blunt the penetrating effect of publicity.

There simply is no actual or reasonably presumptive evidence that transfer of this case to any other county would have provided a jury panel more satisfactory than that which was available in Los Angeles.

Appellants next argue that several occurrences after the commencement of trial required the trial court to permit them to voir dire the jury to determine if the jury had been subjected to these revelations. On October 9, 1970, the Los Angeles Herald Examiner carried an article by William Farr reporting that appellants planned to kill well-known entertainment personalities. The court properly denied applications of appellants' counsel to voir dire the jury to determine if it had been exposed to this publicity. The application was not supported by any showing that the court's security or jury maintenance order had been violated.[91]

Manson's counsel made a similar request concerning the reported proceedings of December 30, 1970, involving an arraignment of his client on two other charges of homicide. The trial court informed counsel that it was monitoring the sequestration and was satisfied that the jurors were not subjected to news about the case. Under the circumstances the court's decision was correct. The whole purpose of the elaborate sequestration would have been frustrated if the court had been required

[90]In *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 290 [95 Cal.Rptr. 798, 486 P.2d 694], where a change of venue from Santa Cruz County was mandated, the local board of supervisors equated that case to " 'the same magnitude as the Sharon Tate slayings.' "

[91]Krenwinkel's counsel stated he had heard that jurors had been seen in the hotel coffee shop and near newsstands. However, neither he nor anyone else tendered any evidence of that assertion.

to voir dire the jury to ask if they had knowledge of the very information that was to be kept from them. In the absence of hard evidence that jurors were subjected to news stories or any other information that might have been prejudicial, there was no sense in allowing the court to be drawn into a "Catch 22."

To recapitulate, we have found no evidence of any flagrant departure from fundamental due process standards to bring this case within the operation of the "presumed prejudice doctrine." Accordingly, *Rideau, Turner, Estes* and *Sheppard* are not controlling. Our independent examination of the record and the voir dire proceeding reveals that appellants ". . . received a fair and impartial trial under the standard of 'reasonable likelihood' set forth in *Maine*." (*People* v. *Sommerhalder* (1973) 9 Cal.3d 290, 301 [107 Cal.Rptr. 289, 508 P.2d 289].)

The fact that a case receives enormous publicity does not by itself establish error nor does conceded "massive" publicity automatically translate into prejudice. Here the court issued silence orders, conducted a controlled and searching voir dire, properly admonished the jury and implemented court procedures to afford appellants a dignified and restrained trial atmosphere. In addition, and perhaps most importantly, the jurors, selected from a diverse and populous county, were sequestered for the entire guilt phase of the trial.

Appellants' posture with regard to the use of peremptories exposes a disposition to rest their entire argument on the prominence of the case and the publicity it received. Only 6 of the 20 separate and none of the 20 joint peremptory challenges were used. We reject the notion that anyone can, relying solely on the prominence of the case, refuse to meaningfully participate in the jury selection.

Except in the extraordinary cases previously discussed the courts must ". . . do all they reasonably can to mitigate the effects of prejudicial publicity in any trial. To reverse convictions because [of the possibility that some residual prejudice remains] would effectively immunize some defendants in highly sensational cases." (*Prejudicial Publicity in Trials of Public Officials* (1975) 85 Yale L.J. 123, 135.) Exposure to publicity alone does not make it impossible for jurors to perform their obligation.[92]

---

[92]"The . . . conclusion that mere exposure to publicity necessarily prevent[s] any person from serving as a juror has an extremely unsettling sidelight. If, in this age of instant, mass communication, we were to automatically disqualify persons who have heard about an alleged crime from serving as a juror, the inevitable result would be that truly heinous

Concluding that the "totality of the circumstances" standard is the test applicable to the case before us, we note the absence of either "prejudice to the appellants from the publicity [or] a probability thereof." (*United States* v. *Calvert* (8th Cir. 1975) 523 F.2d 895; *United States* v. *Gay* (6th Cir. 1975) 522 F.2d 429; *United States* v. *Chapin* (D.C. Cir. 1975) 515 F.2d 1274; *United States* v. *Liddy* (D.C. Cir. 1974) 509 F.2d 428.)

## PROSECUTION'S FAILURE TO DISCLOSE

Arguing that respondent failed to comply with the court's discovery order by failing to disclose information that Kasabian had informed Deputy District Attorney Bugliosi of her prior use of LSD, Manson ignores a record to the contrary. The defense was fully aware of Kasabian's prior use of LSD. Prior to Kasabian's testimony Manson and his coappellants made an offer of proof in support of their application to have Kasabian examined by a psychiatrist. The offer referred to Kasabian's past experience with LSD.

Manson makes similar contentions with respect to a photograph depicting a dune buggy, a letter from the attorneys for Kasabian to the district attorney's office pertaining to the grant of immunity for Kasabian and a belated delivery to Krenwinkel's attorney of the notes taken by Bugliosi when he interviewed Atkins at Caballero's office. Also, Manson argues that Bugliosi was obligated to tape record his interview with Atkins. As to each of these assignments of error we note they are unsupported by any ". . . citation of authority or by argument showing that the alleged errors of the trial court resulted in prejudice to appellant, and [that appellant] has left it to the court to search the record and the law in order to uphold [his] claims of error." (*People* v. *Paramount Citrus Assn.* (1957) 147 Cal.App.2d 399, 407 [305 P.2d 135].) "It is not proper to attempt to shift that burden upon the court" and we refuse to accept it. (*People* v. *Klimek* (1959) 172 Cal.App.2d 36, 44 [341 P.2d 722]; *People* v. *Ford* (1962) 200 Cal.App.2d 905, 916 [19 Cal.Rptr. 758].)

██ In a similar vein Manson argues that the testimony of Lake should have been excluded because the prosecution failed to reveal that her trial testimony would be contradictory to testimony given by her

---

or notorious acts will go unpunished. The law does not prohibit the informed citizen from participating in the affairs of justice. In prominent cases of national concern, we cannot allow widespread publicity concerning these matters to paralyze our system of justice." (*Calley* v. *Callaway* (5th Cir. 1975) 519 F.2d 184, 210, cert. den., (1976) 425 U.S. 911 [47 L.Ed.2d 760, 96 S.Ct. 1505].)

before the grand jury. Again, the contention is not supported by the record. Krenwinkel's attorney conceded in open court that the deputy district attorney had, on November 2, 1970, delivered to the defense a copy of the statement made by Lake indicating that she would give testimony adverse to the defense and consistent with the testimony she ultimately gave in open court. Another statement was provided to all counsel at the direction of the court on November 4, 1970. Moreover, the court permitted all defense counsel to voir dire Lake out of the presence of the jury in great detail. Not only does it appear that there was no failure to reveal that Lake would testify at trial, there is no showing that respondent in any way misled the defense as to this witness' testimony.

DeWayne A. Wolfer, a criminalist for the Los Angeles Police Department, testified for respondent. He related that on August 18, 1969, he went to the Cielo Drive residence to conduct acoustical testing and investigation. The primary purpose of the test was to determine whether or not William Garretson, residing in the guest house at the rear of the residence, would have heard the shots fired on August 9, 1969. It is contended that the evidence should not have been introduced because respondent failed to disclose this information to the defense prior to the time that Wolfer was called as a witness.

Wolfer testified that he prepared his original written report within a day or two after he made the test. When a written report was subsequently requested by the district attorney's office it could not be located. Later—a week or two prior to Wolfer's testimony—another police officer found the original and so informed Wolfer. From that report a revised report, dated September 21, 1970, was prepared and delivered to the district attorney. The district attorney then requested another report in narrative form. Compliance with his request resulted in a report dated October 5, 1970, which was given to the deputy district attorney the same day. That report was provided to all defense counsel on October 5, the day Wolfer testified. The belated production of Wolfer's report appears to be the result of the original being lost, coupled with the district attorney's dissatisfaction with the September report. This sequence of events does not add up to suppression of evidence.

Failure to disclose or suppression of evidence does not constitute reversible error unless it results in denying access to ". . . substantial material evidence *favorable to an accused* . . . relat[ing] directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness." (*People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121

Cal.Rptr. 261, 534 P.2d 1341].) Although Wolfer's testimony may have related to the credibility of another witness, Garretson, the report did not constitute substantial material evidence favorable to the accused. If anything, Wolfer's report tended to support the testimony of Garretson that he did not hear any gunshots on the night of the Tate murders and mitigates any suspicion that might fall on him as opposed to appellants. Accordingly, the error, if any, does not come within the scope of *Giglio* v. *United States* (1972) 405 U.S. 150, 154 [31 L.Ed.2d 104, 108, 92 S.Ct. 763]; *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194] or *In re Ferguson* (1971) 5 Cal.3d 525, 532 [96 Cal.Rptr. 594, 487 P.2d 1234].)

We conclude that claims of error based upon failure to disclose material information are not supported by the record. We are of the further opinion that even if a specific act hereinabove discussed is considered as error it is harmless beyond a reasonable doubt within the meaning of *People* v. *Ruthford, supra,* 14 Cal.3d at pp. 406, 409.

## Interference With Witness Interviews and Interference With Production of Defense Witnesses

Manson claims he was prevented from cross-examining Danny DeCarlo about an incident where "defense counsel" was purportedly prevented by law enforcement officers from interviewing DeCarlo.[93] We understand the core of this contention to be a complaint by Manson that his counsel was unable to interview DeCarlo.

It is clear from the record that DeCarlo was produced at trial with some difficulty. Brought from out of state by California law enforcement officers and placed in protective custody during trial, DeCarlo was accompanied and represented by an attorney who was also representing him in a pending federal prosecution. Nevertheless, an opportunity to conduct an interview during a noon recess was offered to the defense by

---

[93]The incident alluded to is set forth in the record as follows:

"Q. BY MR. KANAREK: Do you recall this afternoon after the morning session, Mr. DeCarlo, when I was in the lobby of the Hall of Justice here?

"A. Yes, sir.

"Q. And I tried to talk to you?

"A. Yeah.

"Q. And you and Mr. Gutierrez left my immediate presence?

"A. I said I would talk to you.

"Q. You said you would talk to me but you ended up in about a half second going off with Mr. Gutierrez, right?"

Further testimony was precluded by a sustained objection.

the trial court. There is no evidence to support the contention that respondent interfered with any legitimate and reasonable effort on the part of Manson's counsel to interview DeCarlo.

Manson also contends that respondent interfered with his counsel's efforts to interview Lake. The record does not support this contention. Lake was 17 years old at the time of trial. She had a history of mental disturbance related to the use of hallucinogenics. When she appeared as a witness she was the conservatee of Jack Gardiner, an investigator for the district attorney's office of Inyo County. The trial court appointed counsel to represent her. When Manson's counsel complained that he could not communicate with Lake, the court advised him to consult with her court-appointed attorney. The record is devoid of any evidence that respondent interfered with any attempt by the defense to interview Lake. (*People* v. *Aadland* (1961) 193 Cal.App.2d 584, 594 [14 Cal.Rptr. 462].)

Manson also contends that respondent interfered with his attempts to interview Kasabian. This argument is totally untenable. Kasabian was a coindictee and represented by private counsel. She categorically refused to speak with attorneys for the defense. We are aware of no law that compels any witness to grant any attorney or party a private interview. It appears to us that the full range of subject matter which might possibly have been covered in a private interview was accomplished by thorough and complete cross-examination during the course of the trial in and out of the presence of the jurors. The contention that respondent interfered with any cognizable right to interview is without support and is rejected.

Manson further complains that respondent interfered with the production of certain purported witnesses for the defense. Specifically, he claims the prosecuting attorneys were responsible for the failure of John Haden Marsh and James Breckenridge to appear as witnesses for appellants. With respect to Marsh, Manson's attorney advised the court that the witness was a United States Marine and that Los Angeles law enforcement agencies caused him to be harassed by the shore patrol. The insinuation of the charge is that this was done to deter him from testifying. We are not told the nature of Marsh's potential testimony.

Breckenridge was purportedly hitchhiking and picked up by Linda Kasabian after she left Spahn ranch and while she was driving to New Mexico. She allegedly told Breckenridge her name was Yana and that she was a witch.[94] When he arrived at the trial court Breckenridge

---

[94]Kasabian testified that she did use the name Yana and sometimes referred to herself as a witch.

engaged in a conversation with one of Kasabian's attorneys, Gary Fleischman. There is no evidence that the prosecution had any contact with Breckenridge.

. We are not directed to anything in the record to show that these witnesses were under subpoena or that they were forever unavailable to appellants. Furthermore, nothing shows that respondent interfered with their attendance or participation in the trial.

Another incident characterized as prosecutorial interference with defense witnesses stems from an altercation between Bugliosi and Family member Sandra Good. It is admitted that Bugliosi addressed Good as a "god-damn bitch" and threatened her with prosecution in response to conduct by her that he regarded as threatening.[95] She, in fact, did appear for the defense during the penalty phase of the trial. Presumably she was not deterred from giving her assistance. The assignment of error is vapid.

### MOTION TO QUASH SERVICE OF SUBPOENA

During the time Richard Caballero was representing Atkins, three removal orders were signed by judges of the superior court. These orders were signed upon the submission of a "Request for Removal of Prisoner." The requests are supported by affidavits dated December 1, 1969, December 12, 1969, and January 22, 1970. The affidavits are signed by Atkins' then counsel, Caballero, Deputy District Attorney Bugliosi and Sergeant Paul Whiteley of the Los Angeles Sheriff's office. The removal orders directed the sheriff to transport Atkins to her attorney's office and to various locations to assist in the investigation of the case.

During the course of the trial Atkins caused subpoenas to be served on each of the three superior court judges who signed the removal orders. Through the county counsel the judges moved to quash the subpoenas. The motion was supported by their declarations stating in substance they had no knowledge of the matters at issue and their only relationship to the case had been as judicial officers and what information they did have was disclosed by the records of the superior court. The trial court granted the motion to quash. Atkins complains that this constitutes reversible error.

---

[95]The argument referred to took place away from the courtroom and out of the presence of the jury.

It is true that a defendant in a criminal cause has the right to compel attendance of witnesses in the defendant's behalf. (Cal. Const., art. I, § 15, cl. 2, formerly art. I, § 13, cl. 2.) However, that right is not unqualified. The courts have inherent power to control the issuance of their own process and to preclude an abuse of the right to subpoena witnesses. (*People* v. *Fernandez* (1963) 222 Cal.App.2d 760, 769 [35 Cal.Rptr. 370].)

Our examination of the record reveals that the signing of the removal orders by the judges constituted nothing more nor less than the tangential procedural activity surrounding Caballero's efforts to favorably dispose of Atkins' case. Nothing indicates that the judges had any more information than is set forth in the applications for the "Request for Removal of Prisoner." The declaration in opposition was totally insufficient.

The trial court's order quashing the subpoenas was fully justified (*In re Finn* (1960) 54 Cal.2d 807, 813 [8 Cal.Rptr. 741, 356 P.2d 685]; *People* v. *Rhone* (1968) 267 Cal.App.2d 652, 657 [73 Cal.Rptr. 463]).

## DISAPPEARANCE OF RONALD HUGHES

Ronald Hughes became trial counsel for Van Houten on July 17, 1970,[96] after commencement of trial and during the jury voir dire but before any jury was sworn or any evidence taken. He continued to actively represent her through the course of trial until Monday, November 30, 1970, when he failed to appear in court. By that time respondent and appellants had rested, but the trial court had not ruled on all submitted jury instructions and closing arguments had not commenced. When Hughes could not be located, Maxwell Keith was appointed for Van Houten as cocounsel under the provisions of Penal Code section 987.2. The appointment was over Van Houten's objection that she could better represent herself in argument than could newly appointed counsel. Hughes never returned to court. The full responsibility for proceeding on behalf of Van Houten then fell to Keith, who undertook the labor of reading transcripts and examining exhibits.

[96]Van Houten was first represented by Marvin Part. Prior to trial she replaced Part with Ira Reiner on February 6, 1970. On July 17, 1970, she replaced Reiner with Ronald Hughes. Hughes failed to appear on November 30, 1970. On December 3, 1970, Maxwell Keith was appointed to represent Van Houten.

Prior to argument Van Houten moved for a mistrial. Asserting that he was greatly handicapped, Keith contended his absence during the taking of evidence made it impossible for him to effectively argue the issue of credibility.[97] The court denied the motion. Predicated on the assumption that Keith was incapable of effectively arguing on her behalf, Van Houten contends on this appeal that the motion should have been granted and that its denial resulted in reversible error.

Integrity of the process of appellate review demands that we consider Van Houten's contention uninfluenced by the sensation and notoriety of the case at bench or the indicia of her bad character. Despite the strong evidence of Van Houten's guilt "more enduring values are challenged whenever there is reason to doubt that a notorious public trial has been conducted" in a manner comporting with the requirements of due process of law. " '[T]he guilty are almost always the first to suffer those hardships which are afterwards used as precedents against the innocent.' " (*United States* v. *Barrett* (7th Cir. 1975) 505 F.2d 1091, 1114-1115, dis. opn. then Judge now Mr. Justice Stevens.) So considering the issue in light of the record here, we find merit in Van Houten's contention on two interrelated grounds. First, she was denied effective representation because Keith was incapable of arguing credibility. Second, the disappearance of Hughes after the submission of all evidence severely interrupted the continuity of representation necessary to a fair trial.

Included in the Sixth Amendment guarantee of assistance of counsel is the accused's right to have a closing summation made to the jury. (*Herring* v. *New York* (1975) 422 U.S. 853 [45 L.Ed.2d 593, 95 S.Ct. 2550].) It is elementary that the right to counsel means the right to effective representation. (*In re Williams* (1969) 1 Cal.3d 168, 174 [81 Cal.Rptr. 784, 460 P.2d 984].) In our opinion an accused is denied effective representation if her trial attorney is unable to effectively argue the case.

In a somewhat different context, the United States Supreme Court recognized the importance of argument by tracing its historical roots in

---

[97]In that regard he advised the court as follows: "I advert primarily to the total inability, helplessness, of myself or any other attorney to argue the credibility of the witnesses in this case against Miss Van Houten because I was not there when they testified. Now, if the Court please, credibility may well be crucial to the defense in this case. I know that credibility is very much in issue. Yet I didn't have the opportunity to observe the demeanor of the witnesses on the stand nor the manner in which they testified, nor was I able to observe their character as they testified."

the early American colonies and its evolvement in the law of England: "There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial. Accordingly, it has universally been held that counsel for the defense has a right to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge." (*Herring* v. *New York, supra,* 422 U.S. at p. 858 [45 L.Ed.2d at p. 598].)

An integral part of argument includes fair comment on the credibility of witnesses. (*People* v. *Roberts* (1966) 65 Cal.2d 514, 520 [55 Cal.Rptr. 412, 421 P.2d 420].) The importance of the issue of credibility is punctuated by its inclusion in our statutory law. Penal Code section 1127 mandates the court to instruct the jury of its responsibility as the exclusive judge of the credibility of witnesses. (See also, Pen. Code, § 1093, subd. 6.) Evidence Code section 780 catalogues 11 specific considerations the trier of fact may entertain with respect to the credibility of any witness. Every trial judge and trial lawyer grasps the value attached to the manner in which testimony is presented. Counsel addresses this issue by pointing out to the jurors such things as the manner in which a witness testifies, the nuances suggested by inflections of the voice, long reflections before answering, body language and a variety of other mannerisms bearing on the assessment of truthfulness of the witness.

Such comments generally cannot be made unless the witness is observed, for their basis is rarely perceivable on the cold pages of the transcript. Keith neither saw nor heard any witness during the guilt phase of the trial. He could not deal with this subject effectively or at all.[98]

Here, more so than in the "average" case, credibility was of major importance. To begin with, the credibility of 88 witnesses was in issue

---

[98]Neither could Keith take advantage of that part of argument described in *People* v. *Molina* (1899) 126 Cal. 505, 508 [59 P. 34]: " 'The right of discussing the merits of the cause both as to the law and facts, is unabridged. The range of discussion is wide. He may be heard in argument upon every question of law. In his addresses to the jury it is his privilege to descant upon the facts proved or admitted in the pleadings; to arraign the conduct of the parties; impugn, excuse, justify, or condemn motives as far as they are developed in the evidence; assail the credibility of witnesses, when it is impeached by direct evidence, or by the inconsistency or incoherence of their testimony, their manner of testifying, their appearance on the stand or by circumstances. His illustrations may be as various as the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wings to his imagination.' "

and corroboration of accomplice testimony was required. The only corroborating evidence as to Van Houten consisted of Lake's testimony with respect to Van Houten's admissions and that testimony was in edited from to comport with *Aranda* and *Bruton*. While Keith could argue Lake's lack of credibility from her instability, he was precluded by lack of observation from relating specific conduct of Lake while testifying to her unstable emotional character. Nor could Keith attack the portion of the Kasabian testimony incriminating Van Houten by reference to conduct of the witness while testifying.

Clearly, it is impossible for us to know whether conduct of witness observable by competent counsel would have aided Keith's argument. That is not matter ascertainable from a cold record on appeal. It is only slightly more apparent to a trial judge sitting as an arbiter and not an advocate. For these reasons disappearance without fault of defense counsel near the close of a criminal case presents a policy choice. If the focus is on convenience, new counsel is thrust on the defendant to avoid the burden of a new trial. If the focus is on the Sixth Amendment and the worth of a good trial lawyer, the defendant is given the right to a trial where his counsel charged with the duty of arguing witness credibility may observe witness behavior.

The plain fact is that Van Houten's counsel did not provide adequate argument because he could not effectively argue the issue of credibility. In a different context and before Hughes disappeared, the trial court recognized the magnitude of the case before it. At that time it was suggested that another attorney be substituted for the purpose of questioning appellants. The judge commented on that suggestion as follows: "It would undoubtedly place an undue burden on any counsel coming into the case. At this date the trial has been in progress for five months; the transcript is in excess of 18,000 pages, and it would be a terrible burden to bring a new attorney into the case and expect him to adequately and effectively represent anyone for the remainder of the trial."[99]

The structure of a jury trial is divided into distinct but related segments. Beginning with the selection of the jury and ending with closing arguments, it preserves a continuity of representation insuring each side the opportunity to cogently and effectively urge their contentions. (See *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 697 [122 Cal.Rptr. 778, 537 P.2d 898].) In this case Van

[99]If this were not true the convictions of the other defendants would be in jeopardy.

Houten's counsel disappeared at a time severely severing the continuity of representation, producing an irreversible disruption in the structure of the trial process. In a case of this dimension substituted counsel cannot assume a meaningful adversary posture, handicapped as he is by his absence from every segment of the trial process except argument. In the final analysis the infringement on Van Houten's right to effective counsel is produced from the extraordinary disruption of the trial process resulting from the disappearance of her trial counsel at the moment he would have argued her contentions within the framework of the trial and the plan of defense which he had developed. Viewing the situation from this perspective, we do not see how the issue can be assessed by comparing Keith's argument with any other argument. It is not a matter of what Keith did or did not argue or even how well he argued. The fact is that after about five months of testimony and 88 witnesses it is presuming too much to believe he could enter the proceedings and effectively advocate his client's case. We hasten to acknowledge our adherence to the accepted standard of "effective counsel" and not "perfect counsel." But our own experience as former trial lawyers convinces us that the natural incapacity flowing from the unusual circumstances of this case deprived Van Houten of the minimal requirement.

The significance of continuity of representation has been recognized within the past year by the Supreme Court of the United States. In concluding that an accused has a constitutional right to self representation the high court disposed of the dilemma of the proper-deliberately-disruptive-defendant by the statement that such a defendant's right of self representation may be terminated. Significantly the Supreme Court does not suggest that in such an event counsel *not previously involved* may then be appointed to represent the accused. Rather it says: "Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self representation is necessary." (*Faretta v. California* (1975) 422 U.S. 806, 834-835, fn. 46 [45 L.Ed.2d 562, 581, 95 S.Ct. 2525].)

Confronted with these circumstances the trial court should have granted the mistrial. It was not necessary to compel Van Houten to go forward with Keith, however convenient that may have been for the court or respondent. Under our system of justice expediency is never exalted over the interest of fair trial and due process.

Because a trial judge's determination to not grant a mistrial is a discretionary matter, it is not lightly tampered with. We note, however, that statutory and case law authority authorize the granting of a mistrial on the ground of "legal necessity." (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 713 [87 Cal.Rptr. 361, 470 P.2d 345].) "Legal necessity" may arise when there is a death, protracted illness, or other unavoidable absence of a judge or juror. (Pen. Code, §§ 1123, 1147.) Mistrials have been granted when there has arisen a breakdown .in a relationship between the accused and his counsel frustrating the realization of a fair trial. (Cf. *People* v. *Smith* (1970) 13 Cal.App.3d 897, 911 [91 Cal.Rptr. 786, 52 A.L.R.3d 875].)

Penal Code section 1141 provides that "In all cases where a jury is discharged or prevented from giving a verdict by reason of an accident or other cause, except where the defendant is discharged during the progress of the trial, or after the cause is submitted to them, the cause may be again tried." Implicit in this provision is recognition of the fact that circumstances may arise due to the fault of no one—characterized as "accident or other cause"—precluding the jury from rendering a verdict. Here the unexplained disappearance of Hughes is an event of "legal necessity" which should have resulted in the granting of a mistrial as to Van Houten. To hold otherwise would be to deny Van Houten the right to have her cause effectively argued with respect to a major issue in the case. Here the absence of counsel qualifies as legal necessity in the same manner as would the absence of judge or juror. (See *Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 713-714 [87 Cal.Rptr. 361, 470 P.2d 345].)[100]

The purpose of the concept of "legal necessity" is to obtain the fair administration of justice. In the context of this case the disappearance of Hughes is not attributable to appellant, to respondent or to the court.

[100]In *State* v. *Thompson* (1964) 148 W.Va. 263 [134 S.E.2d 730], cert. den., 379 U.S. 819 [13 L.Ed.2d 30, 85 S.Ct. 39], the Supreme Court of Appeals of West Virginia, interpreted a code provision of that state pertaining to the discharge of a jury in a criminal case without the jury rendering a verdict in the event that there is a ". . . manifest necessity for such discharge." (134 S.E.2d at p. 734.) "Manifest necessity," analogous to "legal necessity," was defined as follows: "While the term 'manifest necessity' has not been abstractly defined, we view it as the happening of an event, beyond the control of the court, which would require the discharge of the jury and would permit a new trial without justifying a plea of double jeopardy. Such occurrences as the illness or death of a juror, the accused, the judge *or counsel* exemplify cases in which a manifest necessity exists which would warrant the discharge of the jury. In other words, where unforeseeable circumstances arise during the trial, making its completion impossible, a manifest necessity to discharge the jury exists and the defendant may again be tried." (134 S.E.2d at p. 734 [italics added].)

The "other cause" provision of Penal Code section 1141 clearly contemplates retrial under the circumstances now before us and retrial is clearly in order after this reversal.[101] Balancing the harm to Van Houten caused by the absence of her lawyer at a critical stage of trial against the burden of respondent in retrying the case, we believe the fair administration of justice demands reversal.[102] (Cf. *People* v. *Davis* (1957) 48 Cal.2d 241, 257-258 [309 P.2d 1].)

## JURY INSTRUCTIONS

### Diminished Capacity

Appellants requested a jury instruction on diminished capacity. The court refused.

A record revealing a sufficient factual showing that, by reason of mental defect, mental illness, intoxication or otherwise, appellants or any of them could not form the necessary specific intent to commit murder would require appropriate instructions on diminished capacity. (*People* v. *Nichols* (1970) 3 Cal.3d 150, 165 [89 Cal.Rptr. 721, 474 P.2d 673], cert. den., 402 U.S. 910 [28 L.Ed.2d 652, 91 S.Ct. 1388]; *People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].) Here, however, the trial court found no such evidence.

Although Manson and Krenwinkel now argue that the record supports giving diminished capacity instructions, they do not rely on the rule just

---

[101]"All will agree that if the defendant's attorney exhibits objective evidence of *physical incapacity* to proceed with a meaningful defense of his client, such as illness, intoxication, or a nervous breakdown [citation], the court need not sit idly by; it should inquire into the matter on its own motion, and if necessary relieve the affected counsel and order a substitution. Yet even that action should be taken with great circumspection and only after all reasonable alternatives, such as the granting of a continuance, have been exhausted. Failure to observe these standards, although in a case of undisputed physical incapacity of counsel, will compel a reversal of the ensuing judgment; and this result will follow regardless of whether the defendant's substituted counsel was competent or whether the defendant received a 'fair trial' with respect to the guilt-determining process. [Citation.]" (*Smith* v. *Superior Court, supra*, 68 Cal.2d at p. 559; see also, *English* v. *State* (1969) 8 Md.App. 330 [259 A.2d 822, 825-826].)

[102]By this determination we are not pronouncing a universal rule that absence or loss of counsel in any stage of the proceedings necessarily compels a reversal. It must be clear that this case is unusual in its length and complexity. Moreover, the timing of the substitution of Keith as counsel for Van Houten is truly crucial. Each case will have to be decided on its own facts. No per se rule can be stated. (*United States* v. *Tramunti* (2d Cir. 1975) 513 F.2d 1087, 1117.)

stated. We understand Manson's argument to be as follows: since there is no direct evidence that he made an agreement with Watson, respondent has failed to establish the specific intent necessary to a charge of conspiracy. The argument continues with Manson's contention that his absence at the time of the homicides establishes a lack of the requisite specific intents to premeditate, deliberate and harbor malice with respect to the substantive crimes. These arguments have nothing to do with the doctrine of diminished capacity.

Van Houten's claim of error pivots on two other factors: (1) the established availability and use of hallucinogenic drugs by members of the Family; and (2) the prosecutor's depiction of the Family as devoted and fearful followers of Manson.

No evidence suggests that anyone ingested any drugs at any time proximate to the Tate or La Bianca murders. Consequently, there is no showing that anyone's mental capacity was affected by a foreign chemical. If we interpret this as an argument that by prolonged usage diminished mental capacity is presumed, the contention is not supported by evidence. Admittedly there is a great deal of testimony that drugs were commonly used by Family members. However, it does not necessarily follow that all members used drugs and nothing indicates with particularity the kind, quantity, or regularity of use by anyone. In short, this common circumstance is no more than a generalization without specific application to any one appellant. (*People* v. *Harris* (1970) 7 Cal.App.3d 922, 926 [87 Cal.Rptr. 46].) Moreover, no evidence was produced concerning the affect of such drugs on a particular defendant. (Cf. *People* v. *Rocha* (1971) 3 Cal.3d 893, 901 [92 Cal.Rptr. 172, 479 P.2d 372].)

The defense of diminished capacity is generally tendered by testimony of the defendant or a psychiatrist or both. That is the orthodox method of raising the issue and it was the method employed in virtually every case cited by appellants.[103]

Manson points to the fact that two psychiatrists testified concerning the use of LSD and marijuana by Lake. Their opinions of Lake, however, have no bearing on appellants' mental capacity and no

---

[103] *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] is distinguishable. It concerned use of alcohol, not drugs. The effect of alcohol is of sufficiently common knowledge to obviate the use of expert testimony. *People* v. *Conley* (1966) 64 Cal.2d 310, 325 [49 Cal.Rptr. 815, 411 P.2d 911].

evidence of Lake's use of drugs could responsibly be applied to any appellant. Absent specific evidence pertaining to the use of drugs, and absent expert testimony as to the effect of such use on appellants, a diminished capacity instruction on that ground was not required. (Cf. *People* v. *Smith* (1970) 4 Cal.App.3d 403, 412 [84 Cal.Rptr. 412].)

The prosecutor's argument characterizing Manson's coindictees as "slaves" "robots" and "automatons" is not evidence, nor do his hyperbolic descriptions affect the evidence bearing on the mental capacity of appellants. The evidence is persuasive that Van Houten, Krenwinkel, Atkins and Watson were Manson's followers. There is no doubt they were subjected to his influence. That some people are followers is an ordinary circumstance of any concerted activity. In nearly every conspiracy there is a leader.

Krenwinkel asks us to determine that the specific intent requisite to the crimes charged was negated by the showing of peer pressure alone. The evidence that a party is a follower does not, however, translate itself into a prima facie showing of diminished capacity. We find no evidence in the record and know of no authority to support that proposition. The trial court's rejection of the tendered instruction was proper. (*People* v. *Carr* (1972) 8 Cal.3d 287, 294-295 [104 Cal.Rptr. 705, 502 P.2d 513].)

The record is devoid of any evidence that any appellant suffered from undisputed mental illness or from incapacity to maturely and meaningfully reflect upon the gravity of contemplated acts. (*People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959].) No medical or other expert testimony was offered as to a mental disease or defect of any appellant (*People* v. *Henderson* (1963) 60 Cal.2d 482, 488-489 [35 Cal.Rptr. 77, 386 P.2d 677].) Plainly put, appellants cannot point to any evidence compelling a diminished capacity instruction.

Emphasis of life style in the commune only shows its members embraced bizarre concepts, accepted depraved standards and followed a warped philosophy. "It is not enough, to relieve from criminal liability, that the prisoner is morally depraved. [Citation.] It is not enough that he has views of right and wrong at variance with those that find expression in the law. The variance must have its origin in some disease of the mind. [Citation.] The anarchist is not at liberty to break the law because he reasons that all government is wrong. The devotee of a religious cult that enjoins polygamy or human sacrifice as a duty is not thereby

relieved from responsibility before the law. [Citations.]" (*People* v. *Schmidt* (1915) 216 N.Y. 324 [110 N.E. 945, 949-950].)

Accordingly, evidence of bizarre, depraved or weird conduct standing alone does not compel an instruction on diminished capacity. Such circumstances are not subject to common interpretation. Had appellants gone forward in the classical tradition of *Wells-Gorshen,* the trial court in all probability would have instructed on diminished capacity. (*People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53], cert. den., 338 U.S. 836 [94 L.Ed. 510, 70 S.Ct. 43]; *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492]; and see Witkin, Cal. Crimes (rev. 1975 Supp.) Diminished Capacity, § 147a, p. 98.) Failure to proceed in that manner resulted in a record too shadowy to expose the presence of diminished capacity. The trial court's refusal to instruct on this subject was not error.

## Compulsion

 Krenwinkel, extending the argument for a diminished capacity instruction by reference to subdivision 8 of Penal Code section 26,[104] confuses the defense of compulsion with the defense of diminished capacity. Nothing in the record compels a *sua sponte* instruction on that subject.

 Compulsion as a legal defense requires evidence that the accused acted upon reasonable cause and belief that her life was presently and immediately endangered if she refused to participate. (*People* v. *Richards* (1969) 269 Cal.App.2d 768, 773-774 [75 Cal.Rptr. 597]; *People* v. *Villegas* (1938) 29 Cal.App.2d 658, 661 [85 P.2d 480].) Here there is no evidence that Manson's instructions were accompanied by any threat. Simply following orders is not a defense under the facts of this case. An instruction on compulsion was neither required nor appropriate.

## Lesser Included Offenses

 The contention that the trial court erred in failing to instruct the jury on manslaughter is without merit. To the extent the contention is based on the assumption that there is evidence of diminished capacity,

---

[104]As relevant, that section provides: "All persons are capable of committing crimes except . . . [¶] 8. Persons (unless the crime be punishable with death) who committed the act . . . charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

our discussion of that subject is dispositive. It is further contended that an instruction on manslaughter as a necessarily included offense must always be given in a trial on the charge of murder. That is not accurate. An instruction on manslaughter is not required where the evidence does not support it. Here there is no such evidence. The basic posture of the defense was to put respondent to its proof. No appellant testified concerning intent, no evidence was produced to show whether or not any appellant was under the influence of an intoxicant or narcotic and no evidence suggested that any appellant was legally incompetent. The trial court was justified in refusing to instruct the jury on the theory of manslaughter. (*People* v. *Preston* (1973) 9 Cal.3d 308, 319 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Thomas* (1962) 58 Cal.2d 121, 127 [23 Cal.Rptr. 161, 373 P.2d 97], dism., cert. den., 371 U.S. 231 [9 L.Ed.2d 495, 83 S.Ct. 327].)

### Felony-murder Rule

 Over the objection of appellants the trial court instructed the jury on the felony-murder rule. (CALJIC No. 8.21.) The concomitant felonies referred to were robbery (Pen. Code, § 211) and burglary (Pen. Code, § 459). The choice of these felonies was appropriate in view of the entries into private residences and the taking of personal property and the use of force in each instance.

Because the prosecution emphasized the contention that both the Tate and La Bianca murders were wilful, deliberate and premeditated homicides, appellants assert that instructing the jury on felony-murder was error. Respondent, however, also produced evidence bearing on the felony-murder doctrine. The trier of fact is not limited by any hierarchy of theories selected by the prosecution. If there is substantial evidence to support convictions of first degree murder by proving deliberation and premeditation *or* by proving the perpetration of a felony, the jury should be instructed on both and may rely on either theory. (*People* v. *Mulqueen* (1970) 9 Cal.App.3d 532 [88 Cal.Rptr. 235].)

Application of the felony-murder rule requires that the homicide be committed in the course of perpetrating one of the felonies designated in Penal Code section 189.[105] (*People* v. *Ford* (1966) 65 Cal.2d 41, 55-56 [52 Cal.Rptr. 228, 416 P.2d 132], cert. den., 385 U.S. 1018 [17 L.Ed.2d 554, 87 S.Ct. 737].)

---

[105]E.g., Perpetration or attempted perpetration of arson, rape, robbery, burglary, mayhem and certain sex offenses.

*TATE MURDER:* On cross-examination by Manson's counsel, and without objection, Kasabian testified that Watson took $70 from the Cielo Drive residence. That evidence, coupled with the showing that access to the Cielo Drive residence was accomplished by a breaking and entering, established a prima facie burglary. Whether Watson harbored the requisite *animus furandi* prior to entering was a question of fact for the jury. The fact that Watson did take the money is a reasonable and logical basis from which the jury could properly infer that he intended to do so prior to entering the residence. (*People* v. *Hamilton* (1967) 251 Cal.App.2d 506, 508-509 [59 Cal.Rptr. 459]; *People* v. *Pineda* (1940) 41 Cal.App.2d 100, 106 [106 P.2d 25].) The evidence relating to a plan to perpetrate homicides in furtherance of the broader design to ignite "Helter Skelter" did not preclude existence and application of other criminal purposes. (*People* v. *Finkel* (1945) 70 Cal.App.2d 508, 512 [161 P.2d 298].)[106]

*LA BIANCA MURDER:* Manson entered the La Biancas' residence and subdued them. When he left he had in his possession Mrs. La Bianca's wallet, presumably taken from her person or from within her immediate presence. As Kasabian disclosed, it was Manson's declared intention to place this wallet some place where it could be found by a black person, thereby implicating the black community with the commission of that crime. This evidence has a tendency to reasonably demonstrate that Manson harbored the intent to steal even prior to his entry into the La Bianca home. The evidence is sufficient to find that either a burglary or robbery occurred.

In connection with the La Bianca murders, we must also determine whether the robbery terminated before the La Biancas were killed. Appellants, of course, contend the robbery was complete before the killings and demand reversal on the ground the felony-murder rule instruction was therefore improper. We disagree. Within the extraordinary facts of this case the jury could have concluded either way.

When Manson exited the La Bianca residence he implied the occupants were tied-up but alive. At that time he directed Watson, Krenwinkel and Van Houten to perpetrate the killings. Assuming the La Biancas were then in fact still alive, the proximity in time of their

[106]We need not decide when the *animus furandi* arose in relationship to the homicides. In view of the fact that the entry, the larceny and the homicides are interfused it is not unreasonable to view their commission as one transaction. It follows that the jury could logically infer that the homicides were committed in the course of perpetrating either the burglary or the robbery.

subsequent death is sufficient to cement together the burglary-robbery and the homicides as one indivisible transaction. (*People* v. *Ford* (1966) 65 Cal.2d 41, 56 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 523-524 [30 Cal.Rptr. 538, 381 P.2d 394] (vac. and revd. on other grounds, 63 Cal.2d 859 [48 Cal.Rptr. 614, 409 P.2d 694]; mod. 71 Cal.2d 635 [79 Cal.Rptr. 92, 456 P.2d 660]); *People* v. *Boss* (1930) 210 Cal. 245, 250-251 [290 P. 881].) Here the demonstrated causal connection between the underlying felony and the killings suggests the robbery was not complete and supports application of the felony-murder rule. (Cf. *People* v. *Carroll* (1970) 1 Cal.3d 581 [83 Cal.Rptr. 176, 463 P.2d 400]; see also *People* v. *Sirignano*[107] (1974) 42 Cal.App.3d 794, 801-802 [117 Cal.Rptr. 131]; *People* v. *Chapman* (1968) 261 Cal.App.2d 149, 175 [67 Cal.Rptr. 601].)[108]

Appellants' reliance on *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130] is absurd. That case holds the felony-murder rule inapplicable to killings committed by a victim of the underlying felony. Neither the La Biancas nor any of the Tate victims caused any of the deaths with which appellants are charged. (See also, *People* v. *Burton* (1971) 6 Cal.3d 375, 388; *People* v. *Stamp* (1969) 2 Cal.App.3d 203, 209 [82 Cal.Rptr. 598], cert. den., 400 U.S. 819 [27 L.Ed.2d 46, 91 S.Ct. 36].)

We conclude that no error resulted from the giving of the felony-murder rule instruction.[109] We further conclude that the felony-murder rule was equally applicable to each appellant. ■ It is axiomatic that each member of a conspiracy is liable for all acts of his coconspirators,

---

[107]In *People* v. *Sirignano* (1974) 42 Cal.App.3d 794 [117 Cal.Rptr. 131], the evidence revealed a plan to rob and to kill. In response to a defense contention that the robbery had terminated before the killing occurred, the court stated as follows: "The record supports the inference that the defendant and her associates had planned to kill the victim so that he would not be able to testify against them. There was substantial evidence to support the conclusion that the events of the evening formed one 'continuous transaction,' and such a finding clearly results in felony-murder, in the first degree." (42 Cal.App.3d at p. 802.) That observation is applicable to the evidence of this case.

[108]"Felony-murder trials frequently feature a doubt or conflict on the issue of divisibility or continuity of the several criminal acts. When that doubt or conflict exists, the issue should be submitted to the jury." (*People* v. *Chapman, supra,* 261 Cal.App.2d at p. 176.)

[109]Because we conclude the evidence supports a determination that the felonies of burglary and robbery were committed, we are not concerned with the primary holding of *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]—that the felony-murder doctrine is inapplicable where the concomitant felony is "included in fact" in the charge of murder, i.e., burglary with intent to assault (*People* v. *Wilson* (1969) 1 Cal.3d 431, 441 [82 Cal.Rptr. 494, 462 P.2d 22]). In both the Tate and La Bianca murders evidence supports the conclusion that the concomitant felonies turned on the presence of an intent to steal.

intended, unintended, or even actually forbidden, provided only that such acts be in furtherance of the common purpose of the conspiracy. (*People* v. *Smith* (1966) 63 Cal.2d 779, 794 [48 Cal.Rptr. 382, 409 P.2d 222], cert. den., 388 U.S. 913 [18 L.Ed.2d 1353, 87 S.Ct. 2119]; *People* v. *Beaumaster* (1971) 17 Cal.App.3d 996, 1003 [95 Cal.Rptr. 360].)

## CONSPIRACY/SPECIFIC INTENT

We disagree with the contention that error occurred because the court failed to instruct the jury that conspiracy is a "specific intent" crime. The jury instructions included CALJIC No. 6.10 as then drafted.[110] The Committee on Standard Jury Instructions, Criminal, of the Superior Court of Los Angeles County, responding to *People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300], modified CALJIC No. 6.10 sometime after appellants herein were convicted. This modification was not compelled but simply reflects the committee's cautious disposition to minutely refine the uniform instructions to reflect the most current pronouncements of our Supreme Court.

No one questions that the crime of conspiracy is a specific intent crime. The Supreme Court did not suggest that the instructions given were improper. Holding that evidence pertaining to diminished capacity at the time of the conspiracy should have been admitted, *Horn* did not condemn the use of CALJIC No. 6.10. Appellants' argument, based on a misinterpretation of the grammatical structure of the instruction given and encouraged by the amendment of CALJIC No. 6.10, albeit a nonsubstantive change, is rejected. In any event, the jury was expressly instructed on the specific intent required for the crime of conspiracy. (CALJIC No. 3.31.)

---

[110]The jury was instructed: "A conspiracy is an agreement between two or more persons to commit any crime, and with the specific intent to commit such crime, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement. Conspiracy is a crime.

"In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement, there must be proof of the commission of at least one of the overt acts alleged in the indictments. It is not necessary to the guilt of any particular defendant that he himself committed the overt act, if he was one of the conspirators when such an act was committed.

"The term 'overt act' means any step taken or act committed by one or more of the conspirators which goes beyond mere planning or agreement to commit a public offense and which step or act is done in furtherance of the accomplishment of the object of the conspiracy."

### GENERAL INSTRUCTIONS REFUSED

Appellants assign error to the trial court's refusal to give certain special instructions. Although appellants refer to a host of refused special instructions, the actual issues are not substantial. Many pertain to common subjects easily categorized. To expedite their disposition, we address them in that fashion.

Many of the rejected instructions pertain to Kasabian's grant of immunity; Lake's history of mental illness, her admitted untruthfulness and her purported inconsistent statements; DeCarlo's admitted prior felony conviction and other matters pertaining to credibility. Our review of the rejected special instructions exposes them as argumentative, redundant, or superfluous. Credibility was properly explained to the jury by use of CALJIC No. 2.20.

By their "Special Instruction No. 103," appellants wanted the jury instructed that: "Evidence involving the defendants on trial before you after August 10, 1969, may not be considered by you in your deliberations as to whether or not the conspiracy alleged by the prosecution ever came into existence."

The requested instruction is entirely too broad; it also misstates the law. (*People* v. *Goldberg* (1957) 152 Cal.App.2d 562, 573 [314 P.2d 151].)[111]

■ Manson asserts that he was entitled to an alibi instruction. Since the prosecution never contended Manson was present at the time of the actual commission of any homicide, and since his presence was not a requirement for culpability, Manson's absence was not, as the submitted instruction states, ". . . [a] complete defense that we call an alibi." The instruction was properly refused.

Appellants' special instructions pertaining to accomplice testimony are redundant and argumentative. The court correctly instructed the jury that Kasabian was an accomplice as a matter of law, that her testimony must be corroborated, and that it ". . . ought to be viewed with distrust." Nothing more was required.

[111]Nine other related instructions were also properly rejected. All presumed that admissions of one appellant were admitted against a coappellant, a contention clearly contrary to the record. *People* v. *Saling* (1972) 7 Cal.3d 844 [103 Cal.Rptr. 698, 500 P.2d 610] and *People* v. *Leach* (1975) 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296] are therefore inapplicable.

Appellants' remaining assignments of error concerning refused special instructions are rejected. They have failed to direct us to any portion of the record supporting their contention that the instructions should have been given. They have similarly failed to support their assertion of error as to the instructions that were given. Our independent review of all instructions, including those given and those refused, convinces us that the jury was fully and correctly instructed on all propositions of law applicable to the facts of this case.

## OPENING AND CLOSING ARGUMENTS

During cross-examination of Juan Flynn by Manson's counsel, Bugliosi interposed several objections. Coupled with one objection was the assertion that Manson's attorney, Kanarek, was lying. Without request by appellant or anyone else, the trial judge immediately admonished Bugliosi. Additionally, the court admonished the jury to disregard Bugliosi's comment concerning Kanarek's credibility.

In view of the length and intensity of this case this occurrence was more regrettable than unexpected. Viewing the matter in the context of the entire trial, we conclude this incident was not likely to have caused a miscarriage of justice. There is little likelihood the jury was affected by this event. Consequently, we find no justification for reversal of the judgment on this ground. (*People* v. *Perry* (1972) 7 Cal.3d 756, 790-791 [103 Cal.Rptr. 161, 499 P.2d 129]; *People* v. *Chavez* (1958) 50 Cal.2d 778, 793 [329 P.2d 907], cert. den., 358 U.S. 946 [3 L.Ed.2d 353, 79 S.Ct. 356].)

Manson takes exception to certain portions of the prosecution's opening statement and closing argument. Most of these specifications of error were not objected to in the course of trial. The misconduct complained of is not so gross that it should be assigned as error on appeal in the absence of an objection at trial. (*People* v. *Mitchell* (1966) 63 Cal.2d 805, 809 [48 Cal.Rptr. 371, 409 P.2d 211], cert. den., 384 U.S. 1007 [16 L.Ed.2d 1021, 86 S.Ct. 1985]; *People* v. *Beyea* (1974) 38 Cal.App.3d 176, 197-198 [113 Cal.Rptr. 254].)

Manson's reference to that part of the opening statement in which the deputy district attorney refers to "Manson's lust for death, blood and murder" immediately drew an admonition. The jury was also admonished that Bugliosi's motives were not in issue after the deputy district attorney apologized for frequent references to Helter Skelter. Neither comment resulted in prejudicial error.

No error resulted from Bugliosi's comment that he anticipated that Manson would claim that ". . . neither he nor anyone else was the leader of the Family and that he never ordered anyone in the Family to do anything, much less commit these seven murders." That comment did not constitute prosecutorial misconduct. (Cf. *People* v. *Womack* (1967) 252 Cal.App.2d 761, 764 [60 Cal.Rptr. 870].) Appellants' other exceptions to the opening statement are not well taken. In the aggregate Bugliosi's comments were well within the bounds of the evidence produced at trial.

Manson also complains about an epithet used by the prosecutor during the course of his argument and directed to Atkins: "You little bitch." The exclamation was not a planned part of argument, but rather was a reaction produced by the misconduct of Atkins when she and Krenwinkel interrupted Bugliosi's argument by shouting. Atkins walked to the rostrum and grabbed Bugliosi's notes. This incident is no basis for complaint. While the prosecutor must be fair, he cannot be expected to be a saint. We do not believe that any of the prosecutor's remarks were so significant that their absence would have resulted in appellants' acquittal. This is not a closely balanced case. The evidence as to each appellant is substantial and guilt is shown by clear and convincing evidence. In sum, we find no prejudicial error arising from the opening or closing argument of the prosecution. (*People* v. *Baker* (1974) 39 Cal.App.3d 550, 555 [113 Cal.Rptr. 248]; *People* v. *Jones* (1970) 7 Cal.App.3d 358, 365 [86 Cal.Rptr. 516].)

PROCEDURES DURING JURY DELIBERATION

Court Communication

After the jury commenced deliberations it requested that certain exhibits be identified. It appeared there was some discrepancy between the jurors' notes and the clerk's markings on the exhibits. The court directed the bailiff to ask the foreman to set aside all the exhibits about which there was some question. Relying on Penal Code section 1138 and *People* v. *Weatherford* (1945) 27 Cal.2d 401 [164 P.2d 753], Manson asserts that such a communication constitutes reversible error.

Here there is no record or other evidence of the bailiff's communication to the foreman. In *Weatherford, supra,* 27 Cal.2d 401, the court was presented with affidavits of the bailiff and of jurors showing that the bailiff had addressed the jurors on a point of law. Here the only possible inference is that the bailiff gave the foreman an innocuous ministerial

instruction. In any event, appellants offer no showing of prejudice to justify reversal. (*People* v. *House* (1970) 12 Cal.App.3d 756, 765 [90 Cal.Rptr. 831] [overruled on other grounds, *People* v. *Beagle* (1972) 6 Cal.3d 441 (99 Cal.Rptr. 313, 492 P.2d 1)].)

A collateral assertion of error is based on the fact that the court went off the record while discussing the foregoing with counsel. The court informed counsel that there was no need to report the informal conversation concerning the method to be used to clarify exhibit numbers. No objection was made. In the absence of request that a record be made of a conference between court and counsel, none is required. (Code Civ. Proc., § 269.)

During jury deliberations Manson's attorney moved that "all of the testimony that was admitted into evidence go into the jury room so that [the jury] can have the benefit of all of the evidence." In this case, counsel's proposal is patently ridiculous. As pointed out by respondent there is no authority for the requested procedure. In any event, transcripts of the trial should never be delivered into the jury room. Penal Code section 1137 specifically excepts depositions from the items that may be taken into the jury room. The obvious reason for that rule is that depositions may contain a great deal of inadmissible material. The same is true of the unedited transcript of the trial.

### Jury Use of Record Player

Received into evidence without objection were two phonograph records enclosed in a cardboard jacket. These were identified as the sound recording of the Beatles rendition of musical compositions including "Helter Skelter." Three identified compositions were referred to by various witnesses in the course of the trial.[112] These phonograph records were received into evidence without objection.

In the course of its deliberation on the merits, the jury directed a request to the court for a record player. The ostensible purpose for the machine was to listen to the Beatles' phonograph album.

All counsel except Manson's stipulated that the phonograph records could be played for the jury by the bailiff.[113] The record was played and Manson now contends this was reversible error.

---

[112]The lyrics for each of the compositions recorded were received in written form.

[113]The stipulation was stated by the court as follows: "With respect to the playing of the Beatle album, and the jury's request for a record player, I propose to have the jury

A phonograph record is a "writing" within the meaning of Evidence Code section 250. It is elementary that as such it may be admitted into evidence. (*People* v. *Marcus* (1973) 31 Cal.App.3d 367, 370 [107 Cal.Rptr. 264].) The admission of a phonograph record without provision of the necessary electronic device to use it is inefficacious. Surely no one would expect the jury to examine photographs in the dark. In *People* v. *Walker* (1957) 150 Cal.App.2d 594, 603 [310 P.2d 110], a tape recording was admitted into evidence. After the jury began deliberations it was furnished a machine and permitted to play the tape out of the presence of the court, counsel and parties. The *Walker* court held there was no prejudicial error. We reach the same conclusion here. Manson's failure to establish that he was prejudiced by this event supports our conclusion that the procedure did not constitute reversible error. (Cal. Const., art. VI, § 13.)

### Impeachment of Verdict

Following the verdict in the guilt phase of the case appellants offered to prove that one of the jurors "had taken to drink." By declaration based upon the information and belief of Manson's counsel and the production of a purported videotape of a televised interview with the juror's spouse, appellants offered to prove that the spouse stated that his wife was a teetotaler before she was exposed to this case but that she "took to taking and consuming alcoholic beverages" after she became a sequestered juror. The offer of proof does not make the slightest suggestion that the juror used alcoholic beverages at any time or in anyway interfering with her capacity to function as a juror. The offer of proof falls short of the standard that evidence on this issue be ". . . of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a).)

In support of Krenwinkel's motion for a new trial, her counsel, Paul Fitzgerald, submitted a declaration concerning purported statements of some of the jurors. He declared: that juror William McBride informed him that McBride had read some newspaper accounts of the trial during the course of his sequestration; that at an unspecified time,

---

brought back into court and advise them that they will be furnished with a record player; that the bailiff will be instructed to play the Beatles album through once in its entirety without any comment or conversation with any of the jurors, between the bailiff and any of the jurors, and that thereafter if the jury wants any particular portion of the album played that he will then go back and play the portion that they request. And upon completion of that, without any comment whatever with the jury, he will then bring the record player out of the jury room and leave the room itself."

McBride had read newspaper accounts of criminal proceedings against ". . . other so-called Manson family members who were witnesses in the instant case"; that McBride was "familiar" with newspaper reports concerning the juror who allegedly consumed alcoholic beverages; that McBride on occasion had seen newspaper headlines relating to the case through the windows of the bus used to transport the jury during the time they were sequestered.[114] Additional parts of Fitzgerald's declaration pertain not only to juror McBride, but also to statements purportedly made by jurors Anlee Sisto, Larry Sheely and Herman C. Tubick.[115]

Insofar as Fitzgerald's declaration purports to indicate McBride's disposition and subjective feelings, it is totally deficient to impeach the verdict. The purported statements are nothing more nor less than hearsay or double hearsay and are incompetent and insufficient to impeach the verdict or to compel the court to conduct a post-verdict voir dire of the jury. (*People* v. *Aeschlimann* (1972) 28 Cal.App.3d 460, 471 [104 Cal.Rptr. 689]; *People* v. *Spelio* (1970) 6 Cal.App.3d 685, 689-690 [86 Cal.Rptr. 113].)

An additional deficiency of Fitzgerald's declaration is the fact that it is unclear when all the events purportedly described by juror McBride occurred. Furthermore, all the purported statements of jurors Sisto, Sheely and Tubick pertain to events occurring after the guilt phase had been concluded. Any overt acts or other conduct occurring during or after the penalty phase are irrelevant in view of the fact that the penalty verdict was nullified by operation of law. (*People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], cert. den., 406 U.S. 958 [32 L.Ed.2d 344, 92 S.Ct. 2060].)[116]

---

[114]The court ordered that the windows of the bus transporting the jurors be covered with Bon Ami i.e., soaped.

[115]The Fitzgerald declaration also expressed McBride's consternation concerning a *Morse* instruction and potential sentencing in general. Fitzgerald also related Sisto's statement concerning a television interview in which Sisto purportedly stated that while unsequestered he had been approached by third persons telling him to "get them." Fitzgerald's declaration pertaining to jurors Sheely and Tubick is based on Fitzgerald's information and belief founded on newspaper reports. The declaration reports that during the penalty phase Sheely had communicated with a Long Beach attorney concerning the marketability of the juror's impressions. After the penalty phase had been concluded Sheely purportedly told the other jurors that they should stick together and sell their story for a significant amount of money. Tubick reportedly said that the jurors were shocked by Sheely's suggestion.

[116]The sequestration of the jury was terminated during the penalty phase of the trial, February 17, 1971. The jury was re-sequestered on March 23, 1971, at the commencement of their deliberations on the penalty issue. It was during this unsequestered period that Sheely allegedly contacted the lawyer, and the jurors were purportedly harangued by third persons making comments adverse to the appellants.

Manson contends the court should have permitted appellants' counsel to examine one or more of the jurors as witnesses in connection with the motion for new trial argued April 19, 1971. The jurors had been subpoenaed and were present in court. The primary basis for the application to interrogate the jurors under oath was to pursue the information set forth in Fitzgerald's previously mentioned declaration. Because the declaration was legally insufficient, the court's denial of the motion to put the jurors on the witness stand was correct. (Cf. *People* v. *Reyes* (1974) 12 Cal.3d 486, 506, fn. 2 [116 Cal.Rptr. 217, 526 P.2d 225].)

### UNMERITORIOUS ASSIGNMENT
### OF ERROR

In addition to the issues we have discussed appellants have raised other assignments of error. We have read and considered these additional contentions and all authorities cited in support thereof. All are unsubstantial and devoid of any merit.[117] We reject each such contention.

### DISPOSITION

The disappearance of Ronald Hughes, resulting in a denial of effective counsel to Van Houten, constitutes the only valid assignment of reversible error. Without further exception, appellants' other contentions are rejected.

The judgment of conviction as to appellant Leslie Van Houten is reversed for retrial.[118]

The judgments of conviction as to Charles Manson, Patricia Krenwinkel and Susan Atkins are affirmed in all respects except that, insofar as the judgments impose the penalty of death, they are modified to provide a punishment of life imprisonment pursuant to *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880].

Thompson, J., concurred.

---

[117]We note also that these contentions are generally unsupported by either citations of legal authority or references to the record. As noted in the text, where citations were provided they were reviewed.

[118]Van Houten's companion appeal, *People* v. *Van Houten*, 2d Crim. 24376, is directed to the single issue of whether or not she was entitled to credit for the time she was held in custody prior to the time sentence was imposed. In light of the reversal of the judgment of conviction in the primary matter, this ancillary appeal is ordered dismissed. However, if appellant is retried and convicted any sentence imposed must allow credit for all time served in custody pursuant to Penal Code section 2900.5. (*In re Kapperman* (1974) 11 Cal.3d 542, 549, 550 [114 Cal.Rptr. 97, 522 P.2d 657].)

**WOOD, P. J.,** Concurring and Dissenting.—I concur in the judgment which affirms the convictions of defendants Manson, Atkins, and Krenwinkel on the seven charges of murder and on the charge of conspiracy to commit murder; and as to modification of penalty, concur by reason of mandate of Supreme Court in *People* v. *Anderson* (1972) 6 Cal.3d 628, 657 [100 Cal.Rptr. 152, 493 P.2d 880]. The convictions of all the defendants, including Van Houten, should be affirmed.

I dissent as to the reversal of the conviction of defendant Van Houten on the charges of murdering Mr. and Mrs. Leno La Bianca, and on the charge of conspiracy to commit murder. The verdicts of the jury finding Van Houten guilty on all those counts were supported by ample evidence. She was convicted after a long trial—about seven months of trial, with the jury sequestered. She did not testify.

The two other justices have reversed the conviction of Van Houten for an alleged reason that the attorney who was appointed to represent her (after her attorney disappeared and after all the evidence had been presented) could not argue the credibility of witnesses effectively because he (not being present) had not observed the demeanor or manner of the witnesses while they were testifying.[1]

After all the evidence had been presented and all the parties had rested and the case was ready for arguments to the jury, the attorney (Mr. Hughes) for Van Houten disappeared under mysterious circumstances, and there was uncertainty as to whether he would return. Thereupon, the judge was confronted with making a decision as to whether, in view of the totality of the then existing circumstances, another attorney should be appointed as cocounsel for Van Houten and the trial be finished (by presenting the arguments), or whether the whole case as to Van Houten should be started over and tried again. The judge appointed Mr. Maxwell Keith as cocounsel for her, and continued the date for commencing arguments for 12 days in order to give the cocounsel time to prepare for the argument. Also, the continuance afforded an opportunity for an investigation to be made as to whether the missing attorney might return to court.

When cocounsel for Van Houten was appointed, he was asked if he would accept the appointment. He replied in the affirmative, but he did

---

[1]Another alleged reason, asserted by the other justices, for the reversal is that the continuity of the trial was interrupted by the disappearance of attorney Mr. Hughes. This is similar to the alleged point about argument.

not say that he could not argue the credibility of witnesses because he had not observed them while they were testifying. Thereafter, and before he made his argument, he said that he could not argue credibility of witnesses on the basis of witness-demeanor because he had not observed the witnesses. He did not ask to be relieved as counsel.

Appointed counsel argued on behalf of Van Houten for two days and ably covered the whole range of the record evidence involving her. With reference to credibility of Kasabian (a principal witness against Van Houten and the other defendants), he said that she was a sinister person who has never been above practicing fraud, deception, burglary, or theft to get what she wants; her characterization of herself as a little girl lost in the forest was a deliberate falsehood; if she was attempting by her demeanor on the witness stand to lend the impression that she was just a little girl lost in the woods trying to find her way out, that was a facade and she was committing a fraud on the jury; she was wily, opportunistic, and frightfully resilient, and she bounces back every time no matter what she does; when he speaks of her credibility, he speaks also of her testifying here; she testified in expectation of immunity which she received during the trial; expectation of immunity brings into play the strongest of human motives, that is, self-preservation which can turn people into liars; he believed that she had the strongest motives to deceive; the jurors would be instructed that if they found that a witness had testified falsely as to a material part of her testimony, they are entitled to disbelieve all of her testimony.

He argued further that, after analyzing Kasabian's testimony, any interpretation pointing towards Van Houten's guilt is unreasonable. After discussing Kasabian's testimony about riding in an automobile with Manson, Van Houten and others to various places (to look for victims) and stopping near a church in Pasadena, he said that the jury should disregard her testimony on the basis of a reasonable doubt as to its truth; that there was a reasonable doubt regarding Kasabian's testimony about Manson's planning to kill a person who was driving a white sports car; the jurors should remember that Kasabian prefaced her testimony, regarding conversation outside the La Bianca residence, with the words "I think" and "I'm not positive."

Appointed counsel also said that Diane Lake (a witness who testified against Van Houten and other defendants) had been discussed at length by other counsel during their arguments; she was a 17-year-old drug addict, who was mentally disabled and had been committed to a mental

institution; that she lied when testifying before the grand jury; that her testimony should be viewed with caution; that in going over Lake's testimony he would try to use the same analysis he used for Kasabian's testimony; and that Lake's statement that Van Houten said she stabbed someone who was dead and then wiped off fingerprints was not reasonable and must be viewed with caution; that Hughes (attorney for Van Houten) had done an excellent job of cross-examining Lake; and that her testimony was frail.

With reference to credibility of Hoyt (witness against Van Houten and other defendants), appointed counsel referred to her testimony that when a man came to the house where Hoyt and Van Houten were, Van Houten hid under a sheet and told Hoyt not to let the man see her, because he had just given her a ride from Griffith Park. Then counsel said he did not concede that that incident happened, but if it be assumed that it happened, a reasonable inference therefrom would be that Van Houten feared for her own safety.

He argued further that the jurors are the judges of the facts; and since he did not know what they were going to believe, he could not take a chance and he had to meet these issues head on. He also said that as to conspiracy, Van Houten did not agree to do anything; and she did not aid or abet in the homicides. After referring to "Helter Skelter," he said there are a lot of other things which he thought the jurors ought to consider, and that these matters had been gone into amply by his brother counsel; the jurors must view Kasabian's testimony with distrust; if the jurors decide, after deliberation on her credibility, to believe Kasabian as to any participation by Van Houten, then the jurors have to believe Lake; if they believe Lake, then they have to decide whether her testimony corroborates Kasabian's testimony; and he did not see how the jurors can convict Van Houten when they have to go through all of this analysis.

It is clear that Mr. Keith, counsel for Van Houten, argued ably, at length, and with emphasis that the testimony of Kasabian and Lake was completely lacking in credibility, and that they should not be believed. He used language that was very much derogatory of them and their credibility.

The fact that counsel for Van Houten could not argue credibility of witnesses, based on their demeanor, does not mean that credibility of witnesses based on demeanor was not argued. The attorneys for the three

other defendants observed the witnesses. They argued the issue of credibility of prosecution witnesses, and referred particularly to witnesses Kasabian, Lake, and Hoyt, and denounced them in derogatory language as being thoroughly unreliable and unbelievable.

In order to indicate the "witness-demeanor," particularly of Kasabian, Lake, and Hoyt, which was observed and argued by the other defense attorneys, it will be necessary to refer to some of the statements in their arguments.

Some of the statements by Mr. Fitzgerald, attorney for Krenwinkel, were: As he sat in court and watched Kasabian for a long period of time, his initial reaction was that she was well-mannered, sincere, straightforward, gentle, and soft-spoken. She was always a model of decorum, always quiet, contained, and reserved. Her recollection was bad. Her memory for specifics was horrible. She was a peculiar lady to be involved in a case like this, but in a sense one cannot really judge a book by its cover—the (her) facade was good, it stood up, and it was well done. We have to draw on our own experience and see if she is really telling the truth.

He argued further: She was granted immunity from prosecution. She was an accomplice, and the testimony of an accomplice must be treated with distrust. An accomplice usually testifies in expectation of leniency. If the jurors find that she lied as to a material point, they may disregard her entire testimony. Do not trust the testimony of a liar. In determining the credibility of a witness, the jurors may consider her demeanor and manner while testifying; and they may consider whether the use of drugs has influenced her ability to perceive or recollect.

In his further argument, in referring to many parts of Kasabian's testimony relative to various occurrences, he said many times, "Do you believe that?" He argued further: She testified that it was only after she was charged with these offenses that she decided to tell the truth. She cried on three occasions while testifying, but the jurors should be very suspicious of her tears. In the context of this case her tears do not mean a thing. It is an attempt to make her look pure. Her credibility is an issue in the case, and the jurors have to determine carefully whether she was telling the truth.

Some of the statements in the argument of Mr. Shinn, attorney for Atkins, were: Mr. Fitzgerald, attorney for Krenwinkel, covered Kasa-

bian's testimony adequately and very well in his argument. While Kasabian was testifying she cried when pictures were shown to her, but the jurors should not let that fact make them feel that she was telling the truth. She said she took LSD in order to seek God, and he (Shinn) guessed that she used the word "God" to get more sympathy for herself.

Some of the statements in the argument of Mr. Kanarek, attorney for Manson, were: Witness Kasabian was a great percentage of the prosecution's case. She had been told by the prosecution that if she testified to everything she knew about the seven murders she might be granted immunity from prosecution. Was it humanly possible for her to tell the truth, knowing that such offer had been made? She was conditioned to make dishonest statements. She defrauded Joe Sage of money he had paid. Her testimony should be viewed with caution. She was less than candid. She has told us the unbelievable regarding the written word "pig" (at the Tate house). She is not telling the truth. The question is whether she can be believed. She cannot be relied upon. His (Mr. Kanarek's) purpose was to see whether her testimony can be used to sustain the prosecution's view of the case. The same purpose goes for Lake. Witness Hoyt (who told about Van Houten's hiding under a sheet after the La Bianca murders) cannot be believed. Hoyt stated the most incredible of events when she said she went to Kansas to look for someone whose name she did not know. Clearly, Kasabian is not telling the truth when she said she did not know about the death of the La Biancas until she read about it in Miami. What she has taken as drugs into her body is a factor to be considered in determining her credibility.

It thus appears that the issue of lack of credibility of prosecution witnesses, particularly witnesses Kasabian, Lake, and Hoyt, was argued by the four defense attorneys. Also, it appears that even though counsel for Van Houten did not observe the witnesses while they were testifying, the three other attorneys (representing Krenwinkel, Atkins, and Manson), who were present when the witnesses testified, argued the matter of demeanor or manner of the witnesses. As just shown, in some of those arguments there were statements (by Mr. Fitzgerald, and by Mr. Shinn who approved Mr. Fitzgerald's argument) that Kasabian was well-mannered, sincere, gentle, quiet, soft-spoken, and reserved; and that on three occasions she cried; and there was a statement (by Mr. Kanarek) that on one occasion she squinted. The arguments of these experienced attorneys (who observed the witnesses) show the meager factual background in this case for a defense argument on credibility of witnesses on the basis of demeanor of witnesses while they were testifying.

Presumably, these specifications of witness-demeanor by the three other experienced defense attorneys were the only instances of witness-demeanor observed by them (as to Kasabian, Lake, and Hoyt—principal witnesses against Van Houten), or the specifications were the only instances of witness-demeanor which they deemed worthy of being mentioned.

In the reversal of the Van Houten conviction by the two other justices, for the asserted reason that her attorney had not observed the witnesses while they were testifying, there is an implication that if her attorney had observed the witnesses while they were testifying he might have observed witness-demeanor which was not observed by the three other defense attorneys, or if he observed only the same demeanor which the other attorneys observed he might have made a better argument on credibility than they made.

In any event, the reversal of the Van Houten conviction is based principally on the other justices' application of the above-mentioned narrow legal point (about not arguing witness-demeanor) to a factual situation where it was practically certain that, in view of the arguments of the other attorneys, there was no significant witness-demeanor to be argued.

Furthermore, it is not always necessary, in order for a judgment to be valid, that an attorney who makes a summation argument shall be in a position to argue credibility of witnesses based upon his observations of the witnesses. In this respect, it is to be noted that there are several situations wherein the testimony given at a prior judicial proceeding may be received in evidence in a subsequent proceeding in the same case when the witness who gave the testimony is not available as a witness in a subsequent proceeding (Evid. Code, § 1291; Witkin, Cal. Evidence (2d ed.) pp. 566-570); and under such circumstances a judgment in the subsequent proceeding may not be set aside or reversed merely because an attorney in the subsequent proceeding could not argue credibility of the missing witness based upon observation of demeanor of the witness while testifying. An example of such a circumstance is the testimony of a witness at a preliminary examination which is received at the trial when the witness is not available. (*People* v. *Contreras* (1976), 57 Cal.App.3d 816 [129 Cal.Rptr. 397].) Another such example is the testimony of a witness at a former trial which is received in evidence at a retrial when the witness is not available. It is to be noted further that under such circumstances as indicated by those examples where the witness in the

former proceeding was unavailable, even the trier of the facts at the subsequent proceeding would not have observed the demeanor of that witness; and even under that situation (where no one at the subsequent trial had observed the witness) a judgment would not be set aside or reversed merely because the trier of the facts had not observed the demeanor of the witness. In the instant case the only one who did not observe the witnesses was Van Houten's attorney. The jurors, however, who were to decide the factual issues, did observe the witnesses, and they were instructed by the judge, and were told by attorneys in their arguments, that in determining the credibility of witnesses they were entitled to consider the demeanor of the witnesses while they were testifying.

A comparison of the unavailable witness situation with the Van Houten situation shows that, with respect to observation of witnesses, Van Houten was in a much more favorable position in that the jurors who were to decide the facts did observe the witnesses, and were instructed to consider the witnesses' demeanor in determining their credibility; whereas, in the situation where former testimony of the unavailable witness is received, it is clear, of course, that no one at the subsequent trial had observed the witness testifying, and no argument could be made regarding demeanor of the witness, and no consideration could be given by the trier of the facts (judge or jurors) to the demeanor of the witness. Over a period of many years innumerable valid judgments have been rendered in cases where an important part of the evidence is former testimony of unavailable witnesses; and, of course, in such cases no argument could have been made on credibility of witnesses on the basis of their demeanor while testifying.

The reversal of the Van Houten conviction because her counsel (not having observed the witnesses) could not argue credibility of witnesses, on the basis of witness-demeanor, is inconsistent with statutory and decisional law to the effect that judgment may be rendered, as above shown regarding unavailable witnesses, even though counsel cannot argue credibility of the witnesses based on witness-demeanor, and even though the trier of the facts has not observed the witnesses.

If the reason announced by the two other justices for reversing the Van Houten conviction is proper, then a question arises as to validity of judgments that may be rendered in cases where testimony of unavailable witnesses is received and an attorney cannot argue credibility of witnesses on the basis of witness-demeanor.

Furthermore, Mr. Keith, counsel for Van Houten, did not regard the matter of his appointment (including the question of arguing demeanor) as the strong point in his case, but he regarded it as cumulative. (At oral argument he made a statement to that effect.)

After the former counsel for Van Houten had disappeared, and after the evidence had been presented and all the parties had rested, the trial judge, in the exercise of his discretion and in view of the totality of the then existing circumstances, appointed counsel to represent Van Houten. It is apparent that at the time of appointing counsel, the trial judge, who had observed the demeanor of the witnesses, decided that the matter of counsel's not being able to argue credibility of witnesses based on witness-demeanor was not of material significance. At the time of appointing Mr. Keith as counsel for Van Houten, the trial judge said, in part, that there were three counsel who have been through the entire trial and have had the opportunity of seeing all the witnesses, and that some of them were witnesses against Van Houten, and those who testified as to anything involving her were the same witnesses who testified as to matters involving the other defendants; and that any argument of counsel for the other defendants with respect to credibility of those witnesses would inure to the benefit of Van Houten, apart from any argument Mr. Keith might make.

Furthermore, in view of the order denying a new trial, it is apparent that the trial judge, after hearing the arguments of the four defense attorneys, decided that the inability of Van Houten's counsel to argue credibility of witnesses based on witness-demeanor was not prejudicial.

In this case it is to be emphasized that the jurors observed the witnesses; that the judge instructed the jurors, and the attorneys told them, that in determining the credibility of the witnesses the jurors were to consider the demeanor of the witnesses while they were testifying; that, as above shown by reference to arguments of the three defense attorneys who saw the witnesses, there was a meager factual background for a defense argument on credibility of witnesses on the basis of witness-demeanor; that those three experienced attorneys argued credibility of prosecution witnesses on the basis of witness-demeanor, and in view of the few instances of demeanor referred to by those attorneys (such as Kasabian's being well-mannered and soft-spoken, and having cried three times and squinted once) it seems clear that there was no significant witness-demeanor to be argued; and that all the defense attorneys argued ably and with emphasis the asserted lack of credibility

of prosecution witnesses, particularly witnesses Kasabian, Lake, and Hoyt (principal witnesses against Van Houten), whose testimony affected not only Van Houten but all the other defendants.

This is not a case where no argument was allowed. Mr. Keith argued very ably for two days without any limitation, except that he had not observed the witnesses while they were testifying; however, as above shown, the fact that he did not argue lack of credibility on the basis of witness-demeanor was practically of no significance, and certainly was not significantly prejudicial. In *In re William F.,* 11 Cal.3d 249 [113 Cal.Rptr. 170, 520 P.2d 986], it was said (p. 256 in fn. 6): "We do not imply that each infringement on, as distinguished from a denial of, the right to counsel is to be deemed so fundamental that prejudice must be presumed without further inquiry." The above detailed statements specifying references to witness-demeanor, which were made in arguments of defense attorneys who had observed the witnesses, show that in practical effect there was no prejudicial infringement or limitation on the right of Van Houten's attorney to argue credibility on the basis of witness-demeanor.

It seems that principles of law referred to in the part of the opinion reversing the Van Houten conviction are to be understood as meaning that the right of counsel to argue credibility of witnesses on the basis of witness-demeanor is so fundamental that the absence of that right is a reason for reversal of the conviction. It is to be noted, however, that in a footnote it is said, in effect, that by the determination which the justices were making they were not pronouncing a universal rule that absence or loss of counsel in any stage of the proceedings necessarily compels a reversal; that each case will have to be decided on its own facts; and no per se rule can be stated. The facts in this Van Houten case show that repeated arguments as to witness-demeanor were made.

In the above opinion of the two other justices, there is a quotation from the dissenting opinion in *United States* v. *Barrett* (7th Cir.), 505 F.2d 1091, wherein it is said it is tempting to acquiesce in a decision which may represent the just and inevitable conclusion of the matter; nevertheless, more enduring values are challenged when there is reason to doubt that a notorious trial has been conducted in a proper manner. In that case the county clerk of Cook County, Illinois, was convicted of mail fraud, bribery, and income tax evasion. It is to be noted that notwithstanding the asserted philosophy in the dissenting opinion about "enduring values," the majority opinion affirmed the conviction.

In *State* v. *Thompson,* 148 W.Va. 263 [134 S.E.2d 730], cited in support of the reversal of the Van Houten conviction, a question on appeal was

whether there was "manifest necessity" for declaring a mistrial on the ground that certain evidence (unlawfully seized) had been received erroneously. On appeal therein, it was held that the erroneous ruling did not constitute "manifest necessity" for declaring a mistrial. After making that decision, the reviewing court proceeded, by way of dictum, to state examples of "manifest necessity," and in so doing included an occurrence such as illness or death of counsel, which was not involved in that case. In the present case, however, the footnote above referred to seems to be contra to the dictum in the cited West Virginia case. The footnote states, in part, that each case will have to be decided on its own facts; and that no per se rule can be stated.

The verdicts finding Van Houten guilty of the murders of Mr. and Mrs. La Bianca were amply supported by the evidence.

Van Houten had been a member of the Manson family longer than any of the girls. On the night after the five Tate murders, Manson told Van Houten and other members of the family that last night was too messy and he was going to show them how to do it. Then seven of the members including Manson and Van Houten left the ranch in an automobile and drove around for several hours. About 2 a.m. they stopped in the Griffith Park area in front of a house where Manson got out of the car, walked up the driveway and disappeared. Soon thereafter he returned to the car and said that a man and woman were tied up in the house. He told Van Houten, Krenwinkel, and Watson to get out of the car, not to stir up fear in those people, and not to let them know they were going to kill them. He told Van Houten and Watson to hitchhike back to the ranch and told Krenwinkel to go to the waterfall. Manson and the others went away in the car, leaving Van Houten, Krenwinkel, and Watson in front of the house. Later that morning the mutilated dead bodies of Mr. and Mrs. La Bianca were found in the house. His hands were tied. A knife was sticking in his throat; a fork was sticking in his stomach; and many stab wounds were on his body, and blood was smeared on many things. Her hands were tied and there were 41 stab wounds on her body. Words were written in blood on the walls, front door and refrigerator.

Diane Lake testified that Van Houten told her she had stabbed a woman who was already dead, and that the more she did it the more fun it was; after the killings they showered and ate food; she wiped fingerprints off everything they had touched; and the killings took place around Griffith Park. At the ranch Van Houten burned a blouse, some rope, and clothing she had been wearing.

Barbara Hoyt testified that later that morning four men came to the house, and Van Houten hid under a sheet, and told Hoyt she did not want one of the men to see her, because he had just given her a ride from the Griffith Park area.

When the attorney disappeared after several months of trial, the only unfinished part of the trial was the matter of argument and instructions. In my opinion the trial judge, in exercising his discretion and viewing the totality of circumstances, properly appointed counsel for Van Houten.

As above shown, there was a meager factual background for a defense argument on credibility based on demeanor of witnesses, particularly as to witnesses Kasabian, Lake, and Hoyt. In view of such a limited background for argument, it is reasonably certain there was no significant witness-demeanor to be argued. In any event, the credibility of witnesses, based on witness-demeanor, was argued by the three defense attorneys who had observed the witnesses. Also, as above noted, there are various circumstances where, under statutory and decisional law (relative to former testimony of unavailable witnesses), a valid judgment may be rendered even though a litigant cannot argue credibility on the basis of demeanor of witnesses—thus indicating that the matter of arguing such credibility is not a fundamental privilege that must always be accorded a litigant.

Under the circumstances of this case, there was no prejudice to Van Houten because her attorney could not argue on the subject of witness-demeanor. The denial of the motion for a new trial indicates that the trial judge, who of course observed the witnesses, decided there was no prejudice to Van Houten.

Under the facts of this case, the asserted basis for reversal as to Van Houten is practically negligible. Under our system of justice, form is not to be exalted over substance.

The judgment of conviction of Van Houten should be affirmed.

Petitions for a rehearing were denied September 10, 1976, and the opinion was modified to read as printed above. Wood, P.J., was of the opinion that the petition of respondent People for a rehearing as to appellant Van Houten should be granted. The petitions of the respondent and of appellant Manson for a hearing by the Supreme Court were denied December 9, 1976. Mosk, J., Clark, J., and Richardson, J. were of the opinion that the respondent's petition as to appellant Van Houten should be granted.

## APPENDIX

## ANALYSIS OF MAJOR COUNTIES IN CALIFORNIA

(major has been defined as having an excess 500,000 population)

| | [1] 1970 population | [1] 17-69 density | [1] 17-69 % of pop. | [1] 68 per cap. income | [2] female | [2] 1970 urban | [2] figures black | [2] spanish surnames |
|---|---|---|---|---|---|---|---|---|
| ALAMEDA | 1,064,049 | 1,433 | 5.3% | 4,381 | 51% | 99% | 15% | 13% |
| CONTRA COSTA | 553,415 | 766 | 2.8 | 3,429 | 51 | 94 | 8 | 9 |
| LOS ANGELES | 6,993,371 | 1,721 | 35.3 | 4,295 | 52 | 99 | 11 | 18 |
| ORANGE | 1,409,359 | 1,763 | 6.9 | 3,610 | 51 | 99 | 1 | 11 |
| SACRAMENTO | 636,137 | 649 | 3.2 | 3,519 | 51 | 95 | 6 | 9 |
| SAN BERNARDINO | 672,163 | 34 | 3.5 | 2,915 | 51 | 90 | 4 | 16 |
| SAN FRANCISCO | 706,546 | 15,571 | 3.6 | 6,063 | 52 | 100 | 14 | 14 |
| SAN MATEO | 551,027 | 1,232 | 2.8 | 5,010 | 51 | 98 | 5 | 11 |
| SANTA CLARA | 1,057,032 | 794 | 5.2 | 3,992 | 51 | 98 | 2 | 18 |
| SAN DIEGO | 1,351,135 | 321 | 6.9 | 3,702 | 48 | 94 | 5 | 13 |

The source materials relied on to formulate the above analysis are:

1) 1971 CALIFORNIA COUNTY FACT BOOK
 COUNTY SUPERVISOR ASSOCIATION OF CALIF.

2) COUNTY AND CITY DATA BOOK 1972
UNITED STATES DEPARTMENT OF COMMERCE

An arabic numeral corresponding to one of the indicated publications is placed at the top of each column to identify the source of the statistic or the factors used in the compilations set out above.

## ANALYSIS OF MAJOR COUNTIES IN CALIFORNIA

*1970 figures*

| | 2completed high school | 2completed college | 2median age | 2Mfg. | 2wholesale/ retail | 2educa- tion | 2const- ruction | 2services |
|---|---|---|---|---|---|---|---|---|
| ALAMEDA | 63% | 15% | 28.5% | 19% | 20% | 9% | 5% | 8% |
| CONTRA COSTA | 68 | 17 | 27.9 | 21 | 20 | 9 | 7 | 8 |
| LOS ANGELES | 62 | 13 | 29.6 | 27 | 21 | 7 | 5 | 9 |
| ORANGE | 71 | 16 | 26.2 | 29 | 22 | 8 | 6 | 8 |
| SACRAMENTO | 66 | 13 | 27 | 9 | 21 | 9 | 6 | 8 |
| SAN BERNARDINO | 57 | 9 | 26.8 | 19 | 22 | 9 | 7 | 8 |
| SAN FRANCISCO | 62 | 17 | 34.5 | 12 | 20 | 6 | 4 | 11 |
| SAN MATEO | 72 | 17 | 30 | 18 | 23 | 7 | 6 | 9 |
| SANTA CLARA | 69 | 20 | 27.7 | 31 | 19 | 9 | 6 | 8 |
| SAN DIEGO | 65 | 14 | 25.6 | 18 | 22 | 10 | 7 | 10 |